## UNITED STATES v. CASSIDY et al.

### (District Court, N. D. California. April 1 and 2, 1895.)

### No. 3059.

1. CONSPIRACY TO COMMIT OFFENSES AGAINST THE UNITED STATES—REV. ST. § 5440.

The statute relating to conspiracies to commit offenses against the United States (Rev. St. § 5440) contains three elements, which are necessary to constitute the offense. These are: (1) The act of two or more persons conspiring together; (2) to commit any offense against the United States; (3) the overt act, or the element of one or more of such parties doing any act to effect the object of the conspiracy.

2. SAME—CONSPIRACY DEFINED.

A conspiracy is a combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal, by criminal or unlawful means. Pettibone v. U. S., 13 Sup. Ct. 542, 148 U. S. 203, cited.

3. SAME—MANNER OF CONSPIRING.

The common design is the essence of the charge; but it is not necessary that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plan or the means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner or through any contrivance, positively or tacitly, come to a mutual understanding to accomplish a common and unlawful design.

4. SAME—PARTIES TO CONSPIRACY.

Where an unlawful end is sought to be effected, and two or more persons, actuated by the common purpose of accomplishing that end, work together in any way in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part any one was to take therein was a subordinate one, or was to be executed at a remote distance from the other conspirators.

5. SAME.

Any one who, after a conspiracy is formed, and who knows of its existence, joins therein, becomes as much a party thereto from that time as if he had originally conspired. U. S. v. Babcock, Fed. Cas. No. 14,487, 3 Dill. 586, cited.

6. SAME—EVIDENCE—ACTS OF ONE PARTY.

Where several persons are proved to have combined together for the same illegal purpose, any act done by one of them, in pursuance of the original concerted plan, and with reference to the common object, is, in the contemplation of the law, the act of the whole party, and therefore the proof of such act will be evidence against any of the others who were engaged in the conspiracy.

7. SAME—DECLARATIONS BY PARTIES.

Any declaration made by one of the parties, during the pendency of the illegal enterprise, is not only evidence against himself, but against all the other conspirators, who, when the combination is proved, are as much responsible for such declarations, and the acts to which they relate, as if made and committed by themselves. This rule applies to the declaration of a co-conspirator, although he may not himself be under prosecution.

8. SAME—CONSPIRACY AS DISTINCT OFFENSE.

The law regards the act of unlawful combination and confederacy as dangerous to the peace of society, and declares that such combination and confederacy to commit crime requires an additional restraint to those provided for the commission of the crime itself. It therefore makes criminal the conspiracy itself, with penalties and punishments dis-

tinct from those it attaches to the crime which may be the object of the conspiracy.

9. SAME—MEANS CONTEMPLATED—ALLEGATIONS AND PROOFS.

It is not incumbent upon the prosecution to prove that all the means set out in the indictment were in fact agreed upon to carry out the conspiracy, or that any of them were actually used or put in operation. It is sufficient if it be shown that one or more of the means described in the indictment were to be used to execute that purpose.

10. SAME—OVERT ACTS.

While at common law it was not necessary to aver or prove an overt act in furtherance of a conspiracy, yet, under the statute relating to conspiracies to commit an offense against the United States, the doing of some act in pursuance of the conspiracy is made an ingredient of the crime, and must be established as a necessary element thereof, although the act may not be in itself criminal. U. S. v. Thompson, 31 Fed. 331, 12 Sawy. 155, cited.

11. SAME.

It is not necessary, however, to a verdict of guilty, that the jury should find that each and every one of the overt acts charged in the indictment was in fact committed; but it is sufficient to show that one or more of these acts was committed, and that it was done in furtherance of the conspiracy.

12. OBSTRUCTING THE MAILS—REV. ST. § 3995.

Although the law, which now appears in Rev. St. § 3995, and which makes it an offense to obstruct and retard the passage of the United States mails, was originally passed prior to the introduction into the United States of the method of transporting mail by railroads, and the phraseology of the law conforms to conditions prevailing at that time (March 3, 1825), yet it is equally applicable to the modern system of conveyance, and protects alike the transportation of the mail by the "limited express" and by the old-fashioned stagecoach.

13. SAME.

The statute applies to all persons who "knowingly and willfully" obstruct and retard the passage of the mails or the carrier carrying the same; that is, to those who know that the acts performed, however innocent they may otherwise be, will have the effect of obstructing and retarding the mail, and who perform the acts with the intent that such shall be their operation. U. S. v. Kirby, 7 Wall. 485, cited.

14. SAME.

The statute also applies to persons who, having in view the accomplishment of other purposes, perform unlawful acts, which have the effect of obstructing and retarding the passage of the mails. In such case, an intent to obstruct and retard the mails will be imputed to the authors of the unlawful act, although the attainment of other ends may have been their primary object. U. S. v. Kirby, 7 Wall. 485, cited.

15. SAME—MAIL TRAINS.

A mail train is a train as usually and regularly made up, including not merely a mail car, but such other cars as are usually drawn in the train. If the train usually carries a Pullman car, then such train, as a mail train, would include the Pullman car as a part of its regular make up. Therefore, if such a train is obstructed or retarded because it draws a Pullman car, it is no defense that the parties so delaying it were willing that the mail should proceed if the Pullman car were left behind. U. S. v. Clark, Fed. Cas. No. 14,805, 23 Int. Rev. Rec. 306, followed.

16. SAME.

Any train which is carrying mail, under the sanction of the postal authorities, is a mail train, in the eye of the law.

17. SAME—INTENT.

It is not necessary that defendants should be shown to have had knowledge that the mails were on board of a train which they have detained and disabled. On the contrary, they are chargeable with an

intent to do whatever is the reasonable and natural consequence of their acts; and as the laws make all railways postal routes of the United States, and it is within every one's knowledge that a large portion of the passenger trains carry mail, it is to be presumed that any person obstructing one of those trains contemplates, among other intents, the obstruction of the mail. U. S. v. Debs, 65 Fed. 211, followed.

18. COMBINATIONS TO OBSTRUCT INTERSTATE COMMERCE—ACT JULY 2, 1890.

The word "commerce," as used in the act of July 2, 1890, to protect trade and commerce against unlawful restraints and monopolies, and in the constitution of the United States, has a broader meaning than the word "trade." Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, as well as the purchase, sale, and exchange of commodities.

19. SAME.

While the primary object of the statute was doubtless to prevent the destruction of legitimate and healthy competition in interstate commerce, by the engrossing and monopolizing of the markets for commodities, yet its provisions are broad enough to reach a combination or conspiracy that will interrupt the transportation of such commodities and persons from one state to another. U. S. v. Workingmen's Amalgamated Council, 54 Fed. 995, cited.

20. SAME—PULLMAN CARS.

Pullman cars in use upon railroads are instrumentalities of "commerce." U. S. v. Debs, 64 Fed. 763, cited.

21. CONSPIRACIES—COMBINATIONS OF RAILROAD EMPLOYES — UNIONS AND PROTECTIVE ASSOCIATIONS—STRIKES.

The employés of railway companies have a right to organize for mutual benefit and protection, and for the purpose of securing the highest wages and the best conditions they can command. They may appoint officers, who shall advise them as to the course to be taken in their relations with their employer, and they may, if they choose, repose in their officers authority to order them, or any of them, on pain of expulsion from their union, peaceably to leave the employment because the terms thereof are unsatisfactory. But it is unlawful for them to combine and quit work for the purpose of compelling their employer to withdraw from his relations with a third party, for the purpose of injuring that third party. Thomas v. Railway Co., 62 Fed. 817, followed.

22. SAME.

A strike, or a preconcerted quitting of work, by a combination of railroad employés, is, in itself, unlawful, if the concerted action is knowingly and willfully directed by the parties to it for the purpose of obstructing and retarding the passage of the mails, or in restraint of trade and commerce among the states.

23. CRIMINAL LAW—REASONABLE DOUBT.

A reasonable doubt is one arising out of the evidence; not an imaginary doubt, a fanciful conjecture, or strained inference, but such a doubt as a reasonable man would act upon or decline to act upon when his own concerns are involved,—a doubt for which a good reason can be given, which reason must be based upon the evidence or want of evidence.

24. SAME—PROVINCE OF JURY—CREDIBILITY OF WITNESSES.

The jury are the exclusive judges of the credibility of the witnesses. A witness is presumed to speak the truth, but this presumption may be repelled by the manner in which he testifies, by the character of his testimony, or by the evidence affecting his character for truth, honesty, or integrity, or his motives, and by contrary evidence. But the power of the jury to judge of the effect of evidence is not arbitrary; it must be exercised with legal discretion, and in subordination to the rules of evidence.

This was an indictment against John Cassidy, John Mayne, and others, under Rev. St. § 5440, for conspiracy to commit offenses against the United States, namely, the offense of obstructing the

mails of the United States, and the offense of combining and conspiring to restrain trade and commerce between the states of the Union and with foreign countries. The prosecutions grew out of the great Pullman strike, which occurred during June and July, 1894, and which was mainly supported and carried on through the organization known as the "American Railway Union." The charge delivered by Judge MORROW in this case is believed to be the longest ever delivered in a criminal case in this country, and only exceeded in any case by the charge of Lord Chief Justice Cockburn in the Tichborne Case. While only two of the defendants were tried, the case was treated as a test case, both by the government and by the strikers, and it involved, as a practical result, the disposition of some 132 other cases. Most of the defendants were recognized leaders of the strike in California. The character of the charge—conspiracy to retard the United States mails and restrain interstate commerce—brought up the entire strike, so far as the Pacific coast was concerned. Two hundred and sixteen witnesses were examined, and the trial occupied five months, beginning November 12, 1894, and ending April 6, 1895. The testimony covered nearly 6,000 pages of typewritten matter, and was practically a record of all the incidents relating to the strike. The charge was delivered on April 1 and 2, 1895.

H. S. Foote, Special Asst. U. S. Atty., and Samuel Knight, Asst. U. S. Dist. Atty.

Geo. W. Monteith, for defendants.

MORROW, District Judge (charging jury). Gentlemen of the Jury: I congratulate you on the approaching termination of this case. For five months you have been required to give your constant, and, I might say, exclusive, attention to the daily proceedings in this court. The trial of the case has been protracted, but I am not prepared to say that any greater time has been occupied than was necessary, under the circumstances, to secure the testimony of the 216 witnesses who have appeared before you upon the stand. The nature of the charges against the defendants now on trial, covering, as they do, the whole field of the railroad strike of last summer in this district, necessarily involves the closest scrutiny into every feature of that affair. In this examination you have displayed a patient interest of such a commendable character as to call for the special acknowledgment of the court. You are, indeed, entitled to the gratitude of every good citizen of the community for the sacrifices you are making, and for the service you are rendering in the faithful performance of a public duty.

In submitting the case to your consideration, it becomes my duty to call your attention to the character of the charges against the defendants, and the provisions of law under which the prosecution is being conducted. It is the duty of the court to declare the law; it is your exclusive province and responsibility to apply the law so declared to the facts as you, upon your conscience, believe them to be established.

The indictment contains two counts, which, in general terms, charge that the defendants conspired, combined, and agreed together, and with divers other persons, to obstruct and retard the passage of the United States mails, and the carrier carrying the same, and also that they engaged in a combination and conspiracy in restraint of trade and commerce among the several states of the United States, and with foreign countries. The crime of conspiracy is based upon section 5440 of the Revised Statutes of the United States, which provides as follows:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years or to both fine and imprisonment, in the discretion of the court."

To make this statute as clear to you as possible, I will call your attention to its three essential provisions. The first element is the act of two or more persons conspiring together; the second is to commit any offense against the United States; and the third is what is termed the "overt act," or the element of one or more of such parties doing any act to effect the object of the conspiracy. With respect to the first element, we find that a conspiracy has been described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself unlawful or criminal, by criminal or unlawful means. Pettibone v. U. S., 148 U. S. 203, 13 Sup. Ct. 542. The common design is the essence of the charge, and while it is necessary, in order to establish a conspiracy, to prove a combination of two or more persons, by concerted action, to accomplish the criminal or unlawful purpose, it is not necessary to constitute a conspiracy that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plan or means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design. In other words, where an unlawful end is sought to be effected, and two or more persons, actuated by the common purpose of accomplishing that end, work together, in any way, in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part he was to take therein was a subordinate one, or was to be executed at a remote distance from the other conspirators. A combination formed by two or more persons, to effect an unlawful end, is a conspiracy, said persons acting under a common purpose to accomplish the end designed. Any one who, after a conspiracy is formed, and who knows of its existence, joins therein, becomes as much a party thereto, from that time, as if he had originally conspired. U. S. v. Babcock, 3 Dill. 586, Fed. Cas. No. 14,487. Furthermore, where several persons are proved to have combined together for the same

illegal purpose, any act done by one of the parties in pursuance of the original concerted plan, and with reference to the common object, is, in the contemplation of the law, the act of the whole party, and therefore the proof of such act will be evidence against any of the others who were engaged in the same conspiracy. It is also true that any declaration made by one of the parties during the pendency of the illegal enterprise is not only evidence against himself, but is evidence against the other parties, who, when the combination is proved, are as much responsible for such declarations and the acts to which they relate as if made and committed by themselves. This rule, you will understand, applies to the declaration of a co-conspirator, although he may not be under prosecution, his declaration being equally admissible with those of one under indictment and prosecution.

The confederacy to commit an offense is the gist of the criminality under the law. The law regards the act of unlawful combination and confederacy as dangerous to the peace of society, and declares that such combination and confederacy of two or more persons, to commit crime, requires an additional restraint to those provided for the commission of the crime, and makes criminal the conspiracy, with penalties and punishments distinctive from those prescribed for the crime which may be the object of the conspiracy. You will readily understand why this is true. A conspiracy becomes powerful and effective in the accomplishment of its illegal purpose in proportion to the numbers, power, and strength of the combination to effect it. It is also true that, as it involves a number in a lawless enterprise, it is proportionately demoralizing to the well-being and character of the men engaged in it, and, as a consequence, to the safety of the community to which they belong.

The second essential element in the offense described by the statute is the purpose of the conspirators to commit an offense against the United States. The indictment charges that the defendants conspired with others to commit two offenses against the United States,—one to obstruct and retard the passage of the United States mail and the carrier carrying the same; and the other, that they engaged in a combination and conspiracy in restraint of trade and commerce among the several states of the United States and with foreign countries. The first charge is based upon the provisions of section 3995 of the Revised Statutes, which provides as follows:

"Any person who shall knowingly and willfully obstruct and retard the passage of the mail, or any carriage, horse, driver, or carrier carrying the same, shall, for every such offense, be punishable by a fine of not more than one hundred dollars."

This section of the Revised Statutes was originally section 9 of the act of March 3, 1825 (4 Stat. 104), and, having been passed prior to the introduction into the United States of the method of transporting mail by railroads, the phraseology of the law conformed to the conditions prevailing at that time, but it is equally applicable to the modern system of conveyance, and protects alike the transportation of the mail by the "limited express," as it does the carriage by the old-fashioned stagecoach. There are, however, certain

provisions of law directed specifically to the transportation of the mail by railroad trains, to which I desire to call your attention.

Section 3964 of the Revised Statutes provides as follows:

"The following are established post-roads: * * * All railroads or parts of railroads which are now or hereafter may be in operation."

Section 3, Act March 3, 1879 (20 Stat. 358), provides "that the postmaster general shall, in all cases, decide upon what trains and in what manner the mails shall be conveyed." Section 4000 of the Revised Statutes provides that:

"Every railway company carrying the mail shall carry on any train which may run over its road, and without extra charge therefor, all mailable matter directed to be carried thereon, with the person in charge of the same."

There is still another provision of law applicable to the transportation of mails on the Pacific railroads, which is as follows:

"That the grants aforesaid are made upon the condition that said company shall * * * transport mails * * * upon said railroad for the government, whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service), and all compensation for services rendered to the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid." Act July 1, 1862, to aid in construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, § 6 (12 Stat. 493).

Recurring, now, to section 3995 of the Revised Statutes, making it an offense to obstruct and retard the passage of the mails, and you will observe that the statute applies to those persons who "knowingly and willfully" obstruct and retard the passage of the mails, or the carrier carrying the same; that is to say, to those who know that the acts performed, however innocent they may otherwise be, will have the effect of obstructing and retarding the passage of the mail, and they perform the acts with the intention that such shall be their operation. U. S. v. Kirby, 7 Wall. 485. "It would be no defense under this statute," said an eminent judge in a recent case, "that the obstruction was effected by merely quitting employment, where the motive of quitting was to retard the mails, and had nothing to do with the terms of employment." Thomas v. Railway Co., 62 Fed. 822.

The statute also applies to those persons who, having in view the accomplishment of other purposes, perform unlawful acts, which have the effect of obstructing and retarding the passage of the mails. In such case, the intention to obstruct and retard the passage of the mails will be imputed to the authors of the unlawful act, although the attainment of other ends may have been their primary object. U. S. v. Kirby, supra.

The second offense, which, it is charged in the indictment, was the object of the conspiracy, was to restrain trade and commerce among the several states and with foreign nations. This offense is described in an act of congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (26 Stat. 209), which provides as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

"Trade" has been defined as "the exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange." The word "commerce," as used in the statute and under the terms of the constitution, has, however, a broader meaning than the word "trade." Commerce among the states consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, as well as the purchase, sale, and exchange of commodities. County of Mobile v. Kimball, 102 U. S. 702; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 203, 5 Sup. Ct. 826. Pullman cars in use upon the roads are instrumentalities of commerce. U. S. v. Debs, 64 Fed. 763. The primary object of the statute was, undoubtedly, to prevent the destruction of legitimate and healthy competition in interstate commerce by individuals, corporations, and trusts, grasping, engrossing, and monopolizing the markets for commodities. U. S. v. Patterson, 55 Fed. 605. But its provisions are broad enough to reach a combination or conspiracy that would interrupt the transportation of such commodities and persons from one state to another. U. S. v. Workingmen's Amalgamated Council, 54 Fed. 995, 1000.

We come, now, to consider the third element involved in the crime of conspiracy, as it is declared in the statute under consideration; that is to say, the overt act, or the element of one or more of the parties to the conspiracy doing any act to effect its object. At common law, it was neither necessary to aver nor to prove an overt act in furtherance of a conspiracy. Bannon v. U. S., 15 Sup. Ct. 467. The offense was complete when the unlawful concert and agreement was entered into and concluded, although nothing was done in pursuance thereto, or to carry it into effect. It was one of the few cases in which the law undertook to punish criminally an unexecuted intent or purpose to commit a crime. U. S. v. Walsh, 5 Dill. 58, Fed. Cas. No. 16,636. But, under the statute of the United States now under consideration, the doing of some act in pursuance of a conspiracy is an ingredient of the crime, and must be established as a necessary element of the offense, although the act need not be in itself criminal or amount to a crime. U. S. v. Thompson, 12 Sawy. 155, 31 Fed. 331.

With this general statement and explanation of the statute involved in this case, I will proceed to consider the allegations in the indictment, which, as I said before, contains two counts.

The first count charges that the defendants conspired both to obstruct and retard the passage of United States mails, and to unlawfully engage in a combination and conspiracy in restraint of trade and commerce, while the second count charges a conspiracy in re-

straint of trade and commerce alone. Otherwise, both counts are, in substance and form, identical. In general terms, the two counts charge: (1) Formation of the conspiracy; (2) legal corporate existence of the Southern Pacific Company, and its means, manner, and methods of transporting the mails and interstate commerce; (3) means conspired to be used in effecting the object of the conspiracy; (4) overt act charged; (5) concluding with an allegation of unlawful intent.

Bearing these general features of the indictment in mind, you will now be able to understand the meaning of the various allegations of the indictment, as I proceed to refer to them somewhat more in detail.

Taking up the first count: The formation of the conspiracy is alleged, and it is charged that John Cassidy, John Mayne, Fred Clarke, and James Rice, with divers others, names unknown, did conspire to obstruct and retard the passage of the mails of the United States, and to restrain trade and commerce among the several states and with foreign nations. (2) The legal corporate existence of the Southern Pacific Company, and its means, manner, and method of carrying the mails and interstate commerce, are set out. It is averred that the Southern Pacific Company was a railroad corporation, duly organized and existing under the laws of the state of Kentucky, engaged in the business of a common carrier of the mails of the United States, and of passengers, freight, express matter, and other commodities, comprising and constituting trade and commerce, within the meaning of the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies, approved July 2, 1890." The lines of railroad over which it carried on its mail and interstate commerce; the manner and means employed and necessary to its doing so, viz. yards, depots, tracks, trains of cars, and other equipment suitable for the transportation of the United States mails, passengers, freight, and express matter, and other commodities,—are also set out. (3) Then follow the means conspired to be used in effecting the object of the conspiracy. These are, briefly: First.. By forcibly taking and keeping possession and control of all yards, depots, tracks, and trains of cars upon said lines of railway, and by forcibly holding and detaining the same. Second. By causing to be assembled, and assembling with, large crowds of persons in said depots and yards of said Southern Pacific Company, at various points and places upon said lines of railway, in said state and Northern district of California, to wit: 1. At the city and county of San Francisco. 2. City of Sacramento. 3. City of Oakland. 4. City of San José. 5. City of Stockton. 6. Town of Red Bluff. 7. Town of Dunsmuir, county of Siskiyou. 8. City of Vallejo, county of Solano. 9. Town of Lathrop, county of San Joaquin. 10. Town of Palo Alto, county of Santa Clara. By gathering in great numbers in said yards and depots, and other places, around, in, and upon the trains, cars, and engines of the said Southern Pacific Company, and upon the tracks of the railways, preventing the movement and passage of said engines, cars, and trains. Third. By threats, intimidation, personal assaults, and other force and violence, to prevent the engineers, firemen, conduct-

ors, brakemen, switchmen, and other employés of said Southern Pacific Company from discharging their duties, and from moving and operating said engines, trains, and railways. Fourth. By forcibly disconnecting air brakes upon such trains,—mail, passenger, and freight. Fifth. By putting out the fires in the engines drawing the same. Sixth. By throwing switches, in order to prevent the passage of such trains through depots and stations. Seventh. By opening drawbridges over navigable and other streams, upon which drawbridges the tracks of said railway cars were situated. Eighth. By burning and destroying bridges, trestles, and culverts, over which such trains necessarily and usually would pass. Ninth. By loosening, removing, and displacing the rails of the tracks of said railroads. Tenth. By greasing the rails of the said tracks. Eleventh. By stopping trains upon railway crossings and upon switches, and by forcibly refusing to allow such trains to be hauled from such crossings and switches. Twelfth. By compelling the employés of said railroad company to leave their trains, shops, and the work of said company, while in the performance of their duty. Thirteenth. By using all such other forcible means as to them should seem expedient to prevent, for an indefinite period, the use of the said railways for the transportation of the mails of the United States and interstate commerce.

It will be well to observe, at this point, that the indictment does not charge that the defendants did, in fact, use or put in operation the means herein set out, in effecting the object of the conspiracy; the charge is that such were the means conspired to be used for that purpose. Now, when you come to consider the testimony, you will probably find that some of it tends to show that certain persons did, in fact, use such means to prevent the movement of railway trains. This testimony was admitted, not to prove that such acts had been committed, but because of the relevancy of such testimony to the charge in the indictment,—that such means were to be used in effecting the object of the conspiracy. In other words, it tends to show that a conspiracy was formed to obstruct and retard the passage of the United States mails, and to restrain trade and commerce among the several states and with foreign nations, and that such means were to be used to carry the conspiracy into effect.

This brings us to a feature of this charge of conspiracy which you will bear in mind. It is not incumbent upon the prosecution to prove that all of the means set out in the indictment were, in fact, agreed upon to carry out the conspiracy, or that any of them were actually used or put into operation. It will be sufficient if it be established to your satisfaction. and beyond a reasonable doubt, that one or more of the means described in the indictment were to be used to execute that purpose.

After stating the means by which the conspiracy was to be effected, the indictment then sets out the overt acts; that is to say, it charges the doing of certain acts to effect the object of the conspiracy. They are as follows: That on the 6th day of July, 1894, the defendants, at Palo Alto. (1) forcibly took possession and control of the yards, depots, buildings, tracks, engines, and cars, and other appliances and

property, of the Southern Pacific Company: 1. By causing to be assembled, and assembling with, a large crowd of persons in said depots, buildings, and yards of the Southern Pacific Company; and by gathering with said crowds of persons in said depots, buildings, and yards, around, in, and upon the aforesaid trains, cars, and engines, and upon the tracks of the railways. 2. By threats, intimidations, personal assaults, or other acts of force and violence, in, upon, and towards the engineers, firemen, conductors, brakemen, switchmen, agents, and other employés of said company having charge of said depot, buildings, and other property, etc. It is further charged (2) that, on the 6th day of July, 1894, said defendants, at Palo Alto, forcibly and violently prevented the movement of all trains of the Southern Pacific Company to, from, or through the town of Palo Alto: 1. By gathering in crowds, etc. 2. By placing physical obstructions upon said track. 3. By displacing the switches. 4. By forcibly and violently assaulting, threatening, and intimidating said engineers, firemen, conductors, brakemen, switchmen, agents, and other employés, while engaged as aforesaid. 5. By uncoupling the cars of said trains and disconnecting the same. 6. By removing said cars from said tracks. 7. By withdrawing the water from the boilers and tanks of said engines, and putting out and removing the fires therein. 8. By displacing and removing valves, pins, bolts, plates, and other appliances and portions of the machinery of said engines and cars, and of the rails of said railways, thereby loosening said rails. 9. By other violent, forcible, and unlawful acts and means to the grand jurors unknown. It is further charged (3) that said defendants, at the time and place above indicated, unlawfully, forcibly, and violently occupied and held possession and control of said yards, depots, tracks, engines, trains of cars, and other appliances and property of the Southern Pacific Company, by the means aforesaid, and by said means excluded the Southern Pacific Company and its employés from the possession, use, and control thereof, and by said means prevented the movement of said trains from and including July 6 to and including July 10, 1894.

The same observation, which I have just made to you with respect to the establishing of one or more of the means alleged to have been concocted and conspired to be used, is applicable to the overt acts charged. It is not necessary to a verdict of guilty that you should find that each and every one of the overt acts charged have, in fact, been committed. If you are satisfied beyond a reasonable doubt that one or more of these overt acts have been committed, and that they were done in furtherance of the conspiracy alleged to have been entered into by and between these defendants, and to carry out or effectuate in some way the object of the conspiracy, that is all that the law requires. The indictment concludes with allegations of intent, viz.: That the defendants, by the acts and means aforesaid, knowingly and willfully obstructed and retarded the passage of the mails and the carrier carrying the same, and restrained interstate commerce from the 6th of July to and including the 10th day of July, 1894, at Palo Alto. The second count, as stated above, is confined to charging a conspiracy to restrain trade and commerce

.alone; otherwise it is identical in form and substance with the count just elaborated upon.

Having directed your attention to the different provisions of law involved in the charges against these defendants, and having also stated to you, in brief terms, the several allegations of the indictment, you are now prepared to consider the testimony in the case in its proper light, for the purpose of determining the guilt or innocence of the defendants; but in referring to the testimony you will distinctly understand that you are the exclusive judges of the facts, and that it is not my province or purpose to intrude upon your jurisdiction in any particular or to any degree. If, in any of my rulings during the progress of this trial, I have appeared to indicate that any controverted fact has been established, or if I now assume or appear to consider or treat any fact as proved, unless it may be an admitted fact, you will disregard such assumption, and act entirely upon your own judgment and conscience in determining the facts of the case.

From what has been stated, it will appear to you that you are brought to the consideration of three questions which may be properly suggested to you as a guide for your deliberation: (1) Has the government proved the existence of a conspiracy alleged in the indictment? (2) If it did exist, were any of the alleged acts performed by one or more of the parties to the conspiracy? (3) If such a conspiracy existed, were the defendants parties to it?

Taking these questions in their order, you will first consider whether the conspiracy charged in the indictment has been established.

### General Conspiracy.

This is the important question in this case, and is a question of fact for you to determine, subject to such rules of law as the court will give you to assist you in arriving at a correct conclusion. The evidence on this point is largely circumstantial, and involves a consideration of the acts of members of the American Railway Union; the course and methods of the association in boycotting the Pullman cars, and subsequently declaring a strike against the Southern Pacific Company; and, generally, the attitude and conduct of the strikers and those acting with them during the time the strike was in operation.

### American Railway Union.

The evidence tends to show that the American Railway Union is a fraternal organization, composed of railroad employés below a certain grade. The headquarters of the association are located at Chicago, Ill. In June and July last Eugene V. Debs was its president; Geo. W. Howard, vice president; and Sylvester Keliher, secretary. The union is divided up into local unions. In the constitution of the order, introduced in evidence, the principles and purposes, so far as they are pertinent to this feature of the case, are stated as follows:

"It is a self-evident truth that 'in union there is strength,' and, conversely, without union weakness prevails; therefore the central benefit to be derived from organization is strength,—power to accomplish that which defies indi-

vidual effort. The American Railway Union includes all railway employés, born of white parents, organized within one great brotherhood. There is one supreme law for the order, one roof to shelter all, and all united when unity of action is required. The reforms sought to be inaugurated and the benefits to be derived therefrom, briefly stated, are as follows:

"First. The protection of members in all matters relating to wages and their rights as employés is the principal purpose of the organization. Railway employés are entitled to a voice in fixing wages and in determining conditions of employment. Fair wages and proper treatment must be the return for efficient service, faithfully performed. Such a policy insures harmonious relations and satisfactory results. The order, while pledged to conservative methods, will protect the humblest of its members in every right he can justly claim; but, while the rights of members will be sacredly guarded, no intemperate demand or unreasonable propositions will be entertained. Corporations will not be permitted to treat the organization better than the organization will treat them. A high sense of honor must be the animating spirit, and even-handed justice the end sought to be attained. Thoroughly organized in every department, with a due regard for the right wherever found, it is confidently believed that all differences may be satisfactorily adjusted; that harmonious relations may be established and maintained; that the service may be incalculably improved; and that the necessity for strike and lockout, boycott and black-list, alike disastrous to employer and employé, and a perpetual menace to the welfare of the public, will forever disappear.

"Second. In every department of labor, the question of economy is forced to the front by the logic of necessity. The importance of organization is conceded, but, if it costs more than a workingman is able to pay, the benefits to accrue, however great, are barred. Therefore, to bring the expenses of the organization within the reach of all is the one thing required,—a primary question which must be settled before those who stand most in need can participate in the benefits to be derived; hence to reduce the cost to the lowest practical point is a demand strictly in accord with the fundamental principles of economy, and any movement which makes it possible for all to participate in the benefit ought to meet with popular favor.

Third. The organization will have a number of departments, each of which will be designed to promote the welfare of the membership in a practical way and by practical methods. The best thought of workingmen has long sought to solve a problem of making labor organizations protective, not only against sickness, disability, and death, but against the ills consequent upon idleness and those that follow in its train. Hence there will be established an employment department, in which it is proposed to register the name of every member out of employment. The department will also be fully informed where work may be obtained. It is doubtful if a more important feature could be suggested. It evidences fraternal regard without a fee, benevolence without alloy."

Section 54 of the constitution of the American Railway Union (entitled "Laws of Protection") provides for what is called a "board of mediation," and defines its powers. It is as follows:

"The board of mediation of each local union shall elect a chairman. The chairman of the local board of mediation shall be a member of the general board of mediation of the system or line on which they are employed. The general board of mediation shall elect a chairman and secretary. The general board of mediation shall meet on the second Tuesday of September of each year at the headquarters of the road on which they are employed, for the transaction of such business that may emanate from the local board of mediation. All complaints and adjustments of a general character shall be handled by the general board of mediation. All complaints and adjustments must be taken up first by the local union; if accepted by a majority vote, it shall be referred to the local board of mediation for adjustment; and, if failing, the case shall be submitted to the chairman of the general board of mediation; failing in which, they shall notify the president of the general union, who shall authorize the most available member of the board

of directors to visit and meet with the general chairman of the board of mediation, and issue such instructions as will be promulgated by the directors."

The right of employés of railway companies to organize in this way for their own benefit and protection is not questioned  They are entitled to the highest wages and the best conditions they can command, and they may organize an association or union for that purpose. There is no controversy on this point.  It is a benefit to them, and it is not prejudicial to the interests of the public, that they should unite in their common interests and combine for such lawful purposes.   In Thomas v. Railway Co., 62 Fed. 817, Judge Taft, in the circuit court of the United States for the Southern district of Ohio, speaking of the relation of railway employés to the American Railway Union, says:

"If they (the employés) stand together, they are often able, all of them, to command better prices for their labor than when dealing singly with rich employers, because the necessities of the single employé may compel him to accept any terms offered him. The accumulation of a fund for the support of those who feel that the wages offered are below market prices is one of the legitimate objects of such an organization.  They have the right to appoint officers who shall advise them as to the course to be taken by them in their relations with their employer. They may unite with other unions. The officers they appoint, or any other person to whom they choose to listen, may advise them as to the proper course to be taken by them in regard to their employment, or, if they choose to repose such authority in any one, they may order them, upon pain of expulsion from their union, peaceably to leave the employ of their employer, because any of the terms of their employment are unsatisfactory."

This is clearly the law; but there is a just and reasonable limitation to the power and privilege of railway employés, even under the protection of such an organization.   They are not entitled to interfere with the rights and property of others, and by force and intimidation compel a carrier of United States mails or of interstate commerce to suspend the operations of such necessary and lawful business; or, to state the proposition a little more exactly, they have no privilege or right to violate a law of the United States.

Now, with respect to the general charge of conspiracy contained in this indictment, I will direct your attention to some of the testimony which the government claims tends to establish that element of the case.

### Time When the Boycott Took Effect.

It is admitted that in the latter part of June, 1894, a convention of the American Railway Union, assembled at Chicago, resolved to boycott the Pullman Company; this boycott to take effect in five days, should the difficulties existing between that company and its employés not be settled at the expiration of that period.   On June 26, 1894, the president of the general union sent the following telegram, which was received by the American Union Lodge, known as "Local Union No. 310," having its headquarters in Oakland: "Pullman boycott in effect to-day noon, by order of convention."   The telegram was signed by E. V. Debs, the president of the union.   G. D. Bishop, secretary of local union No. 310, at Oakland, identifies

this telegram. The boycot., was therefore declared at noon of June 26, 1894, which fell on a Tuesday.

Mr. Knox, who was an employé of the Southern Pacific Company at Sacramento, and a member of the American Railway Union at that place, being called as a witness for the defense, testified that he was chairman of the mediation committee; that the duties of the committee were to settle the differences between the employés and the corporation. He relates the circumstances connected with the commencement of the boycott, as follows:

"On the 26th of June we were asked to boycott the Pullman cars, and the union took action on it, and the mediation committee were ordered to call at Mr. Wright's office,—this was about 11:20 at night,—and notify him of the action of the union. Mr. Knox, Mr. Compton, and Mr. Mullen composed the mediation committee. We went down, and saw Mr. Wright, and told him what action the union had taken, and went back and reported again to the union. We were authorized then to lay off from our work, and to attend to this boycott; to notify the members, and the like. I went down and asked Mr. Halloran for leave of absence until the trouble was over with, and it was granted me. I was laying off at the time of the strike. Obtained leave of absence about two o'clock or 2:30 in the morning of the 27th of June. The object of the boycott was this: That the American Railway Union had a big lodge at Pullman, Illinois. The Pullman Company had reduced the wages of their employés so that they could hardly live. * * * Received a message from President Debs, asking us to boycott the Pullman cars, and the mediation committee went down to the depot after the meeting. We ordered the boycott. We decided to boycott Pullman cars. We were notified to go down and tell Mr. Wright of the action of the union, which we did. Then we reported back to the union again, and told them what Mr. Wright said, and, after that, the meeting was adjourned, and we went from there to the depot to carry out our instructions. We were given full power to act in the matter. When we got to the depot, or shortly after we arrived there, Mr. Halloran, the yardmaster, and Mr. Small, and several of the officials, showed up around there, and wanted to know what the trouble was. Mr. Halloran called me off to one side, and asked me, as a favor, not to ask the men to boycott the Pullmans on 2, 4, and 16. He said that if we did not wish to handle the Pullman cars, if we would agree not to call him a scab, he would switch the cars. After consulting with the balance of the mediation committee, it was decided to let the Pullman cars on 2, 4, and 16 go through to their destinations without boycotting them. We told him we would switch the cars instead of him. We did not ask him to do any work. On the morning of the 27th, about 8:30, I went through the shops,—there were a great many shopmen belonging to our union,—to see what action they had taken in reference to working on Pullman cars. I found a great many of the men idle. They were not working on the Pullman cars. We told them to go and complete their work; to never mind boycotting the work; to keep on with it. * * * After going through the shops, and notifying the men to keep on with their Pullman work, we then went back to the depot. There was a train due to leave there at 10:25 in the morning, known as 'No. 84.' She has a Pullman car off of No. 2, that comes from Chicago, and another one to put on there at Sacramento. There is a first-class car put on at Sacramento. The other is a tourist car. The one that came through from Sacramento was loaded and the other one was empty. We asked the switchmen not to handle the Pullman car, because it was empty, and it was not necessary for it to go. We thought it was proper to boycott the empty Pullmans. They refused to put Pullman cars on. Mr. Halloran then came to us, and said he would take the engine and go to couple on, and we should come up and ask him not to couple on, and tell him we did not want him to scab on us, and he would not couple on. With that understanding he took the engine, and went around on the track where the Pullman car was, and started to couple on. We went over, and told him we did not like to have the yardmaster

scabbing on us; it did not look well. He said, 'Of course, I will have to yield;' and he went up to the office, and asked us if we would go with him. We went with him. Mr. Jones asked him if he could not get some one else to put on the Pullman cars. He said, 'No; they are all A. R. U. men.' Mr. Jones said, 'Cannot you hire some one else?' He said, 'No; they are all A. R. U. men.' That train stood there until leaving time. Then it started to pull out, and perhaps pulled four or five car lengths out, and some one ran down out of the office, and turned the plug on the hind end of the air hose, and stopped the train. She was backed up to the depot, and stood there for a couple of weeks. They refused to allow the engine to go without the Pullman car on. We tried to induce Mr. Wright to let her go, because it was a mail train, and we did not want to be no parties to holding the mail. He refused. We went to him, and asked him if he would not let this other Pullman car go on 104, because the passengers were very anxious to get through. He said they would, and they switched the loaded tourist car off of 84, and put it on 104. That is about all that happened on the 27th. * * * That train was made up at Sacramento. It runs between Sacramento and Oakland, by Tracy, and around that way. The Pullman cars go to Los Angeles. They carry the Pullmans down to Lathrop, and then they go to Los Angeles. The balance of the train comes into Oakland. It starts from Sacramento. The Pullman car, though, that goes through, that comes from Chicago,—that loaded one,—the tourist car. They sent it out on another train at night, 5:30. '104' it is called. Sent it out in the evening,—on the same day. There was nothing left of that train, then, except the mail, baggage, express, and passenger cars. There was no one in the passenger cars. They went off on the next train,—the passengers; the through passengers from Chicago that went on the next train. There were a good many of the local that went on the next train, too. That only runs to Tracy. It does not come clear around to San Francisco, but stops there. Know C. A. Newton. I had a conversation with him on the night of the 26th, and I might have had on the 28th. I would not say for certain. Had a conversation with him on the night of the 26th, at which I showed him a telegram. The telegram read: 'Boycott declared on Pullman cars. E. V. Debs.' "

C. A. Newton, called for the United States, night yardmaster at Sacramento, for the Southern Pacific Company, contradicts Mr. Knox on this point, and says that Mr. Knox handed him a telegram, which he read. That the telegram read: "H. A. Knox, Sacramento. Boycott declared against Pullman. Hold all Pullmans. E. V. Debs." That he handed the telegram back to Knox, who left the room where they had met, with the exclamation, "That is hell." The witness Knox further states:

"About 12:30, I think it was, on the morning of the 28th, I received a message from Los Angeles, saying that some men were discharged for refusing to handle Pullman cars, and saying that the Los Angeles Union had decided to strike for the reinstatement of those men, and asked us to participate in the strike. The committee having full power to act, we considered the matter, and came to the conclusion it was a just fight, and we would take it up and help them out. In that message from Los Angeles they asked us if we would notify all concerned, which we did. I went down to the depot, and that special that Mr. Newton was testifying about—the officers' special—was just pulling out of the depot. I had had a conversation with the engineer and the fireman before that, and they told me if there was any strike they wanted a finger in the pie, so I ran up and got on the engine, and told the engineer and fireman about what had occurred. They said, 'Well.' Some one stopped them; I don't know who. They were stopped from the hind end of the train, and they said, 'Cut us off, and we will go to the house,' so somebody cut the engine off. I don't know who it was. No one was with me on the cab of the engine,—only the engineer and fireman. Did not offer any threats or intimidation or violence. * * * The

engine was cut off, and the engineer was taking it around to the roundhouse. I was in the depot by that time. Mr. Wright wanted to know what was the matter with the special. I told him, as near as I could find out, the engineer was going to strike with us. He had Mr. Newton stop him there in front of the depot, and he had a conversation with the engineer, and they finally agreed to go on with the special, and asked us if we would couple on. We told him, 'Yes; if they wanted to go.' I told Mr. Wright I thought it was foolish for them to go. They would go just as far as Rocklin, and that was no place to stay. There were no accommodations there at all. He said, 'For God's sake, let them go out of Sacramento, if they don't get over the American river bridge.' I thought to accommodate him. We would not ask the conductor and brakeman to boycott the officers' special. We would let them go as far as Rocklin. I knew they would not get any further than that, because the men had already quit up there. I got on the engine, and rode up through Sixth street yard with them, to see that the switches were all set, and everything ready to go. I rode with the engineer on the engine. After I got back from Sixth street the committee then went up to the Western Union & Postal Telegraph Company, and we sent a good many dispatches notifying them that we had struck."

(These telegrams will appear further on.)

Newton testified as follows with relation to the special car,—or officers' special, as it was called,—and with reference to the statements made by Knox at the time:

"I know Mr. Knox personally. He used to work for me. Mr. Mullen, I knew him personally, too. Mr. Compton I did not know until after the strike. I saw Mr. Knox about the 26th of June. * * * The first train that came into the yard after that conversation I had with Mr. Knox (referring to above) was a special that came from Oakland. It got in about 12:25 on the morning of the 29th. It was a special passenger train, that ran out of its ordinary time. It was composed of two officers' cars and the engine. * * * Saw Mr. Knox on the arrival of the officers' train, a little while after it got in, when it got ready to leave. Knox came running through the depot, and hollered out: 'Stop that train! Stop that train! Not a son of a bitch of a wheel will turn on the system.' This was on the morning of the 29th, about 12:25."

This, it will be observed, flatly contradicts Knox as to what occurred at that time.

The witness Newton testifies further as to Knox's attitude, as follows:

"Did not have any direct conversation with Knox. When No. 3 came in, going east, there was quite a number of shopmen around there, standing in groups, I guess to the extent of forty or fifty. They came in charge of United States Marshal Long. This was along in the morning, about daylight, probably four o'clock, on the 29th. That was a mail train,—the regular Eastern overland,—the Atlantic express; the 'fast mail,' they call it. After No. 3 pulled out, the groups got moving towards the depot,—after she pulled out,—and some one in the groups made the remark to Mr. Knox why he did not hold the train,—what he let her go out for. He said he did not have force enough to hold her, but when seven o'clock came he would call out the shop men, and he would have force enough to hold anything that came along."

Knox testifies that:

"The strike was formally declared about 12:30 or 1 o'clock on the morning of the 29th of June by the Los Angeles Union. In Sacramento it was left in the hands of the committee. The committee had full power to act. The committee decided to strike to have those men in Los Angeles reinstated. As soon as they got the message they consulted probably for 25 or 30 minutes, and went on and did as requested by the message, to notify all those concerned. That was about 12:30 or 1 o'clock on the morning of June 29th. Had not at that time received any notification from Oakland. Did not act

on anything but the notification from Los Angeles. The members that were out on the road,—we notified all the unions along, Truckee, and Rocklin, and Dunsmuir, and all over the system,—we notified them that we had struck; that we had ordered a general strike in Sacramento, and those in Sacramento —the shop men—were all notified the next morning after they went to work, perhaps 8 o'clock or 8:30."

The attitude of the mediation committee, as representatives of the American Railway Union, is stated by Knox as follows:

"Mr. Baldwin and Mr. Knight wanted to know our position that we had taken in the matter, and between us we explained it as thoroughly as possible to them, and told them that, in the first place, we had boycotted the Pullman cars on legal advice; and, if I am not mistaken, I told them who our advice was from,—Mr. Ingersoll; and Mr. Knight said that a Pullman car, as long as it was attached to a mail car regularly made up, was part of a mail car. Of course we had an opinion from a very eminent lawyer and attorney, and we thought he knew as much about it as Mr. Knight did. Consequently we told him we would not handle any trains with Pullman cars attached during the boycott, and, now that the strike had been ordered, we would not handle any trains at all, except mail trains, until those men that had been discharged had been reinstated. That was about the gist of our conversation all the way through. It was repeated several times."

Again he says:

"I told Mr. Baldwin our men would not work on Pullman cars. That is all I told him. * * * We were doing nothing with reference to preventing the movement of trains; only quit work, that is all. * * * We were trying to induce the men that showed up to strike with us. That was the understanding between Mr. Wright and myself. * * * I told Mr. Baldwin that our men would not work on Pullman cars. Did not make the statement that we would not allow Pullman cars to move."

As to the power possessed by the mediation committee, Knox says:

"The committee had full power to act. The union had given them full power to act."

On cross-examination Knox testifies as follows:

"We discriminated between Pullmans that were full of passengers and Pullmans that were empty, on the 27th and 28th of June. After the strike was ordered, we did not. All Pullmans were treated alike, and everything else, except mail. It grew from the Pullman cars to every other form of cars except the mail cars. After those men were discharged it did; did not matter what the destination of the cars was. We thought that we could control the A. R. U. organization, and we did. Anything that we knew anything about we controlled their action, through the strike. Anything that was done by any of the officers of the A. R. U. organization during the strike was done with the full consent, and was under the policy of our organization, as far as Sacramento was concerned. We were given full power to act. That power has never been taken away from us yet. Had control on the 3d of July, but do not know whether there was an A. R. U. man who moved the Pullman cars on that day or not. Could not swear to it. I do not think there were very many of them."

It appears that on July 5th, and during the strike, Knox, Compton, and Mullen, of the mediation committee, appeared before the Citizens' Protective Association of Sacramento, and made a statement concerning the attitude of the American Railway Union. Cornelius C. Howell, who was present at the meeting, testifies as follows:

"Was in Sacramento the latter part of June and the early part of July last. I was employed by the Industrial Improvement & Manufacturers' As-

sociation of Sacramento. I was looking up manufacturers' industries to lo-cate at Sacramento for that company or association. Became a member of the Citizens' Protective Association, I believe, on the 3d of July. That association formed for to get together and see if they could not do something to open up the commerce connected with the city, and such other business as might be necessary, owing to the condition that things were in at that time from the cause of the strike that had been ordered on the 29th of June, or the strike that occurred on the 29th of June. I was secretary of the organization from the day that we organized, up until, I think, the 15th or 20th of July; somewhere along there. Performed the duties of secretary at meetings. Recollect a meeting held on or about the 5th day of July last. It was called by the association to see if they could not do something in order to open up the commerce. Members of the mediation committee of the A. R. U. were present at that meeting. They were Mr. Knox, Mr. Compton, and Mr. Mullen. After discussing the ways and means to adjust matters, it was decided that it would be better to bring these people before the association, this mediation committee, and find out the condition of affairs,—what the causes were of all the trouble,—and see if we could not do something to adjust matters; and in that connection it was agreed that we would admit them, and see what they had to say; they having, I believe, made a proposition to some member of the association that they would like to come before the association, as the mediation committee of the American Railway Union. They came before the meeting and made a statement. Parts of their statement were reduced to writing. This is a part of the record of the meeting of the Citizens' Protective Association held on the 5th of July. Not the entire statements, but I took down part of what they said, and then we dictated it out, and took the minutes to Mr. Knox in his room. Mr. Compton was present when I went there with the minutes. I asked them to read them over, and see if they were correct; that I did not wish to have them quoted as saying something before the association that they did not say, and, before they would become a part of the record, I wanted them to see if they were right. I read the minutes to them. These two were present at the time. They looked them all over; and wherever they wanted any changes made I run the pencil through them, as it appears here, and when they got through—they looked it all over and read it—I wrote this certificate attached, and Mr. Knox signed it, and Mr. Compton signed it, in my presence,—both of them in my presence. I left the paper with them so that they might show it to Mr. Mullen, another member of the committee. He returned, as I understand, after I left, signed the paper, and they sent it down to my office. We had offices in the same building. The interlineations or erasures were made just before that was signed, while Mr. Compton and Mr. Knox were standing at my side. I think they were made—in fact, I know—at the request of Mr. Knox. He did the talking."

This document reads as follows:

"Sacramento, July 7th, 1894.

"When the committee returned and had introduced the mediation committee from the A. R. U. to the chairman, Mr. Katzenstein, he in turn introduced Mr. Knox, Mr. Mullen, and Mr. Compton to the association, and invited Mr. Knox to address the association, which he had come to meet. Mr. Knox, among other things, after thanking the association for allowing him to be heard, stated among the grievances that the original cause for this strike was on behalf of the wage-earners at Pullman, Illinois. Mr. Geo. Pullman had been grinding down his men with such small wages that it was impossible for them to get along. Mr. Knox went into detail as to treatment of the employés received at the hands of the Pullman Car Co., at Pullman, Ill. That through the president of the A. R. U. order he had declared a boycott against the Pullman cars, and to effectually accomplish the object he had ordered the strike, and it had now resolved itself to this: That the A. R. U. order, which he represented, demanded that Pullman restore his men in Chicago to their old places, with the same scale of wages paid to them in 1893; or that the S. P. R. R. Co. purchase the one-quarter ownership of the Pullman Co., paint out the Pullman name from the cars, and restore all the men on the railroad and in all shops to their old position and wages. Senator Cox inquired of Mr.

Knox if he did not think this committee of citizens could be interested to an extent that something might be done to adjust matters beween them and the railroad. Mr. Knox said it had gone so far that nothing could be done until the whole question was settled, and that he had given his ultimatum. Mr. McClatchy asked Mr. Knox what condition affairs were in at this time or what the situation was. Mr. Knox then stated that he would allow the mail and express to be moved, but that no passenger cars or freight cars of any kind or description would he consent to have moved until such time as the demand he made had been complied with. Mr. Mullen said, in part, after Mr. Knox had taken his seat, that this was a fight between capital and labor, and that from the chief justice of the United States down through all the branches—judicial and legislative departments—of the government, they were corrupt, and that labor could not get its just dues, and that his association had taken this way of forcing justice to assist their fellow men in obtaining for honest labor a proper compensation. Mr. Cox then asked what he could suggest. To this Mr. Knox replied that they might intercede with the government, and see if they could not move the mails and express to accommodate the business of the country. He said that that would help us out. 'We are in this fight to win, but we are as anxious to have it settled as you are, and we want to go to work, but will not until this question is settled as I have outlined. There is a revolution going on in this country. To-day it is a principle that we are contending for. Should we give up, they would make us crawl on our bellies after them.' Mr. Compton stated, among other things, that the A. R. U. organization would not resort to any desperate means, so long as the Railroad Co. would deal with them without using armed force. That their organization was composed of law-abiding citizens, and would not commit any overt acts. At this point Mr. Ray tried to have his resolution read, but was declared out of order, and the resolution remained on the table. Several attempts were made by others, but without effect; whereupon Mr. Avery moved that a vote of thanks be tendered this committee for having made this association of business men so frank and fair a statement in relation to their position with the railroad company and this general boycott. The motion being seconded, it was unanimously carried, after which the committee retired.

"We have read the foregoing statement of the records kept by Mr. Howell of our statements, and certify to their correctness.

"Committee: H. A. Knox, Chairman.
"Thos. Compton.
"Jas. Mullen."

Mr. Knox was asked if he signed the statement produced by Howell. He said he did; that there were some alterations, but they were not material.

Continuing, Howell further stated:

"Saw Knox after the 7th. I had no conversation with him, although I saw him a number of times, after the time I went to his room and he signed that paper, until the 9th of July. I saw him then before the executive committee of the Citizens' Protective Association, at the Orangevale office in Sacramento. George B. Katzenstein, Mr. Van Vorhees, Gen. Llewellen Tozier, Mr. Frank Miller, Mr. J. V. McClatchy, of the Sacramento Bee, and I am not sure but I think Senator Cox was present at that meeting. The executive committee was composed of nine members, but they were not always there. Mr. Knox was there. I was there. I think Mr. James Mott was there. He is the manager of the Crocker Company up there. During the time of this strike we were in the habit of meeting every day, sometimes twice a day, and we had received information from some source that the government was going to take charge of affairs, and we had heard a good many rumors. We sent for Knox. We brought him there to see what position he was going to take in view of the fact that the troops were to be expected there. This was the 9th of July. These gentlemen met Mr. Knox in the capacity of the executive board of the Citizens' Protective Association. Mr. Katzenstein, the chairman of the executive committee, asked Mr. Knox some questions in relation to the position that his

association expected to take or that he expected to take after the troops got there. My recollection is that Mr. Katzenstein in one of the questions said that it was reported, and so published, that Mr. Debs, of Chicago, had issued a proclamation advising all men to keep away from these public places, from collecting at the depots, and so forth, and he asked him why that rule could not be enforced by the A. R. U. here. Mr. Knox handed Mr. Katzenstein a telegram. The telegram, as near as I can remember,—the substance of the telegram,—was about this: To pay no attention to newspaper rumors; that they were sure to win; that everything was progressing all right in their interests, or words to that effect. Mr. Katzenstein asked him this further question: That in view of the fact that the troops were ordered there, and would probably be there the next day, or the morning after, and as the matter was passing out from the civil authorities to the military, and in view of the fact that he was a citizen, the same as the balance of the people he had come there to meet, what position he would take; to which he said, as near as I recollect, that, so far as he was concerned himself, he could not do anything, for there were two or three injunctions against him. But, so far as his men were concerned, which was over 2,000, he had no control of them, and he did not believe they would allow any train to go out of the depot with Pullman cars attached. Then Mr. Katzenstein further asked him, as near as I can recollect, * * * that in view of the fact of the military coming there, and if it would be a question between the principles of his order and the protection of the citizens and his family and so forth, which course he would pursue. He said that the principles of the order of the A. R. U. stood first with him in relation to this business, or in relation to this strike. Mr. Katzenstein, as near as I can remember, called his (Knox's) attention to the proclamation, as it was published in the paper. I don't remember Mr. Knox saying anything in relation to the cause of the proclamation. He produced that telegram. It was read. He handed it out, and talked in about the same strain that was expressed in the language of the telegram. I would not undertake to repeat what he said. I remember distinctly he stated you could not depend on the proclamation. He did not believe there was any truth in it, and used this telegram as evidence to corroborate his statement."

### V. S. McClatchy, called on behalf of the United States, testified:

"I am one of the proprietors and business manager of the Evening Bee, Sacramento."

### A paper being shown the witness, he said:

"That paper is a statement made by the secretary of the Citizens' Protective Association, under instructions from its executive committee. * * * The paper was drawn up by Mr. Howell, secretary of the Citizens' Protective Association, under instructions of its executive committee, and purported to embody the statements made by the mediation committee of the American Railway Union before the Citizens' Protective Association at its meeting, I think, of July 5th. Mr. Howell was instructed to draw this paper up and present it to the mediation committee for their approval and signature. * * * I saw it signed by two gentlemen. I did not see the third member of the committee sign it. * * * Mr. Knox, who was chairman of the committee, signed it, and, as certain as I can be at this time, the second one was Mr. Compton. The third member, who I think was Mr. Mullen, was not present. * * * At this time I saw those two names signed Mr. Howell was present. He then left it with Mr. Knox, who was to obtain the signature of the third gentleman. * * * I have in my possession another statement signed by Knox, relative to the strike. * * * Mr. Knox made certain statements before the executive committee of the Citizens' Protective Association, I think about July 9th,—I do not want to be certain of the date,—and under instructions I prepared a report of Mr. Knox's remarks before the committee, or some of them, and submitted it to him for approval prior to its being published in the newspaper. Mr. Knox approved it, after minor amendments, and it was published. * * * Mr. Knox signed it in my presence. * * * Mr. Knox's signature was obtained in the afternoon, shortly before the Bee would go to press. In order to insure its publication

that day, it had to be cut up in what printers call 'short takes.' * * * It was signed before being cut up. It can be readily pasted together."

After further testimony tending to identify the document, it was introduced, and is as follows:

"Chairman H. A. Knox, of the Sacramento mediation committee of the A. R. U., had a short conference this afternoon with the executive committee of the Citizens' Protective Association, at the request of the latter. The work of the committee so far had been directed towards preventing a conflict at Sacramento that could only result in bloodshed, without settling the main issue, and to this end had brought influence to bear on both the Southern Pacific Company and its striking employés to prevent any aggressive measures on either side. The position of the United States government, however, in ordering the opening of the road and the use of federal troops for such purpose, has practically taken all discretion out of the hands of the railroad company and the United States marshal. Mr. Knox was asked, therefore, if the United States government insisted on taking charge at Sacramento and running trains, would the A. R. U. permit it to be done without obstacle, or would it oppose by force the government officials and troops? Mr. Knox stated that personally he would do all he could to prevent a conflict with the government, and, if it moved trains, would not oppose, whether with Pullmans attached or not, and would so advise his men. He said, however, that if the government insisted on moving Pullmans without a settlement of the main question, he could not control the men under him, as they had notified him—over 2,000 strong—that they would not obey orders in that event, and would engage the troops. He said the position of the A. R. U. was in no way changed. It would not permit the running of any trains unless the demands of the organization, as outlined at a former conference with the citizens' committee, and published in the Bee of Friday last, were complied with. His attention being called to the declaration of Eugene V. Debs, head of the A. R. U., calling on all members not to attempt interference with trains or railway property, Mr. Knox said that he had not received officially any such notice, and had been warned by Debs to pay no attention to newspaper reports, unless officially reported to him. He could not, therefore, take any notice of the proclamation referred to, and doubted its genuineness. [Signed] H. A. Knox."

Mr. Knox denies having signed the statement produced by Mr. McClatchy. In this regard he testifies as follows:

"I never signed that statement in the world. That statement, or part of it, was when they called me before their committee in the afternoon, I think, of the 9th. It was simply said verbally, part of it, and part of it was not. I never signed the statement, and they have got more in there than I ever said. * * * The statement is about correct, until we get down to where it says: 'He said, however, that if the government insisted on moving Pullmans without a settlement of the main question, he could not control the men under him, as they had notified him, over 2,000 strong, that they would not obey orders in that event, and would engage the troops.' I never made any such statement as that."

Barry Baldwin, the United States marshal for the Northern district of California, was at Sacramento during the strike, and testifies as follows respecting statements made to him by members of the mediation committee and others, in relation to the attitude of the American Railway Union:

"I know Mr. Knox, Mr. Compton, and Mr. Mullen. Know Mr. Worden. I saw them on the evening of the 1st of July at the depot, in a caboose, in the yard there, right at the depot, on the tracks. I was told that they were a committee; that they were the leaders of the committee of the strikers. Found Mr. Worden there at the time. * * * I went there officially, in order to protect the mails,—to protect the trains carrying the mails; in

order to allow the railroad officials to run the trains carrying the mails. We heard that they were being prevented from doing so. This was Sunday evening, the 1st of July, about eight o'clock in the evening. * * * It was a caboose on the tracks adjacent to the depot building,—the yard at Sacramento; possibly a hundred yards from the river,—fifty to a hundred yards. The parties in the car went to find Mr. Knox. Mr. Knox was not in the car at the time. They found Mr. Knox, and Mr. Knox came in presently, after a little; and they requested a number of people there, who had no business with their committee, to withdraw. A number of people in there withdrew, leaving, I suppose, some six to ten inside the car. It was dark in the car. It was lighted afterwards, but poorly lighted. Mr. Knox was present, and also Mr. Worden, and I believe Mr. Compton, and Mr. Mullen, and several others whom I don't know,—did not recognize at the time. * * * I stated to them the purpose for which I had come to Sacramento, and they asked me whether Pullman cars were to be moved with the train. Knox was the spokesman, and did most of the speaking. The others spoke a little, some of the others, and especially Mr. Worden, who was continually talking and interrupting. I told them who I was, and my purpose in going to Sacramento. * * * My business there was to see them and talk to them, and see what the trouble was, and why these trains could not be moved, and why they were preventing them from being moved. They objected to Pullman cars being moved, claiming that they were willing that the trains should go with the mails and other passenger cars, but not with Pullman cars. They said they had advice that Pullmans were no part of a train,—no part of a mail train; and they gave me to understand that they would not be allowed to go,—to be moved. They said they had eminent legal advice. That they had paid $250 for the advice. They did not state who had advised them. * * * I told them that I should perform my duties, and see that the trains were moved. I told them that the trains should be moved as often as made up, with Pullman cars attached where it was customary to place them. I told them that I was certain they were not right in doing it,—in opposing the proper authorities and defying the law. They continued in the attitude that they could not allow Pullman cars to move. I told them my purpose in being there was to protect those mail trains, and trains carrying the mails,—United States mails. * * * Had conversation with Mr. Worden on my way up from the caboose out across the tracks. He asked if we knew who he was, and I then first learned his name. He said that his name was Worden; that every one knew him there, and he was prominently connected with the movement. * * * It was the A. R. U. people that were organized there. They were the mediation committee of the A. R. U. They were the committee. I treated them officially as leaders of the movement,—ostensible leaders of the movement."

The same witness further testifies, as to the action and attitude of the mediation committee, substantially as follows:

"I saw the members of the mediation committee again (the second time) on the evening of the 2d, at the Golden Eagle Hotel, at my room. Saw Knox, Mullen, and Compton. They came to see me as the mediation committee of the A. R. U. They came to see me as U. S. marshal. They came to see me at the room I occupied. I informed them that it was my intention to go down the next day, and clear the depot grounds of the crowds that were there, in order that the railroad company could move their trains, —the mail trains, or trains carrying the mails,—and that I hoped that the strikers would not offer any resistance; that I was there by lawful authority to do this; it was my duty to do it. Then we talked the matter over. They said that they had no wish to use any violence. They asked me to go down. They said they would do all they could to get the strikers to vacate the depot grounds. They asked me to go down myself, or with as few deputies as possible, for they thought there was less danger of a conflict if I did that; that I could get on better alone than to take down a number of deputies; that it might irritate the people, and we would not get on well. But they said they would assist me as much as they could in inducing the crowd to clear away from the depot, and allow the trains to be operated.

They said that if they did this they wanted me to allow them to send a committee of three to induce the engineers, or those that were to work the trains, in together, to persuade them not to go out with the Pullman cars; to go inside of the line I might form. I told them that I did not know that I would object to their doing that, so long as they did not intimidate them,—so long as they were not too persistent, and would not continue to talk to them too long, or in any other way threaten them, by numbers of talk; and also, if the people they were talking to did not wish to hear them, did not wish to listen to them, and requested them to leave, why, they should leave. But I told them that I could not promise even that I would let them do that; that I could not say at that moment; that there might be some objection arise at the time on the part of the railroad company, and I might have to further consider the question as to their right to be present at the depot grounds, but at that time I did not see any objection to it, as long as they did it peaceably."

Mr. Knox, in his testimony, details this interview in the caboose as follows:

"Mr. Baldwin and Mr. Knight wanted to know our position that we had taken in the matter, and between us we explained it as thoroughly as possible to them, and told them, in the first place, we had boycotted the Pullman cars on legal advice; and, if I am not mistaken, I told them who our advice was from.—Mr. Ingersoll; and Mr. Knight said that a Pullman car, as long as it was attached to a mail car regularly made up, was part of a mail car. Of course, we had an opinion from a very eminent lawyer and attorney, and we thought he knew as much about it as Mr. Knight did; consequently we told him we would not handle any trains with Pullman cars attached during the boycott, and, now that the strike had been ordered, we would not handle any trains at all, except mail trains, until those men that had been discharged had been reinstated. That was about the gist of our conversation all the way through. It was repeated several times."

T. W. Heintzelman, master mechanic in the employ of the Southern Pacific Company at Sacramento, called for the United States, testified as follows:

"I know Knox and Compton. They were out on a strike. Before the strike, Knox was a switchman, and Compton was a machinist working in the shop. * * * I was present during a part of a conversation between Knox and Mr. Small at the roundhouse on June 30th. Mr. Small was the superintendent of motive power. * * * I heard Knox remark that they were in the strike to win, and they were going to win by any means."

E. C. Jordan, locomotive engineer at Sacramento, called for the United States, testified to attending a meeting on June 29, 1894, at which Knox was present, as follows:

"In relation to a telegram he said he would get, it was asked him as to what his jurisdiction was in this matter; and he stated that his jurisdiction extended from Sacramento to El Paso and to Portland and to Ogden, out of Sacramento. * * * There were three orders present,—Conductors, the Engineers, and Mr. Knox, of the A. R. U. * * * The meeting was held for the purpose, as I understood it, of taking some action to bring the strikers or the A. R. U. men and the company together, in order to devise some means by which the strike could be adjusted in some manner to start the road."

The following telegrams, purporting to have been signed and sent by H. A. Knox to various unions within his jurisdiction, respecting the state of affairs at Sacramento, and transmitting advice to other local unions with reference to the action they should take, were in-

v. 67 f. no. 6—46

troduced by the prosecution for the purpose of showing the concert of purpose and action among the different branches of the American Railway Union.

"June 27, 1894. To I. B. Hoffmire, Portland, Or.: Stop all Pullman sleepers. Answer. H. A. Knox."

"June 27, 1894. To E. V. Debs, Pres. A. R. U., Chicago: Will we stop loaded sleepers? Ans. H. A. Knox."

"June 27, 1894. To W. H. Clune, Los Angeles: Stop all Pullman sleepers. Answer. H. A. Knox."

"June 27, 1894. To J. M. Wagner, Ogden, Utah: Stop all Pullman sleepers. Answer. H. A. Knox."

"June 28, 1894. To M. C. Roberts, Dunsmuir, Cal.: Be ready to go out at moment's notice. H. A. Knox."

"June 28, 1894. To E. V. Debs, Chicago, Ill.: The ORC and BRI are going to take train out to-night. We are going to stop everything. Answer. H. A. Knox."

"June 28, 1894. To J. M. Wagner, Ogden, Utah: Be ready to go out at moment's notice. H. A. Knox."

"June 28, 1894. To M. C. Roberts, Dunsmuir: Don't know, but if any, you hold. H. A. Knox."

"June 29, 1894. To E. P. Condrey, Rocklin: Yes; stay in Rocklin. H. A. Knox."

"June 29, 1894. To C. B. McClintock, Truckee, Cal.: Hold Nos. 4 & 2 sure. H. A. Knox."

"June 29, 1894. To G. W. Lindsay, Wadsworth, Nev.: Hold No. 4 there sure. H. A. Knox."

"June 29, 1894. To E. P. Condrey, Rocklin: General tie up ordered. Notify all concerned. Answer. H. A. Knox."

"June 29, 1894. To McClintock, Truckee: General tie up ordered. Notify all concerned. H. A. Knox."

"June 29, 1894. To E. V. Debs, Pres. A. R. U., Chicago: General tie up ordered on S. P. system. All out. H. A. Knox."

"June 29, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: Everything on system at standstill. Company makes their death struggle to-night. H. A. Knox."

"June 30, 1894. To F. Almas, Summit, Cal.: No; stop at once. H. A. Knox."

"June 30, 1894. To J. C. Church, Carlin, Nev.: Ice until further orders. Everything stopped. H. A. Knox."

"June 30, 1894. To J. T. Roberts, Oakland, Cal., A. R. U.: Have any troops left, and where are they going? H. A. Knox."

"June 30, 1894. To J. T. Roberts, A. R. U., Oakland: Has train left with deputy marshals? Rumor here. H. A. Knox."

"June 30, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: This motion was adopted by B. of L. E. and O. R. C.: That the basis of the settlement be that all discharged men who have taken part in the Pullman boycott be reinstated, and guaranty given men won't be discharged for same cause. Pullman boycott to remain in force, and strike declared off. This is the grandest victory ever won, and everybody is on our side. H. A. Knox."

"July 1, 1894. To A. W. Wallace, Rocklin, Cal.: There was, but we stop at other points. Not wheel moving. H. A. Knox."

"July 1, 1894. To J. T. Roberts, A. R. U., Oakland, Cal.: Keep me posted on everything that leaves there. H. A. Knox."

"July 1, 1894. To W. H. Clune, Sec., Los Angeles, Cal.: How are engineers and conductors standing with us down your way? H. A. Knox."

"July 2, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: Did you give permission to move Mrs. Stanford? H. A. Knox."

"July 2, 1894. To H. L. Walthers, Dunsmuir, Cal.: She can go via Davis, not by Sacramento.

"July 2, 1894. To H. L. Walthers, Dunsmuir, Cal.: Troops coming here. Stand firm; we are. Ans. H. A. Knox."

"July 3, 1894. To E. E. Barton, Ogden, Utah: We understand Co. tried to brake block, but we fooled them. H. A. Knox."

"July 3, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: Hunt up the National Pres. of the Marine Engineers. Confer with him. Steamers are a terrible damage to us. H. A. Knox."

"July 4, 1894. To McClintock, Sec. A. R. U., Truckee, Cal.: Big army here. You come with all guns and volunteers. Come by train without orders at once. H. A. Knox."

"July 4, 1894. To E. E. Barton, Ogden, Utah: Good. Same here. We have 4,000 beside the city. Stand firm. H. A. Knox."

"July 4, 1894. To Arthur Wallace, Rocklin, Cal.: Soldiers on this end of American river. Don't stop. Bridge O. K. H. A. Knox."

"July 4, 1894. To Arthur Wallace, Rocklin, Cal.: Come. Bring all hands. Rush. H. A. Knox."

"July 4, 1894. To H. L. Walthers, Dunsmuir, Cal.: One thousand cavalrymen and militiamen here. Come with whole outfit by train, without orders, at once. H. A. Knox."

"July 4, 1894. To W. H. Walthers, Dunsmuir, Cal. Don't close the Western Union office. That will hurt our cause. And take guard away from the Postal office. H. A. Knox."

"July 4, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: We have the troops on our side. They have refused to obey commands, and we are stayers from away back,—bound to succeed. H. A. Knox."

"July 5, 1894. To C. B. McClintock, Truckee, Cal.: Please allow merchants to take perishable freight from cars, but agent must check it to them. H. A. Knox."

"July 5, 1894. To Madden & Turner, Dunsmuir, Cal.: All quiet here. We are sure to win. H. A. Knox."

"July 5, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: It is reported the U. S. marshal and Gen. Dimond, of state troops, has turned our affair over to Washington. Have attorney there to work on it. We have everything our own way, and have not broke the law, only by keeping about 5,000 men in sight. Please advise us what to do. Not a wheel moving. H. A. Knox."

"July 6, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: Any truth in report of strikers and soldiers having battle in Chicago? Please ans. We are firm as rock. H. A. Knox."

"7/7/189. To J. M. Wagner, Ogden, Utah: All quiet. Stand firm. H. A. Knox."

"July 7, 1894. To Wm. O. Leary, Pres. Miners' Union, Virginia City, Nev.: Resolutions received, and return thanks. We are bound to win. We are as solid as rock. H. A. Knox, Chairman."

"July 8, 1894. To W. H. Clune, Los Angeles, Cal.: Force them to stop, or tell them when we settle, their firemen will run their engines. We done that, and you bet it brought them to time. All quiet here. We are solid as rock. H. A. Knox."

"July 9, 1894. To W. H. Clune, Los Angeles, Cal.: Everything very quiet here. Nothing moving here. How is things there? Stand firm, and don't let nothing go. H. A. Knox."

"July 9, 1894. To Chas. Fink, Oakland, Cal.: We sent Geo. Hale to Vallejo, but if there at Oakland he is O. K. H. A. Knox."

"July 11, 1894. To W. G. Boyce, Pres. Miners' Union, Silver City, Nev.: Thanks for sympathy. We are under heavy expense. Financial aid would be gratefully received. H. A. Knox, Chairman."

"July 11, 1894. To Chick Featherson, Summit, Cal.: I received orders from E. V. Debs to order strike on entire system. Hence my order. Sacto. is solid yet. H. A. Knox."

"July 11, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: Sorry you are in jail, but be strong, and we will carry the strike on if they put all of you in jail. Lots of soldiers here, but everything quiet so far. Every man out here, but a few scab engineers. H. A. Knox."

"July 11, 1894. To J. S. Walton, Oakland, Cal.: Adopt code. Lots of soldiers here, but everything quiet yet. H. A. Knox."

"July 12, 1894. To J. Balder, Truckee, Cal.: Train of soldiers getting ready to leave here for Truckee. Everything quiet. H. A. Knox."

"July 12, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: I will stand

·by A. R. U. as long as life lasts. I refused to run for railrcad commissioner, because I thought so much of the fight. We are doing nothing but what is proper. We are going to fight it out on this line. We have 1,800 soldiers here, but no trains out yet. H. A. Knox."

"July 13, 1894. To Chairman A. R. U., Truckee, Cal.: Reports all fake. Stand pat. Freight left here, under protection of soldiers, for the East. H. A. Knox."

"July 13, 1894. To Clune, Chairman A. R. U., Los Angeles, Cal.: Reports all fakes. Strike is on in full force. Stay with them to the last. All O. K. here. H. A. Knox."

"July 13, 1894. To J. C. March, Carlin, Nev.: 1,800 soldiers here for two days, but have only got freight out east. Reports are all false. Stand pat. H. A. Knox."

"July 13, 1894. To F. M. Gillett, San Luis Obispo, Cal.: Reports all false. Stand pat. 1,800 troops here, but got only one train out in two days. Sure to win. H. A. Knox."

"July 13, 1894. To E. V. Debs, Pres. A. R. U., Chicago, Ill.: United Press dispatch says you have declared strike off. I have sent messages all over denying it. Answer. H. A. Knox."

Telegrams have been introduced purporting to have been signed by H. A. Knox, addressed to E. V. Debs, at Chicago, and to other persons, in relation to the strike, dated July 14th, and subsequent dates; but Knox testifies that he was arrested on July 14th, and was in jail for three weeks, and he denies specifically having signed the 11 telegrams dated July 22d, which bear his name. It is possible that some member of the mediation committee, or other officer of the American Railway Union at Sacramento, acting for the committee, may have signed these telegrams in the name of Mr. Knox; but as the testimony in the case, and particularly the telegrams sent out by T. H. Douglass, who appears to have been chairman of the mediation committee after July 14th, indicate that the strike was declared off on July 21st, telegrams purporting to have been signed by Knox, and dated after July 14th, and particularly those dated July 22d, are certainly discredited, and I will not, therefore, refer to them further in this connection. In any view, they do not appear to be important.

George Vice testified, on the part of the defense, that he had been a locomotive fireman for the Southern Pacific Company in June last; that he belonged to the American Railway Union at Sacramento; was the vice president of it; thinks he was present the night that the telegram came from Chicago, announcing the fact that there was going to be a Pullman boycott. He admits signing the following telegram:

"Sacto., July 6, 1894. H. F. Michaels, Master Cactus Lodge, 94, Tucson, Ariz.: Firemen of following lodges out with A. R. U., to the man: 260, 143. 312, 91, 97, 19, 58, 98, 366, 193, and Roseburg. If you tie division up, will guaranty full protection of A. R. U. Not a wheel turned here for six days. Answer. Geo. Vice, Master 260."

Also the following:

"Sacramento, Cal., July 16, 1894. J. Friant, Fresno, Cal.: Firemen here stand firm. Scabs scarce. We are winners. Geo. Vice."

Also the following:

"Sacto., July 16, 1894. Geo. W. Lindsay, Wadsworth, Nev.: Firemen here all firm. Scabs scarce. We're winners. You stand firm. Geo. Vice."

He also admits sending the following:

"Sacramento, Cal., July 17, 1894. R. E. Nobel, Summit: Quit immediately, and tie up everything. Come to Sacramento. We're sure winners. Answer. Geo. Vice."

The witness, being questioned about the wording of the telegram, testified further as follows:

"A Juror: Q. What did you mean by 'tie up everything'? A. Leave their work. Q. You said, 'Quit and tie up everything.' What do you mean by 'tie up everything'? A. Just to leave work. The Court: Q. You say, 'Quit and tie up everything.' 'Quit' seems to be your definition for 'tie up.' A. I meant the same thing by it. Q. 'Quit' and 'tie up' are the same thing? A. Yes, sir. Mr. Knight: Q. By 'tie up everything,' you mean leave work from everything? A. Leave the service. Q. From everything? A. Yes, sir. Q. What is the meaning of the word 'everything'? You said, 'tie up everything.' A. I suppose there is a whole lot of meaning to 'everything.' Q. What is your meaning in that connection? A. If a man is on a job, according to that,—if he is on an engine,—he will leave his work."

He also admits sending the following telegram:

"Sacramento, Cal., July 17, 1894. J. J. Brennan, Rocklin: Stand. Do not allow anybody to report for work. Stronger here than ever. We're sure winners. Geo. Vice."

The witness states:

"When this telegram was sent, it was only meant for the firemen. There were lots of firemen that did not belong to the A. R. U."

Admits writing and sending this telegram:

"Sacramento, Cal., July 17, 1894. Geo. W. Lindsay, Wadsworth, Nev.: Still firm, and will stay to last. Sure winners. Gaining recruits from scabs. Fillmore weakening. He interviews mediation board, and makes concessions. Geo. Vice."

Also this one:

"Sacramento, Cal., July 18, 1894. H. F. Michaels, Tucson, Ariz.: State situation. Tied up here tighter than ever. Use all means to do same there. We're winners. Geo. Vice."

Also this one:

"Sacramento, Cal., July 18, 1894. W. J. Featherson, Summit, Cal.: Quit immediately, and tie up everything. Come to Sacramento. We're sure winners. Answer. Geo. Vice."

Also this one:

"Sacramento, Cal., July 21, 1894. F. P. Sargent, Terre Haute, Ind.: Eastern B. L. F. men taking our jobs. For God's sake, save us. S. P. will not re-employ us. Use all means to save us. Answer. Geo. Vice, Master 260."

The witness states that he had no authority to send telegrams for the American Railway Union; that he sent them by virtue of his being a master of the Brotherhood of Locomotive Firemen. He admits, however, that he was also an officer of the American Railway Union, being its vice president.

H. B. Breckenfeld, called for the United States, testified that he was chief train dispatcher for the Sacramento Division of the Southern Pacific, at Sacramento; that he knew Terry Douglass; that he knew that Douglass was connected with the A. R. U. during the recent strike, because Douglass appeared before Mr. Fillmore, or in his rooms, on one or two occasions, in connection with the strike;

that on one occasion Douglass came in an official capacity; that, when he did come in an official capacity, Douglass announced that they had decided to declare the strike off. This was in the latter part of July. Douglass' position in the American Railway Union was a member of the mediation committee. Douglass was not a member of the mediation committee right through the strike. The witness understood that they (Douglass and the two men who accompanied him on the occasion just referred to) took the place of the original mediation committee at Sacramento. On the occasion referred to they came into the rooms of Mr. Fillmore, and requested the stenographer who was present to prepare upon the typewriter a statement to that effect, which was read to them by the stenographer, and was signed by them. The witness was present when this was done. Witness knows the handwriting of Douglass. Identifies the signature of Douglass on the following telegrams:

"Sacto., July 14th, 1894. To F. P. Cox, Rocklin, Cal.: Men are determined. Situation good. T. H. Douglass."

"Sacto., July 16, 1894. To E. V. Debs, Chicago, Ill.: A committee of fruit growers has waited on us. Are you any nearer a settlement? Ans. quick. T. H. Douglass."

"Sacto., July 16, 1894. To S. Brennan, Rocklin, Cal.: Message from Debs. Situation everywhere good. Switchmen have all quit here. T. H. Douglass."

"Sacto., July 16, 1894. To R. A. Battenfield, Rocklin: Four trains tied up at Red Bluff. No crews to move. T. H. Douglass."

"Sacto., July 16, 1894. To E. V. Debs, Chicago, Ill.: Scabs coming from East. With few exceptions, men solid here. T. H. Douglass."

"Sacramento, Cal., July 17, 1894. To R. A. Battenfield, Rocklin, Cal.: Situation better than yesterday. Prospects brighten every hour to A. R. U. T. H. Douglass."

"Sacto., July 18th, 1894. To R. A. Battenfield, Rocklin: Did any train leave Rocklin this morning? T. H. Douglass."

"Sacto., July 18th, 1894. To W. Balder, Truckee, Cal.: Received message from James Hogan. He states situation firm everywhere. T. H. Douglass."

"Sacto., July 18th, 1894. S. J. Brennan, Rocklin: Situation has not changed. No work for shopmen. T. H. Douglass."

"Sacto., July 18th, 1894. To E. E. Barton, Ogden, Utah: Committee waited on J. A. Fillmore. Nothing satisfactory. Men remain firm. T. H. Douglass."

"Sacto., July 19, 1894. To G. W. Lindsay, Wadsworth, Nev.: No change in situation here. Remain firm. T. H. Douglass."

"Sacto., July 20, 1894. To James Hogan, Chicago, Ill.: True situation men wavering in many places. Give your views affairs. T. H. Douglass."

"Sacto., July 21st, 1894. To F. P. Cox, Rocklin, Cal.: Probably strike will be declared off at 2 p. m. T. H. Douglass."

"Sacramento, Cal., July 21st, 1894. To W. Balder, Truckee, Cal.: Expect strike to be settled by 2 p. m. T. H. Douglass."

"Sacramento, Cal., July 21st, 1894. To G. W. Lindsay, Wadsworth, Nev.: This lodge has declared strike off by unanimous vote. T. H. Douglass."

"Sacto., July 21, 1894. To S. J. Brennan, Rocklin, Cal.: This lodge has declared strike off. T. H. Douglass."

"Sacramento, Cal., July 21, 1894. To W. Balder, Truckee, Cal.: Strike has been declared off Pacific, unconditional. T. H. Douglass."

T. H. Douglass, called for the defendants, testified: That he was a brakeman last June and July, running between Sacramento and Truckee. That he belonged to the American Railway Union and Order of Railway Conductors. That he acted as chairman of the mediation committee, he thinks, from the 12th or 13th or 14th

of July. That the occasion of his so acting was because the original members on that committee were arrested. That John Hurley and G. H. Hale were on the committee with him. That he continued in that capacity until the strike was declared off. That he does not remember the day when the strike was declared off, but he thinks it was the 25th day of July. He attended a meeting of the American Railway Union on the 26th of June. There was a message read from E. V. Debs, declaring a boycott on Pullman cars. The union took action on the matter, and declared a boycott. Was in Truckee when the strike was ordered. First heard of it about 6:30 in the morning. "The train master asked the crew if they would go out on No. 20. They told him, 'Yes.' After he [the train master] left, seven or eight men came in, and told us there was a strike ordered, and we had not better go. Well, we did not go." Douglass admits having received and sent a number of dispatches during the strike.

### Beginning of the Strike at Oakland.

Thomas J. Roberts, a witness for the defendants, testified that he resided in West Oakland; that he had been employed for six years as a locomotive engineer for the Southern Pacific Company; that he was president of local union No. 310, of the American Railway Union, which was organized in May, 1894; that the first he knew of any trouble was a communication he received from Mr. Worden, who was delegate to the convention in Chicago. He says:

"I received a letter from him stating that the Pullman boycott had been declared, to take effect in five days, unless the trouble between the Pullman Company and their employés was settled. On the same day a telegram was read in our meeting—that was Tuesday, June 26th—from the president of our general union, saying, 'Pullman boycott in effect to-day noon, by order of convention.'"

He further says:

"It was the evening before we received the telegram, and, that being our regular meeting night, the secretary held the telegram until the meeting opened; and after the meeting had opened, and we got through with our preliminary work, the telegram was read, and the matter was discussed, and I think the telegram said the Pullman boycott was in effect that day at noon. Still we did not want to take any snap judgment on the company, and we decided not to put it into effect until 12 o'clock the following day, June 27th. That would be Wednesday. A motion was put and carried to that effect, and our secretary was instructed to notify the Southern Pacific officials that after Wednesday, June 27th, at noon, we would not handle any Pullman cars, or do any Pullman work."

Continuing, the witness testified:

"June 27th the boycott took effect, at noon. That afternoon we had some trouble in the passenger yard where I was employed. Some of the boys that were cleaning cars were instructed by some foreman that they were working under to clean some certain Pullman cars, and they refused to do so. They told him that they belonged to the American Railway Union, and that there was a boycott in effect, and that they could not clean the Pullman cars. He told them that if they did not want to do that there was nothing else for them to do, and that they could go home."

The men were reinstated at his request. They went on with their customary work. The strike was to take effect the morning of the 29th, at 12:30. It was for the reinstatement of the men who had

been discharged. By "strike," he means that the men were all to withdraw from the service of the company, and refuse to work. In case the men were reinstated, they would be returned to work. By "the men," he means the strikers. There was no resolution. That was the understanding,—his understanding. The secretary was instructed to notify all the unions on this system, or in this state; he is not sure which. All the action that was taken was that they advised the men to try and keep men from going to work and taking their places; to persuade those that were at work to quit. "Tie up" is a railroad phrase. It means to cease work. It is used by officials and train dispatchers. Perhaps a train at Port Costa may get orders, "Train No. 18 will tie up at Tracy." That means that they will not go any further.

The witness was shown a number of telegrams, among others the following, which he admits having sent:

"West Oakland, Cala., June 28, 1894. To F. P. Sargent, Terre Haute: Firemen's lodge here indorsed Pullman boycott. Will not handle their cars. T. J. Roberts."

"Oakland, Cal., June 30, 1894. To W. H. Russell, Secretary B. R. T., Bakersfield, Cal.: What is situation? Define position of B. R. T. T. J. Roberts."

"Oakland, Cal., June 30, 1894. To H. A. Knox, A. R. U., Sacramento, Cal.: No troops sent out from here. T. J. Roberts."

"Oakland, Cal., June 29, 1894. To E. H. Leon, San José, Cal.: Firemen out here. Do not work. Come home. T. J. Roberts."

"West Oakland, July 14, 1894. To F. P. Sargent, Terre Haute, Ind.: Authorized American Railway Union strike here. Shall B. L. F. men work during strike? T. J. Roberts."

"West Oakland, July 18, 1894. To F. B. Porter, Reno, Nev.: Solid here. Do not waver. Victory is ours. T. J. Roberts."

He was in frequent correspondence with the officers of different lodges of the American Railway Union throughout the state, and in some instances with the American Railway Union headquarters at Chicago, during the strike. Does not know particularly that he sent them by virtue of his official position as president of the American Railway Union in Oakland. It was merely for information. The union sent a great many official notifications of the strike throughout the state. He did not. The secretary sent them. The union ordered the secretary to notify the different local unions in the state of the strike here. They had no authority to send them in his name. They related to the strike. He got some messages from Knox, of Sacramento, and sent him some.

G. D. Bishop, called for the defense, testifies that he was the secretary of the American Railway Union at Oakland. The secretary was instructed, the night of the boycott, to notify other unions in reference to the boycott.

### Beginning of the Strike at Red Bluff, Truckee, and Dunsmuir.

John Kelly testified, as a witness on behalf of the government, that he went out on strike on June 28th or 29th; that he had been a fireman for the Southern Pacific Company; that he went out at Red Bluff; that he was a member of the American Railway Union; that that had to do with his going out on a strike.

J. P. Heaney, a witness called for the defendants, states that he

went to Red Bluff from Sacramento on June 28th; that he lived at Sacramento, and belonged to the Sacramento lodge of the American Railway Union; that he had been braking for the Southern Pacific Company; that there was no American Railway Union organization at Red Bluff. He testifies as to being advised of the strike by a telegram from Mr. Knox; that he had asked Mr. Knox if there was a strike ordered, and the latter had replied, "Yes, there is a general strike ordered by Eugene V. Debs." The witness states that he was appointed chairman of a committee at Red Bluff. The committee were composed of railroad employés who had struck. Although the witness is very uncertain as to the purpose of the meetings, and the appointment of the committee of which he was chairman, he admits that at least one of its objects was in order that there might be some authorized person to receive and send dispatches for the men out on strike at other points, and be a channel of communication between Mr. Knox and the men at Red Bluff. He received quite a number of dispatches from Mr. Knox, and from other places. Although Heaney admits having received a great many telegrams, his recollection as to their contents is extremely vague. But one of these telegrams was introduced on the part of the prosecution. It is as follows: .

"3:15 p. m., July 3/94. Red Bluff, Cal. Received at Sacramento, Cal. Jack Heaney: Trains switched by official. Coaches detained by three thousand people. H. A. Knox."

One from Heaney reads as follows:

"Red Bluff. Cal., July 2, '94. H. A. Knox, Sacramento, Cal.: Shall we let Adams, engineer that brought No. 15 in, go back with Mrs. Stanford's special? He has no fireman. Heaney."

The following is a telegram from Dunsmuir, purporting to be signed by M. C. Roberts:

"Dunsmuir, Cal., June 28th, 1894. H. A. Knox, S. P. Depot, Sacramento, Cal.: Has Portland boycotted Pullman? Answer. M. C. Roberts."

Mr. Knox replied:

"Sacramento, Cal., June 28, '94. M. C. Roberts, Dunsmuir, Cal.: Don't know. But if any, you hold. H. A. Knox."

From Truckee comes the following telegram:

"Truckee, Cal., July 4, 1894. H. A. Knox, Sac.: Do you still want us? Train on mail line ready to go. C. B. McClintock."

Mr. Knox replied:

"July 4, 1894. To C. B. McClintock, Truckee, Cal.: Come without fail; coming from all points. H. A. Knox."

The following telegram purports to have been sent by F. H. Almus to Mr. Knox:

"Summit, Cal., June 30/4. Harry Knox, Chairman of A. R. U. Committee. Sac.: Will I continue service on work train or not? Answer. F. H. Almus."

Almus testified for the defendants, and stated that he was a member of the American Railway Union. Knox's reply is as follows:

"June 30, 1894. To F. Almus, Summit, Cal.: No. Stop at once. H. A. Knox."

The following telegrams are from Los Angeles, signed by W. H. Clune:

"June 27/4. Los Angeles, Cal. G. D. Bishop, Secretary A. R. U. 310, W. Oakland, Cala.: Stand firm. Will boycott at Los Angeles this p. m. W. H. Clune, Sect. No. Eighty."

"L. A. 7/2, 1894. To T. J. Roberts, Prest. A. R. U., Oakland, Cal.: Resolutions in press is fake. Out of one hundred engineers here, ninety-seven are with us till the end. Trainmen, firemen, carmen, shopmen, section and bridge men,—solid. W. H. Clune, Secty."

### Strike in San Francisco by A. R. U. Lodge 345.

It is admitted by the defense that the defendants John Mayne and John Cassidy were members of this lodge at the time of the strike. Rice and Clark, the two other defendants charged in the indictment, but who are not on trial, were also members of the same lodge. Charles Ault, called for the government, testified: That he was a member of the American Railway Union. That the number of his lodge was 345, San Francisco. It was the same lodge to which the defendants belonged. One Bradley was president, and another person, by the name of Elliott, was on the executive committee. This lodge went out on the strike, as a body, on June 29th,—the night of June 29th. It also appeared from the testimony of H. J. Bederman, a witness for defendants, that one J. E. Riordan was its secretary. McClintock was also a member of this lodge. The purpose which prompted the lodge to join the strike is stated by the testimony as follows: T. J. Roberts, president of the Oakland lodge, American Railway Union, testified that the union of which he was president authorized the secretary to send telegrams to different unions, as follows:

"American Railway Union three hundred ten declared strike. Takes effect twelve thirty a. m. to-day."

A telegram to this effect was sent to the lodge in San Francisco:

"Oakland, Calif., June 29, 1894. J. E. Riordan, 118 Sixth St., Room 71, S. F.: American Railway Union three hundred ten has declared strike. Takes effect twelve thirty a. m. to-day. T. J. Roberts, President."

Mr. Roberts, when examined, said that he had not personally authorized the sending of telegrams of such purport, and knew nothing about them. Some 21 others of a similar character were sent to different places.

Mr. Bishop, the secretary of the same organization, testified that these telegrams were sent out by direction of the union. They were authorized by the union. It will be noticed that the dispatch claimed by the government to have been sent to Riordan, of the San Francisco union, of which the defendants were members, is practically to the same effect. This witness acknowledged receiving the following telegram, purporting to come from J. E. Riordan:

"San Francisco, June 30, 1894. G. D. Bishop, Oakland: Committee out on organization Narrow Gauge. Your assistance required. J. E. Riordan."

He testified that he authorized the sending of the following telegram to J. E. Riordan on June 30, 1894:

"Oakland, Cal., June 30th, 1894. To J. E. Riordan, 118 6th St., S. F.: Will send men at once to confer with you. G. D. Bishop, Sec."

H. J. Bederman, a witness called for the defendants, and employed as a switchman by the Southern Pacific Company last spring, testifies, substantially, that he belonged to Lodge 345, San Francisco, of the American Railway Union; that the defendants belong to the same lodge; that the occasion of the strike by his union was on account of some of the members being discharged for not handling Pullman cars; that an executive and press committee was appointed; that the executive had charge of almost everything concerning the strike of the men; that most of the men belonging to his union worked on the Coast Division; that the committees were appointed on the evening of June 29th; that all the power regarding the strike was delegated to the executive committee, so that this committee had charge of the strike; did not seem inconsistent to him in striking on a division where there were no Pullman cars; not a question of sympathy; they were members of the union; they were supposed to do what was right by every member; if one was discharged for a cause he was not guilty of, they would try and protect him; the union protected them; Mr. Riordan was secretary of the union.

George Elliott testified, on being called as a witness for the defendants, that he was a foreman switchman in the passenger yards of the Southern Pacific Company, at Fourth and Townsend streets; that he joined the American Railway Union (Lodge 345, San Francisco) on the night of the 29th of June, or the 30th; that he became chairman of the executive committee; that this committee were to do everything that was to be done in connection with the strike; they had full power; the question of Pullman cars never, to his knowledge, came up; they struck for the reinstatement of employés that had been discharged. On cross-examination he states that he struck because of the discharged employés; he believes some were discharged in Los Angeles, and some in Sacramento; simply struck to see justice done. On redirect examination, he said that he first got some information about the strike from Mr. Bederman; that he believes that Bederman read a message to him; he doesn't know whether it came from Oakland or Sacramento.

Edward F. Gerald, a witness called for the government, gave testimony tending to prove the handwriting of Mr. Riordan. He states, respecting the following telegrams, that he "thinks they are all Mr. Riordan's signatures":

"San Francisco, 6/29, 1891. To Chas. E. Bradley, Engineer S. P. Co., Pajaro: Strike ordered to-day noon. Let trains come north. Notify San José and along the line. J. E. Riordan."

"June 29, 1894. F. Gillett, San Luis Obispo, S. P. Co. Caboose: Strike ordered immediately. Tie up everything. J. E. Riordan, Secretary #345, A. R. U."

"June 29, 1894. C. E. Bradley, Tres Pinos, S. P. Co.: Strike ordered immediately. Tie up everything. J. E. Riordan, Secretary #345, A. R. U."

"June 29, 1894. A. E. Pratt, Pacific Grove, S. P. Co.: Strike ordered immediately. Tie up everything. J. E. Riordan, Secretary #345, A. R. U."

"June 29, 1894. E. B. Stanwood, Castroville Station, S. P. Co.: Strike ordered immediately. Tie up everything. J. E. Riordan, Secretary #354, A. R. U."

"June 29, 1894. G. W. Gillett, Aptos, S. P. Co.: Strike ordered immediately. Tie up everything. J. E. Riordan, Secretary #345, A. R. U."

"F. W. Clark, Pac. Grove: Greer O. K. Keep on good work. Tie up strong. J. E. Riordan."

"San Francisco, 6-30, 1894. G. D. Bishop, Oakland Yard S. P. Co. Committee out on organizing Narrow Gauge. Your assistance required. J. E. Riordan."

It is admitted on the part of the defendants that the following telegrams were signed by George Elliott, although, when the latter was cross-examined, he could not recollect as to whether he signed some of them, and denied that he signed others. The witness J. E. Dillon identified his handwriting.

"San Fran., 7/1, 1894. To R. Gillett, Aptos, Cal.: Not a wheel turning between here and Chicago. It is our fight sure. Will keep you posted. George Elliott, Chairman."

"7/2, 1894. To Ed Stanwood, Castroville Station: Everything is coming our way. Not a wheel moving between here and Chicago. Victory is certain. George Elliott, Chairman A. R. U."

"7/2, 1894. To Ed Pratt, Pacific Grove: We are gaining strength rapidly. The fight is ours. Everything is coming our way. George Elliott, Chairman A. R. U."

"San Fran., 7/3, 1894. To R. W. Gillett, Aptos: No, sir. Allowing no trains to run we can help. Geo. Elliott, Chairman."

"San Francisco, 7/3, 1894. To J. Morehead, Pacific Grove: No, sir. Out to win, and going to. Will advise when settled. George Elliott, Chairman."

"7/3, 1894. To W. H. French, Aptos: You are all in to clear. Eugene V. Debs wires giving you full protection. Tie up everything at once. George Elliott, Chairman."

"7/3, 1894. To J. M. Smith, Tres Pinos: Fight is ours, and win we must. George Elliott, Chairman A. R. U."

"7/3, 1894. To W. Johnson, San José, Care Eureka Hotel: Do not move. Committee will see you to-morrow morning. George Elliott."

"7/3, 1894. To F. W. Gillett, San Luis Obispo: You are a brick. Debs wires that we will win. George Elliott."

I have now directed your attention to some of the testimony that tends to show the communications that passed between the various lodges of the American Railway Union and their members concerning the boycott and strike, and the concert of action that was had in pursuance of such communications. I have also called your attention to some of the statements of Knox and others as to the purpose of the boycott and strike, and the purpose they had in view in taking the action they did. To review all the testimony in the case bearing on this point would take too much time, and will not be necessary, in view of the argument of counsel for the defendants, who admits the concert of action claimed by the government, but denies that it involved a criminal purpose. With respect to these telegrams, and the testimony I have referred to in connection therewith, you will bear in mind that many of them have been admitted in evidence with the consent of counsel for defendants; the genuineness of others has been denied; and the testimony as to still others is, by reason of the contradictory nature of the testimony, involved in more or less uncertainty. As you are the sole judges of the credibility of the witnesses, and of all the evidence introduced in the case, whether it be oral or written or documentary, you will determine the genuineness of such of these telegrams as are in controversy, and this you will do from all the circumstances in the case. In passing upon the telegrams not admitted as genuine, you will be justified in resorting to all

those facts and circumstances in the case which will tend to establish their genuineness, or, on the other hand, serve to show their want of genuineness. For example, you may consider the occasions and occurrences to which the telegrams purport to relate; whether they would have been sent, but for such occurrences; the relation they bear to the events which you may deem the evidence establishes to your satisfaction, and beyond a reasonable doubt; their tenor and subject-matter; the fact that the sender or the recipient, as the case might be, was connected with the American Railway Union. In fact, all those circumstances and incidents which may be rationally and naturally connected may be considered by you in passing upon their authenticity, and the probability of their having been sent and received by the parties whose names appear upon said messages. The importance and materiality of these telegrams as showing, or tending to show, that the conspiracy charged in the indictment did in fact exist, is for you to determine. There are two important facts, however, to which it is proper for the court to call your attention, in your consideration of this question, and these are that most, if not all, of these telegrams were sent, or purport to have been sent,—whether they were or not is, as I have stated, for you to determine,—by and to members of the American Railway Union, and in the greater number of instances by those in authority in that organization, and who the testimony I have referred to, and other evidence adduced during the trial, tends to show were actively concerned in the strike, and took part in it with the avowed purpose of preventing the movement of all Pullman cars. Another significant circumstance, to which I call your attention, is that you are to consider whether these telegrams related to any of the facts charged in the indictment as constituting the conspiracy to commit the acts with which these defendants are accused, and whether they had any bearing or connection in any way with the acts charged in the indictment as means to effect the object of the conspiracy, and with reference to which—or some of which—acts the prosecution has introduced evidence showing, or tending to show, the conspiracy and overt acts, and the connection of these defendants with such conspiracy and acts. If you are satisfied from the evidence that these messages related to, formed a part of, or had any bearing upon the object of the conspiracy, and the means to effectuate such object, charged in the indictment, and the overt acts alleged to have been committed in furtherance of such conspiracy, it is a circumstance which you may consider in determining the existence of such conspiracy. You will consider whether they establish, or tend to establish, the concert or purpose and action which constitute important elements in this case as to the existence of the conspiracy charged; particularly, where a number of telegrams of similar purport and tenor are sent to different places at or about the same time, and all proceeding, or purporting to proceed, from the same person or local lodge of the American Railway Union. Thus, the telegrams sent by Knox, who, as testified to, was chairman of the mediation committee at Sacramento,

and whose jurisdiction as such extended over a good part of the Pacific coast,' or of Roberts, the president of the Oakland lodge or union, or of Bishop, its secretary, or of Douglass, Vice, Elliott, Riordan, and such others as the evidence shows, or tends to show, sent telegrams of the same general character, these persons being officially connected with the American Railway Union,—whether these show, or tend to establish, a unity of design, a community of purpose, an express or tacit understanding to do the acts charged in the indictment.

It is claimed by the defendants that, while there may have been some concert of action on the part of the members of the American Railway Union with respect to the boycott and strike, the purpose of such concerted action was merely to advise members of that organization to quit work until the controversy between Pullman and his employés should be settled. As I have explained to you before, even this purpose would become a criminal conspiracy, if the concerted action were knowingly and willfully directed, by the parties to it, for the purpose of obstructing and retarding the passage of the mails of the United States, or in restraint of trade and commerce among the several states. The government claims, however, that the concerted action on the part of the American Railway Union had something more to it than merely advising its members to quit work. It is claimed that the language of the telegrams, to which reference has been made, indicates that it was the purpose of the strikers to prevent the movement of railway trains belonging to the Southern Pacific Company, by actual and unlawful obstruction; and in this connection the question will arise in your minds, if these telegrams were intended merely to advise members of the American Railway Union to quit the service of the company, why did they not so state that purpose in plain language? It would have been an easy thing to have said, "We advise you to quit work." Why, then, telegraph such instructions as these, —if these telegrams were sent: "Stop all Pullman sleepers." "Tie up everything." "Hold Nos. 4 and 2 sure." "Tie up strong." Furthermore, if it were simply the purpose of the American Railway Union to advise its members to quit work, why did Mr. Knox use this language in his statement of the situation to the Citizens' Protective Association of Sacramento on July 7th, last? "Mr. Knox then stated that he would allow the mail and express to be moved, but that no passenger or freight cars of any kind or description would he consent to have moved until such time as the demand he made had been complied with." Why did Mr. Mullen, on the same occasion, say "that this was a fight between capital and labor, and that from the chief justice of the United States, down through all the branches—judicial and legislative departments—of the government, they were corrupt, and that labor could not get its just dues, and that his association had taken this way of forcing justice to assist their fellow men in obtaining for honest labor a proper compensation"? And why did Mr. Compton, at the same time, say "that the A. R. U. organization would not resort to any desperate means, so long as the railroad company would deal

with them without using armed force"? Was this language used on those occasions consistent with the peaceful and lawful methods of procedure now claimed by Mr. Knox to have been the purpose and action of the members of the American Railway Union during the period of the strike?

But it is claimed by the prosecution that the purpose of the strikers to interpose actual and unlawful obstructions to the movement of railway trains, both passenger and freight, is further shown by certain acts alleged in the indictment and concerning which testimony has been introduced. I will therefore now direct your attention to that feature of the case.

One of the means alleged, in the indictment, that was adopted to promote, carry out, effect, and execute the conspiracy, was (1) that the conspirators were to "forcibly take and keep possession and control of all yards, depots, tracks, and trains of cars on said lines of railway and to forcibly hold and detain the same."

### Sacramento.

The following testimony relates to what occurred at Sacramento, and it is claimed that it tends to prove the feature of the charge now under consideration:

Felix Tracy, agent of Wells, Fargo & Co. at Sacramento, called for the government, testifies on direct examination that: On the 27th of June, train No. 84, which ran from Sacramento to San Francisco by the way of Stockton, on which the express was, was held in Sacramento, and not sent out. The main office in Sacramento was at Sixth and K. He went down to the depot office to ascertain why it was not sent out. He ascertained that the train was not going out, and that the express was held there. The express was taken out of the train and held until they could send it away by different modes of conveyance. The express matter was destined for points between Sacramento and San Francisco, also Los Angeles; and matter for New Orleans also goes out on that train, connecting at Lathrop or Tracy. He could not tell positively whether there was or not any express matter on that train for New Orleans without examining the record. On the morning of the 29th, the express on train No. 4, which is the overland train from the East by the way of Ogden, was held at Sacramento, and he transferred the express from this train to the steamer. Sent it from Sacramento; that is, that portion of it for San Francisco, down on the steamer from Sacramento. This train was held at Sacramento about 10 o'clock in the morning. His recollection is that there was some freight or express matter on this train from New York for one place. The witness thus relates the manner in which he transferred this express:

"I saw that the train was held there and not moved. I saw a large crowd there, and the time for the steamer to leave Sacramento was about ten o'clock; that is, the regular time. I was satisfied, if I was going to get that express to San Francisco, that I must act very quickly. I did not know whether the steamer would be permitted to leave, or whether I would be permitted to transfer the express from this car to the steamer. Consequently I ordered two wagons—the large two-horse wagon and the single wagon—to

the express car, with the idea that we might carry that express up to 6th and K. * * * I did not tell only one or two employés. I did not state to them what I was going to do. We loaded it in as quick as we could, and took the express over to the steamer, and transferred it to the steamer. There was a great deal of excitement both at the depot and the steamer landing. I heard men at the steamboat landing ask the employés of the steamer not to go out."

The witness further states: That a train which left San Francisco on the 28th of June was delayed at Rocklin. He sent up several days afterwards, and had the express brought back to Sacramento, and he saw himself that there was express there going to Ogden, and east of that, from San Francisco and other points. He saw the waybills. With reference to the detention of train No. 84 on the 27th of June, as testified to above by Tracy, Mr. Knox gives the following version of the cause of its detention, which I have heretofore referred to in another connection: He states that there was a train due to leave there at 10:25, known as No. 84. They asked the switchmen not to handle the Pullman car, because it was empty, and it was not necessary for it to go. They thought it was proper to boycott the empty Pullmans. They refused to put Pullman cars on. That train stood there until leaving time. Then it started to pull out, and perhaps pulled four or five car lengths out, and some one ran down out of the office and turned the plug on the hind end of the air hose, and stopped the train. She was backed up to the depot, and stood there for a couple of weeks. As to the detention of train No. 4 on the 29th, Mr. Knox testifies, in substance, that Mr. Saulpaugh, the engineer, declined to go out on the train, and that the fireman also refused to go with the Pullman cars, and that this was the cause of its not going out.

Barry Baldwin, United States marshal, who was at Sacramento from the 1st of July until the middle of August, called for the United States, testified, on direct examination, upon being asked in what condition the tracks and the cars and engines in and about the depot at Sacramento were on the evening of Sunday, July 1st, that they were in great disorder. Engines were driven head to in places, and wheels blocked, and obstructions—cars—placed across the tracks. The cars were placed in such a manner as to impede the business. Saw no steam arising from any of the engines. They were in such a position that the trains and engines could not have free movement. Mr. Knox denies the truth of this statement, and in answer to the question: "Q. What was the condition of the yard?" says:

"It was simply trains had been run in there, and the men refused to put them away, because they would not work until those men had been reinstated, and they simply died on the track of their own free will. No one injured them at all. So far as any obstruction on the track, there were none at all, except that one block I spoke of under that engine to keep her from running down hill into another engine."

Mr. Baldwin further testified on his direct examination that the depot was constantly overrun with men; that it was in the possession of the strikers. Mr. Knox states that this is not correct; that the depot was in the possession of the railroad officials all the time.

Mr. Baldwin further states, in relation to the effort made on July 5th to couple the engine to delayed train No. 4, that it was standing on the track. It had come in there and had been stopped there. In the morning before commencing at all, he went to the mail car, and saw the postal clerk there, and made him open the car, and went into the car, and saw that the mail was there in the car, and that it was the mail that was ordinarily carried on that train, and had come down from the post office, and that is the way he ascertained. The crowd surged in through the depot. The crowd was heaviest around the engine, and standing in the way of the engine, and obstructing its coming up to the train. He had to get down and move them foot by foot to get the engine through. He got on the engine again, and it was moved up to the train, and, just as they reached the train, the crowd broke past and swept through the depot, and broke the train and rolled back the cars,—the passenger coaches. There were some seven cars rolled back. Possibly 500 people took part in rolling back these coaches. They rolled them back at once with their hands, without any difficulty, there were so many of them.

Greenlaw, a witness for the defendants, testifies: That he heard cheering and hollering down at the east end of the depot. That he went down there. That when he got there the Pullman cars had been uncoupled. That there was quite a crowd around Marshal Baldwin when he got there. That he saw they were trying to get at Baldwin, and he did his best to defend him. That a fellow—he thinks it was Jack Harris—picked Marshal Baldwin up and started to carry him out of the crowd. While he was up in the air on Jack Harris' shoulder he drew his revolver. He said, "Let me down." Jack Harris let him down on the ground, and he shoved the pistol up under Greenlaw's nose. Greenlaw states that he said: "Don't point that thing at me. I have been trying to defend you." Marshal Baldwin said: "I will shoot the first man that lays his hand on me." Just then Mr. Galliner broke into the crowd,—a great, large man,—and he said: "What's the matter, Marshal Baldwin?" or, "Baldwin." Baldwin said: "These boys won't leave me alone." Galliner then said: "Leave him alone. He is all right, boys. Go away and leave him alone." That the crowd then dispersed and went over to the depot and Third street bridge. Mr. Baldwin also further testifies: That on July 4th there were larger crowds at the Sacramento depot than on the previous day. Nothing had been done towards cleaning up the yard; no work had been done from the previous day up to that time. That an attempt was made on that day by the militia to take possession of the depot. That at the termination of the militia's efforts the depot was still in the possession of the strikers. That from that time on to the 11th of July, in the morning, the depot, grounds, and tracks and yards around the depot were in the possession of the strikers. The witness Greenlaw, called for the defense, contradicts Mr. Baldwin's testimony on this point, and states that there were more outsiders at the depot than there were strikers; that the strikers were doing the same that the crowd was,—looking on. No effort was made to

keep them out. They just stood there in the depot. He did not see the militia make any effort to get in. In relation to the stoppage of the movements of all trains between the 3d and 11th days of July, Mr. Baldwin states that there was nothing moved out (of the Sacramento depot) between those dates.

### Red Bluff.

The following testimony relates to the possession taken by the strikers of the yard, depot, and trains at Red Bluff:

Joseph C. Day, roundhouse foreman for the Southern Pacific Company at Red Bluff, called for the government, testified as follows: That he was roundhouse foreman at Red Bluff for the Southern Pacific Company in the months of June and July last; that he recollects an attempt to move the Sacramento local No. 12 from Red Bluff on or about the 29th day of June last; that it was composed of the day coach, smoker, and mail car; that he and Mr. Jones and Mr. Robb, the conductor, endeavored to move this train. After explaining the position of the train on the track by means of a diagram on the blackboard, he states:

"We were on the back of the mail car,—myself, Mr. Jones, and Robb. We set the levers to couple on. When we got very near there, Mr. Ray threw one of the levers down onto the coach, so that we could not couple it. There was Ray, Clodtfelder, and Shepler. He told us we could as well give it up. We had done our part, and they would do theirs. That we could not couple that train together. Clodtfelder was the man that made that remark. We stayed there and talked quite a while. Mr. Robb made the remark they were too many for us. We could not make it up. We would have to give it up. The engine stood there for about an hour, and the engineer brought her back to the roundhouse. The mail car stayed there a few feet away from the coach, not coupled."

J. P. Heaney, a witness called for the defense, testified: That he was a brakeman for the Southern Pacific Company in June and July last. That he belonged to the Brotherhood of Railroad Brakemen and the American Railway Union at Sacramento. That he went to Red Bluff on the 28th of June. The following morning (the 29th) he went to the depot. As he turned the corner he saw no engine there. He walked along leisurely, and when he got down to the depot he inquired why the engine was not out. He was told that a strike had been declared. He saw the fireman, and asked him what he thought about it. The latter said he did not know. The witness said: "Will we go, or will we not?" and he told the fireman that he would like awful well to go, but that he would hate to go into Sacramento and have the boys holler "Scab" at him when he got there. That he would not do that for all the jobs he ever saw. That they talked around there a little while, and finally concluded not to go out. He took off his cap and uniform and gave the job up then. He was told that they were obstructing the mail; that that was a mail train. In answer to the question, "Who told you that?" he states:

"I don't know. I think it was some of our men who spoke to me about it. I think it was Montanya and Harper. They said it was a mail train, and we ought to go on it. I says: 'All right. If it is a mail train, we will go.' I went down and says: 'I will go with the mail car, and nothing else.' I

told Mr. Jones and Mr. Robb so,—that I would go with the mail car. I spoke to the fireman about it, and asked him what he thought. He says: 'Yes, we ought to go with the mail, anyhow.' I asked him to get the engine. He started to get the engine, came down,—the train was in on the side track,—and I let the engine in, and went up and cut the mail car from the coaches, and backed the engine up on it, coupled on, and pulled out on the main line. Put my uniform on again, and told Robb and Jones that I was ready to go. They said that I could not go with that train; to put the whole train on, or there would be nothing go. I says: 'That is all I intend to go with. If you won't let me go with that, I won't go.' "

J. C. Shepler, called for the defense, admits that he was present upon the occasion, on the morning of the 29th of June, related by the witness Day. He states that he had nothing to do with the uncoupling the mail from the rest of the train,—the Sacramento local No. 12.

The persons Ray and Clodtfelder, who are implicated by Day in the uncoupling of train No. 12 on the 29th of June, were not called as witnesses.

Day further testifies, with relation to the stoppage of the Oregon express, train No. 15, on the 1st day of July: That he was not down at the train when she came in. After she was there a little while he went down. He saw the train had been cut in three different parts. This was somewhere about 9. He went down to the rear end of the train to see Mr. Kilburn. He saw the two sleepers were cut off and backed down over one crossing, the two coaches and a tourist car were cut in another section and standing on the crossing, and the two mail cars and engine standing in front of the depot, on the main track. At the south end there were two Pullmans; next came a tourist car, day coach, and smoker, and an express car and baggage car was with those coaches and smoker, and the next was two mail cars and engine,—one a mail car and the other a box car. Men were working there taking off the appliances for connecting the train. He saw Mr. Shade there at work; also saw Richard Roe, and a fireman of the name of Hill. Hill's first name is Joe. Mr. Heaney was around there. He did not see him doing anything. There was probably a couple of dozen around there. He saw Mr. Shade and Clodtfelder cut the hose and the Miller hooks behind the mail car. They did that in his presence, when he went down to get the engine to pull her up. He looked at the couplings in the afternoon. He saw the safety chains taken off, and the nuts and keys at the back of the Miller hooks had been taken off.

J. C. Shepler, the same witness whose testimony has been previously referred to on the part of the defense, denies that he assisted in taking any nuts or chains or bolts, or in any way interfering with the Portland express which came in on the 1st of July; that he saw no one in any way interfering with the couplings or brake chains, or any of the nuts or bolts connected with the train. He admits, however, that he saw a couple of chains lying on the ground there. He admits, also, that he was at the station when the train came in, and that there was a crowd about the train. He states that he does not know who uncoupled the train.

Joseph B. Hill, called for the defense, and the person referred to by the witness Day as the fireman who was engaged, with others,

in taking off the appliances for connecting the Portland express on July 1st, states that he was present when the express train came in; that there was quite a crowd about there. He denies that he ever did anything to prevent the coupling of the engine and mail car to the coaches of the Portland express.

J. P. Heaney, called for the defense, testifies that he was around the depot on the 1st of July when the Portland express came in, or shortly after it came in. He gives the following version of the uncoupling of the train:

"Mr. Jones came up there and wanted to know if we would put the train away. I believe I spoke up and said that we would put the train away if he would tell the engineer to obey our signals. He said he would. He went up there and told the engineer. After he told the engineer, we gave him a backup signal, and cut the train in three pieces, so as to clear the different crossings there. There are three crossings there that have got to be cut. If we would run the train all down there, we would stop the wagon transportation. We cut the train in three pieces, and let it stand there."

William H. Jones, agent and train master of the Southern Pacific Company at Red Bluff, testified that on June 29th an attempt was made to move the Red Bluff and Sacramento local. This train carried coaches, the ordinary baggage car, and a mail car. It carried no sleepers. This train is due to leave Red Bluff at 5:15 in the morning. He attempted to move the train. The strikers had cut the train in two,—cut the mail car off. He could not say who cut it off. He did not see them cut it off. He attempted to put it on again and start the train in regular form. Mr. Clodtfelder and Mr. Ray prevented him from coupling it. Mr. Day and Mr. Robb, the conductor, assisted him in trying to put that train together. Mr. Day is the foreman of the roundhouse. They backed the train together. He set the Miller hooks to couple; set one of them to couple, and stepped over to the other platform to couple the other hook. Threw the lever up, as it were. Clodtfelder held it and prevented him from doing it. Mr. Ray got onto the other platform and threw back the other lever, so that it would not couple. The effect of this was that they could not couple the cars together. They were endeavoring to couple the mail car and the coaches. The mail and express and baggage were all in the one car at that time. He knows that that train had not been cut in two in that manner under the authority of the company. At the time that he endeavored to put this train together, Clodtfelder told him: "You cannot couple this train. You have made your attempt. You have done your part. Now we will do ours." The witness told him that his overpowering force—there were 50 to 2 of them—prevented them from coupling it. There was quite a large crowd about at that time. They were all opposing the railroad. They sympathized with the men who were stopping the train. They refused to assist the witness in starting the train, although he called on quite a number of them. They said they would not move any trains until the matter was settled. Clodtfelder and Ray said that the mail car could go. He thinks it was Clodtfelder who said that, or Demmick. Demmick was one of the leaders. They said the mail car could go by itself; no other cars of any kind,—Pullmans or day coaches,—none but the mail car.

Knows a man named Joe Hill. He was a fireman. He was on strike at that time. He went to couple this train together on the morning of the 29th. Hill also took an active part in preventing that. As they started the engine and mail car to couple onto the coaches, Hill tried to apply the air. By "applying the air" the witness means that he opened the automatic air valve of the air hose at the rear of the mail car. That would set the brakes if there had been air enough on the car, but there was not enough pumped, and they went ahead.

As previously stated, Hill denies that he interfered with this train in any way.

It is to be noticed that this testimony of William H. Jones is corroborative of that of J. C. Day, the preceding witness.

### South Vallejo.

The following testimony related to the possession by the strikers of the yard, tracks, and trains at South Vallejo:

Michael Keefe, yard engineer for the Southern Pacific Company at South Vallejo, called for the United States, testified as follows:

"The engines and yards of the Southern Pacific Company on the 10th and 11th of July were not in a condition for service. All the engines were killed; there was no steam in them."

The same witness further testifies:

"The number of my engine was No. 1. It was a switch engine. Some men took the engine away from me. One of them was Thomas Kelly; another was named Laurie; another was named Smith; another Hale. These men ran the engine off an open switch. They ran it off the track. This was on Tuesday, July 10th; about that time. They then hauled the fire, let the water out of the boiler, shut the engine down, let the water out of the tank, and disconnected the hose."

It would be hard for him to state the particular parts each man played. He did not exactly locate them at the time, or what they were doing, because he was talking with them. He tried to get on his engine. He got on the side. They would not let him get on. He thinks it was Smith who would not let him get on. He prevented him getting on. Kelly was a fireman for the company up to the time of the strike. He was out on strike. Laurie also went out on strike. He was a fireman. Smith was a stranger to him. He was the man that came there. Smith and Hale were the ones that came to Vallejo and made that trouble. Does not know where Smith came from. Thinks Hale told him he came from Folsom. Thinks Hale said he was a baggage man, a train man. He did not say why he came to Vallejo. The same witness further testifies that on the following day, he thinks it was, engine 1,190 was killed at South Vallejo. She came from Calistoga that morning. She pulled a mail train. Does not think that there were any Pullman cars on that train. He saw the engine killed. He was on the engine. He ran the engine. Smith came there, with a good many others, and took the engine away from him, and killed it. They took it right

on the main track. They put the fire out, also disconnected the hose, and let the water out; also out of the boiler.

### San Jose.

The following testimony relates to the possession taken by the strikers of the depot, yard, tracks, and trains at San Jose:

James Hewitt, called for the United States, testified: That he was the engineer of the San Jose train No. 19, running between San Francisco and San Jose. That he left San Francisco at 5:10. Was due at San Jose at 7 o'clock in the evening. That it was a mail train, having a combination mail and express and baggage car. That it carried no Pullmans. That he arrived on time. Going into the yard, people rushed from the depot onto the track, and he had to stop. This happened about 400 or 500 feet this side of the depot. The people rushed up the track, and he had to stop or else run over them. Knows a man named McClintock, and also a man named Runyon. When he stopped, Mr. McClintock came up on the front part of the engine, and came through the window on the left-hand side. The window was open. He came in and stepped over to him, and says: "I will take charge of this engine, Jim." Then Hewitt said to him: "Harry, you have got the main track blocked. This is as far as I am going. Let me put this train on the side track and put the engine in the roundhouse." Mr. Runyon stepped up and said: "No, sir. We will kill her right here." During this time there was a deputy United States marshal on the engine with the witness,—one on each side in the gangway. They tried to keep the crowd off. They overpowered the one on the left-hand side. McClintock asked him what business he was doing there, or what he was doing there. He said he was a deputy United States marshal, and showed him his badge. At that time they were trying to get hold of the fireman. McClintock, after he asked him to show his authority, which he did, says: "We can't help that. Boys, take him away." They took the fireman off of the engine. That left the witness and McClintock and Runyon on the engine, and a lot of boys came up over the baggage car and came up on the tender. After that the witness had some conversation with McClintock with regard to putting the engine away and putting the train on a side track. He told him they had the main track blocked. It was not necessary to hold him there. Wells-Fargo's agent stepped up on the right-hand side, spoke to McClintock, and asked him to pull the train down to the crossing, where they could get out their express, mail, and baggage. He says: "All right. Boys, cut off the baggage car." Which they did, and pulled down to the crossing or over the crossing, right in the front part of the depot, and stopped the engine there. One of the gang says: "No one shall move this engine but McClintock." The witness sat down on the fireman's side, and took hold of the bell cord. They got down to the depot. McClintock told him he had better get off and go home; that he would not be responsible for his life. The witness said: "You never mind about my life. I guess I can take care of myself." They got the engine as far as they could get her.

W. S. Runyon, the person referred to by witness Hewitt in the testimony just quoted, was called on behalf of the defendants, and testified, in brief, that he was a locomotive fireman in the employment of the Southern Pacific Company in June last; that he belonged to the Brotherhood of Locomotive Firemen, and also to the American Railway Union; that he was a member of the executive committee of the American Railway Union in San Francisco; that during the strike he went to San Jose, on the evening of July 5th; that he went there of his own accord, to suppress any acts of violence or any deeds of violence that might possibly be committed there, as he understood there were some very troublesome people in that locality. His statements as to what took place at San Jose, and his connection therewith, in his own words, are as follows:

"I left San Francisco shortly after five o'clock of the evening of July 5th, and got onto the train here in San Francisco, and rode until we got to San José. As we were going in the yard at San José, the train slowed up slightly, and when about midway between the roundhouse at San José and the depot she came to a standstill. The people in the coaches commenced to get out. I, in company with a Mr. McQuade, of the Southern Pacific, got out. There was a large delegation of people on the tracks and around the depot. Q. What was done? State what you saw there,—what occurred. A. As I said, the train stopped. I got out, in company with Mr. McQuade, and stood on the outskirts of the crowd. They were doing a lot of scuffling around one place and another, and talking, and so on, and finally a remark was made that they would do Hewitt up,—the man who had charge of the train. I edged my way through the crowd. In the near vicinity I saw a number of men who had those white ribbons on their coat lapels. I said to them: 'I am what you ordinarily term a "striker," and a member of the A. R. U. As you are sympathizers with us, I should like to get your assistance to suppress any violence that might be perpetrated on Mr. Hewitt.' I got up to the engine, and, as I did, those gentlemen followed me. I says to Mr. Hewitt: 'You need not have any fear of doing you up, Jim. If I can possibly lend you any assistance, I shall certainly do so.' He was in a very excited condition; about as pale as my shirt bosom is at the present time. After a while the engine and the train was run down to a crossing or street just north of the depot. They stopped, and cut off all the coaches, with the exception of a combination car that they have for baggage and Wells-Fargo's matter. After they severed the connection between the baggage and smoker, the engine and baggage car went on the south side of the depot, to leave this here crossing clear. Mr. Hewitt changed his overalls. When he left his engine I stepped down behind him. As I did so, the other gentlemen who had the white ribbons on, and who I asked to accompany me, came along, and we walked alongside of Mr. Hewitt until he got through the crowd, and then he left. While he was walking through the crowd they jeered at him some, but there was no acts of violence. After Mr. Hewitt got away there was quite a number of men on the tender of the engine,—men and boys,—upon what is termed the 'running board.' I got them to disperse and leave the engine alone."

The witness admits seeing Mr. McClintock there at that time. The testimony of Mr. Hewitt as to what took place at the engine being read to him, he stated that some of the statements were correct and others not. He states that Mr. Hewitt suggested putting the train on the side track. He testifies that the statement said to have been made by him, viz.: "No, sir. We will kill her right here,"—is false. He states that there were several thousand people at that time there. In answer to the question: "Q. Hewitt states here that you and McClintock were trying to get hold of the fireman,"—he replied: "He is a liar. I did not. I had nothing to do with the fireman, and

did not see any one pull him off the engine at all. The fireman was off of the engine five or six minutes before I got on the engine."

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (2) "by causing to be assembled, and by assembling with, large crowds of persons in said depots and yards of said Southern Pacific Company, at various points and places on said lines of railway, in said state and Northern district of California, and by gathering in great numbers in said yards and depots, to wit, * * * and other places around, in, and upon the trains, cars, engines of the Southern Pacific Company, and upon the tracks of the railways, preventing the movement and passage of said engines, cars, and trains."

### Sacramento.

The following testimony relates to the assembling of crowds at Sacramento:

Felix Tracy, the agent of Wells, Fargo & Co., testified on direct examination: That there were no trains moving after the 29th of June. He saw a good many men down there at the station that were not at work,—railroad men. He saw them there, and he saw them in other parts of the city. There were more people at the depot from the 28th or 29th of June, up to the time of the United States soldiers going there,—some time about the 10th or 11th of July,—than usual, a good many more than usual. There were more there on the 3d of July, more there on the 4th of July, than it was customary to see there. He noticed that whenever he went down there. It will be remembered that Mr. Baldwin's testimony that there were crowds around the station is to the same effect. On the other hand, Mr. Knox denies emphatically that the depot was in the "possession of the strikers."

Mr. Baldwin, United States marshal, testified on direct examination that the station and the tracks were overrun with people,—people in the caboose and cars, and around them, sitting on the steps. Mr. Knox admits this, but denies that he or his committee of the American Railway Union had anything to do with their coming there.

James Sims, called for the defendants, testified that the American Railway Union committee used one of the cars as an office on the 29th of June.

Mr. Baldwin further testifies, as to the crowd around delayed train No. 4, on July 3, 1894, that they were on the track and across the track, and they would not move out of the way of the engine. He had to get down from the engine and get in front of the engine and push them back and move them back, and the engine came foot by foot. They were threatening, and one man threw a rock at them. The same witness further testifies that he was at the depot subsequent to July 3d, and that the strikers continued to occupy the depot grounds. Being asked how he knew they were strikers, the witness stated that there was a crowd there. He was around among these men, and they were constantly informing him that they were strikers,—that they were employés of the railroad

company out on a strike. He was constantly talking with them, and walking among them, and they would address him and talk about the disturbances. That is the way he ascertained that they were strikers. The crowds never left. There was always more or less of a crowd of men there, night and day. With reference to the character of the crowd that was there late in the afternoon of the 6th of July, he states that they were strikers. Some of them said they were there to protect the property of the railroad company, and take care of it; and they were around on the cars, and it was the same crowd in character, except that they were men. The cars of the railroad company were being occupied by men, by strikers. Some of them were occupied apparently for sleeping quarters. They occupied cabooses on the tracks in the yard.

Thomas Compton, one of the mediation committee at Sacramento, called for the defense, testified that they "had our men stationed from one end of the yards to another, to see that the men did not get excited and do any damage to the property, and requested other men who came in on trains not to go out any more."

C. E. Leonard, a city trustee of Sacramento last June, and in the employ of the railroad company before the strike, testifies that there was a very large assemblage of people at the depot of the railroad company on the 3d of July.

### San Jose.

The following testimony relates to the assembling of crowds at San Jose:

Frank Arnold, a railway postal clerk on the route from San Francisco to San Luis Obispo, testifying as to the crowd at San Jose, says on direct examination that there were several thousand people around the train that came in on July 5th. They were all around the train,—inside of it, on the platform, swarming all over it. On cross-examination he says that they were occupying all the spaces in the depot, on the railroad car platforms, and so on.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (3) "by threats, intimidations, personal assaults, and other force and violence, to prevent the engineers, firemen, conductors, brakemen, switchmen, and other employés of said Southern Pacific Company from discharging their duties, and from moving and operating the said engines, cars, trains, and railways."

### Sacramento.

The following testimony relates to threats, intimidations, and acts of violence at Sacramento:

Mr. Baldwin, speaking of the strikers at the Sacramento depot on July 3d, testified on direct examination that they were threatening, and there was one man that threw a rock at them. It struck the cab of the engine, just below where Mr. Clark was standing—between Mr. Clark and himself. He further testifies that there were crowds around the semaphore. The crowd was demonstrative at this time. There were men threatening them as they took the engine through,—hooting. He recollects one man saying, "I will fix you." He seemed

to be particularly addressing himself to the witness that time,—the people on the engine. Heard expressions of anger and defiance. They were angry.

Respecting this testimony of Mr. Baldwin, Greenlaw testifies that there was a good deal of yelling there. Some were "hollering." But he did not hear any threats made. He did not see any forcible means used to prevent the taking out of the train. No threats whatever were made towards Mr. Baldwin. He denies that he incited any people to do anything that day, or that he threatened Mr. Baldwin, or any one. He admits that he called some persons on the engine "scabs," but denies the statements imputed by Mr. Baldwin, in his testimony, to him.

While it is to be observed that Mr. Baldwin was not an employé of the railroad company, yet the testimony, if true, is significant with respect to the actions of the crowd towards Clark, the engineer, and the others on the engine.

Anthony Green, called for the defense, testified that he was captain of police of the city of Sacramento, and was such in June and July last; that he was present on the 3d of July at the depot; that he himself saw no acts of violence committed, but he admits, on cross-examination, that he did not see the cars actually shoved back by the crowd. He testified that he heard the crowd yelling at those who were in the cab of the engine that was being moved from the round-house to the delayed train No. 4; that such exclamations were used as follow: "Don't you go out;" "Don't you take that train out;" "Stand by one another;" "Don't be a scab;" "Don't take the places of those men who are working;" "Come out of there;" "Don't you take that engine out;" "Don't fire that engine;" "I appeal to you as a man;" "Come down out of there;" "Don't go out,"—and such questions as those, appealing to them; that he was in the cab himself several days, mornings and nights; that he stood in the first one.

## Red Bluff.

The following testimony relates to what occurred at Red Bluff:

Joseph C. Day, roundhouse foreman for the Southern Pacific Company at Red Bluff, testified that he was not at liberty to go on the engine. He was told to keep away from the engine and let it alone. A brakeman by the name of Harper and two or three other men told him that. He does not know them. He thinks Harper was on strike. He was out with them. This occurred, according to the witness' testimony, on July 1, 1894. The same witness further states, after describing how engine 1,248 was killed by Van Devinter, Richard Roe, and Harper, that he had a conversation with Van Devinter about the matter. He told him he was doing very wrong, and Van Devinter said he did not think it was any of his damned business what he was doing. They told him if he did not get out of the round-house they would have him carried out on a board. Harper made that remark. Richard Roe and Van Devinter, and one or two others he did not know, were present. This was at the time they were killing engines.

### South Vallejo.

The following testimony relates to what occurred at South Vallejo:

Jeff Gage, passenger conductor for the Southern Pacific Company, running out between South Vallejo and Santa Rosa, whose engine was killed, testified as follows: That on the 12th day of July last he was stopped between North and South Vallejo, and his engine killed. This was near 7:30 or 7:35 in the morning. It could not have been far from that. He was running the train,—conductor. He left North Vallejo, and between North and South Vallejo he found an engine on the main line. The engine was called a "killed" engine,—no steam in it. As they pulled up near that engine, a crowd of men came out and fixed theirs the same way. They were obliged to stop by this "dead" engine. He thinks he must have been very near on time. He makes connection, with passenger and mail cars, with a boat that runs between North and South Vallejo and Vallejo Junction. At Vallejo Junction connection is made with the San Ramon passenger train. It is a mail train that runs between San Ramon and the Oakland pier. He asked a man named Smith to let him couple on and push the dead engine on the siding, so that he could get the train down to the depot. This man refused to do it, saying he was there under orders, and had to obey his orders to stop the train where it was. Smith showed him a card with his (Smith's) name on it,—an A. R. U. card.

William James, fireman of one of the Alameda local trains, testified, in answer to the question, "Did you have any trouble at tower No. 2 that day?" as follows: "The train was stopped by a mob of men, and I was taken off the engine." He further states that about 75 or 100 men got in front of the engine. The engineer stopped when they gave him the stop signals. The crowd, all of them, gave signals,—all those that were on the track. He could not see who they were. They took him through the crowd, and wanted him to go and join the A. R. U. They took him half way to the roundhouse, he would judge about 400 feet. Engineer Willard came out and told them it was a free country, and he would go where he wanted to, and with that they let go of him.

Many witnesses on both sides have testified as to the personal assault claimed to have been made on Mr. James. The testimony is contradictory as to what actually took place at that time. I think, however, this feature of the case is sufficiently fixed in your minds to enable you to determine the actual facts of the case without any extended comments from me.

(With the usual admonition to the jury, an adjournment was here taken until to-morrow, Tuesday, April 2, 1895, at 10 o'clock a. m.)

### Tuesday, April 2, 1895, at 10 o'clock a. m.

When the court adjourned last evening, I was directing your attention to testimony tending to show the means conspired to be used in carrying out the conspiracy. First, I called your attention to the testimony tending to show, or to disprove, that the con-

spirators forcibly took and kept possession and control of all yards, depots, tracks, and trains of cars on said lines of railway, and forcibly held and detained the same; second, that they caused to be assembled, and assembled with, large crowds of persons in said depots and yards of said Southern Pacific Company at various points and places on said lines of railway in said state and Northern district of California, and by gathering in great numbers in said yards, and depots, to wit, * * * and other places, around, in, and upon the trains, cars, engines of the Southern Pacific Company, and upon the tracks of said railways, preventing the movement and passage of said engines, cars, and trains; third, that by threats, intimidations, personal assaults, and other force and violence, they prevented the engineers, firemen, conductors, brakemen, switchmen, and other employés of said Southern Pacific Company from discharging their duties, and from moving and operating the said engines, cars, trains, and railways. I will now proceed to direct your attention to the testimony tending to show other means conspired to be used in carrying out the conspiracy.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (4) "by forcibly disconnecting air brakes upon such trains,—mail, passenger, and freight."

### Red Bluff.

The following relates to what occurred at Red Bluff:

William H. Jones, agent and train master of the Southern Pacific Company at Red Bluff, testified on direct examination that the Oregon express reached Red Bluff about 4:30 or 4:35 in the morning of July 1st last; that it comes from San Francisco,—Oakland. Portland, Or., is its destination. She was on her regular trip. She was stopped at Red Bluff. The train was cut in two. The train came into the station, and they cut it in two; that is, they uncoupled it and uncoupled the hose. He was just passing there. He did not see the man who did it. There was a mob of men there. He elbowed his way through the crowd. As he passed, he heard the air holes pump as they do when they are open. The air was cut behind the mail car. The local cars followed first, then the baggage car, the express car, smoker, coaches, and Pullman. That is the way the train is made up. They all follow the mail car. They were all in the rear of the part cut off. The effect of that cut was to stop the movement of the train. That was about 5:30, a few minutes after they arrived.

Without repeating the testimony given by the defense, it is sufficient to say that the witnesses on their behalf, with reference to the Red Bluff occurrences, deny having had anything to do with the stoppage of the Portland express.

### South Vallejo.

The following testimony relates to what occurred at South Vallejo:

Michael Keefe, yard engineer of the Southern Pacific Company at South Vallejo, testifying as to what occurred to his engine on

July 10th, says that they hauled the fire, let the water out of the boiler, shut the engine down, let the water out of the tank, and disconnected the hose. They ran the engine off the open switch. The testimony of this witness respecting what occurred to engine 1,190 on the following day has already been referred to under a previous head.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (5) "by putting out the fires in the engines, and drawing the same."

### South Vallejo.

The following testimony relates to what occurred at South Vallejo:

Jeff Gage, passenger conductor for the Southern Pacific Company, running between South Vallejo and Santa Rosa, whose engine was killed between North and South Vallejo on July 12th, called for the United States, testified, with reference to putting out the fires on his engine, as follows: That on the 12th day of July last he was stopped between North and South Vallejo, and his engine killed. They pulled the fire out of the engine. They shut the water off first in the tank valve, and started to pull the fire out. He asked them to turn the water back first, and then pull the fire on the engine, which they did. He asked them to do that to keep from burning the engine. The effect of letting the water out of the engine with the fire in it, he thinks, would be apt to burn the bricks considerable.

### West Oakland.

The following testimony relates to what occurred at West Oakland:

C. F. Hall, general foreman of the railroad shops at West Oakland testified that a number of engines were killed in and about the shops in the latter part of June and early part of July last. He could not give the numbers. There were 8 or 10 engines with fire in them, and the fire was let out of them, and all the engines were emptied that were full; that is, all the engines that were about the place were emptied of water,—water let out of them. This was done by the strikers.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (6) "by throwing switches, in order to prevent the passage of such trains through depots and stations."

### Red Bluff.

The following testimony relates to occurrences at Red Bluff with reference to delayed train No. 15 on July 3d last:

William Jones testified as to the throwing and spiking of switches as follows: That, after the Portland express which arrived at Red Bluff on July 1st stood there a while, the engineer said he wanted coal, and Mr. Day, the foreman at the roundhouse, and the witness, took the engine and the mail car, as it was coupled on,—two mail cars,—there was a freight car which they said contained mail.

It was with the mail car. It had United States mail locks on it. He did not see the inside of it. Mr. Monteith: "We will admit that car had mail." The witness, continuing, stated that they took it to the coal pile to give the engine coal. They passed over one of the switches in the yard, and while they were gone the switch was thrown and spiked to the side track, so that when the train backed down it could not back to the balance of the train. It was forced to go to the siding. The switch was opened. It was thrown off the main track to the siding, and spikes driven to hold it there, and the switch blocked. They could not have passed over it if it had been spiked. It was a switch in which the car could not go off the track. They could not have gone over it. It was not the case. The target was in its proper place and position. No orders were given by the railroad company for either the spiking of the switch or locking the switch. Such orders would come through him.

Charles F. Cadwalader, called for the United States, testifies that he saw Hehorn, Shade, Ray, and others spiking a switch on July 1, 1894.

W. H. Winter, also a witness for the government, testified that he saw the switch spiked, but the only person whom he can identify as having participated in the spiking is Hehorn.

Milton D. Clark, called for the United States, testified that he saw the spiking of the switch. He identifies Hehorn as the person who held spikes in his hand; Shade is the man who drove in the spikes; and that Ray was in the crowd with them.

John Kelly, a witness called for the United States, also testifies as to the spiking of the switch. He states that he was a member of the American Railway Union; that he was a fireman for the Southern Pacific Company; that he went out on strike at Red Bluff; that he did so because he was a member of the American Railway Union. He identifies John Shade as just in the act, when he saw him, of leaving with a spike-hammer and a couple of spikes in his hands. This switch, he states, connected with the main line. There were 30 or 40 men around there at that time. He gives the names of others, besides Shade, who were in the neighborhood of this switch, as Peter Ives, S. P. Roller, Jack Shepler, and Clodtfelder. He states that Roller locked the switch after it was spiked. As to the relation these persons bore to the strike, the witness testified that Roller was a brakeman, and that he was on strike at that time. He was an A. R. U. man. Ives was a car foreman up there. He was also on strike and an A. R. U. member. Clodtfelder and Shepler were on strike at that time. They are members of the A. R. U. Knows a man named Demmick. Knows a man named Harper. He (Harper) was there that morning. He is a brakeman, and a member of the A. R. U., and out on strike. Knows a man named Heaney. He did not see him there.

The persons referred to by the witnesses for the prosecution as having participated in the spiking of the switch, which prevented the engine and mail car of the Portland express from getting back to the passenger and Pullman coaches, or, more strictly speaking, those

who have testified, deny that they have been guilty of the acts charged, or did anything in any way which contributed to the spiking of the switch.

### South Vallejo.

The following testimony relates to what occurred at South Vallejo:

Michael Keefe, yard engineer of the Southern Pacific Company at South Vallejo, called for the government, testified that on July 12th last he was making up a passenger train for Calistoga and the vicinity; that it was a mail train, and that it did not carry any Pullmans. He took the engine and made up the train with it, to get ready to go out again. He was going to the roundhouse with the engine. He saw a gang of men. He thought that he would get to the shops before they took the engine away from him. The switch was set for the side track. He would have got to the shop, he thinks, but this man closed the switch on him, so he stopped. Had he gone on he would have run off the track. It was an open switch. The crowd remained there. The engine was killed after that, and was there a day or two.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (7) "by opening drawbridges over navigable and other streams, upon which drawbridges the tracks of said railways were situated."

### Sacramento.

The following testimony relates to what occurred at Sacramento:

T. W. Heintzelman, a master mechanic in the employ of the Southern Pacific Company at Sacramento, called for the United States, testified that he experienced some difficulty, on June 29th, in attempting to get train No. 4, which is a mail train, and came from Ogden, out of Sacramento,—in attempting to get her through. He testifies that he was requested by his superintendent, Mr. Wright, to back up the engine and mail car and express car,—he thinks it was coupled to the engine,—to couple on to the balance of the train that was left in the upper yard, and pull it down the depot. He did so. While pulling the train down in the depot, something was thrown at him while he was on the engine. After he saw what it was,—it proved to be a monkey wrench,—he got the train down to about its usual stopping place, and stopped there. After considerable persuasion he got the engineer and a fireman on the engine, and got the train started. The train had not moved a great ways—about 50 yards—when the drawbridge was swung open, and the train had to stop. This is the drawbridge across the Sacramento river. There was no vessel in sight to occasion the opening of the bridge. It was opened only for the purpose of stopping the train at that time. There was quite a crowd running down by the drawbridge just prior to the time it was opened.

Mr. Knox gives the following version of what transpired respecting the opening of the drawbridge: He says that on the morning of the 29th No. 4 came in. He guesses she got in about 6 o'clock, —somewhere around there. She came in with an engine, mail, bag-

gage, and express car. He went to Mr. Saulpaugh,—he was the engineer that was going out on that train,—and asked him if he was going to do any switching there. He said no, he was not; they would have to get some one else to do their switching. Mr. Wright came down there when they were talking, and asked him if he would back up to Sixth or Seventh street, he believes he said, and get the balance of the train. Mr. Saulpaugh suggested that it would be a pretty good idea to get Mr. Clark or Mr. Heintzelman to do that. They sent for Mr. Clark. The witness here stated that before this strike was ordered it was an understood thing with Mr. Wright and the committee that they should do all in their power to prevent any damage being done. On his (Wright's) side he was to give them permission to talk to the crews, engineers, conductors, firemen, and brakemen, and see if they could induce them to stay with them. When Mr. Clark came over they had the right to talk to him to see if they could induce him not to back up to get the cars. After they talked with him a while he turned around and said he did not want any of this in it. They simply asked him if he wanted to scab on his own son. His son was working there. He said he did not want to have anything to do with this, and turned around and went away.. Heintzelman came, after some time, got up on the engine, and the first thing Knox saw was a monkey wrench coming out of the engine, which pretty nearly hit him. They backed up. While they were up there, he, with the balance of the committee, went through the shops, to notify the men that the strike had been decided on. While they were going through the shops a man was sent over after them to tell them that the drawbridge was open, and to ask them to come and see if they could not get it closed. He ran over there, and sent some men out in a boat to close the bridge,—Mr. Hatch and Mr. Jefford, and two or three more. They closed the bridge, and he went back and told Mr. Saulpaugh that the bridge was closed. After the bridge was closed, he told Mr. Hatch to go up to Mr. Wright's office and get a lock,—a Yale lock,—and put it on there, so that the bridge could not be opened. Mr. Hatch went and got the lock and locked it on the bridge, so that they couldn't open it.

Both Hatch and Jefford corroborated Knox with respect to the latter's statement that he sent them to close the bridge, and Hatch, further, as to the lock being procured at Knox's instance, and being placed by Hatch on the bridge.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (8) "by burning and destroying bridges, trestles, culverts, over which such trains necessarily and usually would pass."

### Trestle No. 2, Near Sacramento.

The following testimony relates to the wreck of train No. 4 at trestle No. 2, near Sacramento:

Mr. Baldwin, who saw the wreck of the delayed train No. 4 at trestle No. 2 about two hours after it occurred, testified on direct examination that the baggage and mail cars were off the track. When he says "baggage," it might have been express cars with the baggage.

One mail car was badly damaged; also a baggage car badly damaged; also two mail cars slightly damaged. These cars were on the side, smashed over. Some of them had reached the water. He made an examination of the trestle. The engine apparently had gone probably three or four car lengths before it went off the trestle. The trestle is about 300 or 400 feet in length. He found that the east end of it, especially the north side, was badly smashed in, as though the bridge had been weakened and smashed down; the bents slivered up, the ties all broken very much more on that end of the bridge than further along, right at once where the engine struck the bridge. The trestle was very badly crushed in on the east side, towards Sacramento, immediately where it joins the track, the embankment, two or three car lengths from where the engine lay in the water. Then the train lay all along the trestle on to the embankment. The trestle, where it joined the embankment, was very badly slivered; there was only a piece of about six or eight inches where the ties were solid enough to walk on. The trestle was all crushed in below the ties at that corner.

The testimony of Mr. Baldwin tends to show that the trestle was blown up, and that delayed train No. 4 was wrecked. I will not take up your time in reading to you all the testimony introduced by the prosecution tending to show that the trestle was blown up by members of the American Railway Union, and was a part of the conspiracy to obstruct and retard the mails, and restrain interstate commerce, nor such testimony as has been put in by the defense contradictory of such design, or as to the participants engaged in such affair, or as to being or playing any part in the policy or plan of the members of the American Railway Union in carrying on the strike between themselves and the Pullman cars. The details of this unfortunate catastrophe, as told by the witnesses on the stand, are doubtless fresh in your minds. The testimony tends to show that a train was made up in Sacramento on July 11th last for Oakland, to be sent by the way of Davisville. It left Sacramento a few minutes past 12 o'clock, under charge of Conductor Reynolds, with Samuel Clark as the engineer and Danicamp for fireman. On the train was Postal Clerk J. A. Brown, in charge of the United States mail. Lieut. Skerrey and a number of United States soldiers were on the train for its protection, some of the troops being on the engine. The train consisted of four mail cars, baggage, passenger coaches, and a Pullman. About two miles west of Sacramento, in crossing trestle No. 2, the engine and four of the cars were thrown from the track into the slough. Clark, the engineer, and four soldiers were killed. The jurisdiction to try and punish the parties who were guilty of murder in this dastardly affair belongs to the state. It is only for you to ascertain who were the parties to the conspiracy that brought about this terrible result, that you may determine who were responsible for the minor offenses involved in the stoppage of the United States mails and interstate commerce. You will recall the testimony of the boy Sherburn, who drove the wagon carrying Worden and others out to a point near trestle No. 2 just prior to the time

the wreck occurred, and the testimony of Knoblauch, Reed, and Winney as to the declarations and conduct of the parties who, the testimony tends to show, were sent out by the American Railway Union along the line of the road, and for a purpose.    What was that purpose?    To guard the road, or to wreck that train?    It is for you to determine.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (9) "by loosening, removing, and displacing the rails of the tracks of said railroad."

### Trestle No. 2, Near Sacramento.

The following testimony relates to the track at trestle No. 2, near Sacramento:

Mr. Baldwin, who testified that he saw the wreck of delayed train No. 4 shortly after the catastrophe, testified that he made a little diagram of the position of the rails.    The north rail was swung over across the south rail.    It apparently had been forced over, lifted over.    He found there, right at the joint a nut, three washers, and two spikes.    They were loose.

### Red Bluff.

The following was testified to as having occurred at Red Bluff:

Joseph C. Day, roundhouse foreman for the Southern Pacific Company at Red Bluff, testified that the spikes and the bolts were pulled out of a rail on the main line.    This was between 1 and 2 in the morning of July 1st last.    He went to the coal bin, just a little ways from the turntable, to see if the coal bin was all right, and there were four men right across the other side of the fence, working at the rail.    They had shovels there.    He went to the turntable, and stood there talking to the fireman, when the four men came down with those tools in their hands.    They came right from the direction where the rail was tampered with.    He could hear them working with shovels, scratching away dirt and covering it up.    He was not there more than a couple of minutes.    He went back to the roundhouse.    He saw John Shade, John Salstrum, Robert Lang, and George Werhing coming from this direction.    Mr. Shade had a claw bar in his hand.    Salstrum and Lang had a shovel apiece.    He did not see anything in Werhing's hands.    A claw bar is a long bar made in the shape of a claw, for drawing spikes.    He examined that rail an hour afterwards, and found the spikes pulled from a rail and a half, the bolts taken from the fishplates and left lying on the ground. He put the bolts back himself.

J. F. Heaney, called for the defense, who was at Red Bluff on the occasion detailed by the preceding witness, with reference to the displacing of the rail states that he may know John Shade, Salstrum, Lang, and Werhing, but he does not know them by name; that he is pretty sure that they did not belong to the A. R. U. at that time; that they had no connection with him there.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (10) "by greasing the rails."

## Red Bluff.

The following testimony was given as to what transpired at Red Bluff with reference to greasing of rails:

John Kelly, a fireman employed by the Southern Pacific Company prior to the strike, but who went out with the A. R. U., testifies on direct examination, as to the part he took, with other members of the A. R. U., in greasing the rails north of Red Bluff, that on July 1st, at about 3 o'clock in the morning, he was about four miles north of Red Bluff; that he was greasing the track; that there were with him Bill Ray, Joe Hill, Clodtfelder, and Archie Montanya; that Montanya is a member of the A. R. U.; that he was on strike; that they went about four miles further than Red Bluff, and greased the track, coming towards Red Bluff, for about three miles. This was done with engine oil. Both rails were greased. They just rubbed it on. There is a down-hill grade from Red Bluff, going north, for about a mile, and then for about three miles it is up hill. It is a pretty steep grade. They got the oil with which they greased the rails from the roundhouse,—from the oil tanks. They had oil cans from the engines, and buckets with which to carry it. They got through greasing about 4 o'clock. There was not any oil left in one of the tanks.

The witnesses J. C. Shepler, William Sheehan, and J. B. Hill all deny that they participated in, or know anything about, the greasing of the rails as testified to by the witness Kelly.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (11) "by stopping trains upon railway crossings, and upon switches, and by forcibly refusing to allow such trains to be hauled from such crossings and switches."

## Sacramento.

The following testimony was given as to what took place at Sacramento with reference to obstructing one of the railway crossings:

C. A. Newton, night yardmaster for the Southern Pacific Company, called for the United States, testified on direct examination that the three main tracks leading into the Sacramento depot were blocked with trains and engines from the 1st to the 11th of July,—blocked east, west, and south. One of the tracks leads in off the Western Division, called "South"; one leads off the Sacramento Division, called "East"; one leads in from the California Pacific, "West,"—that is called the "California Pacific Division." These tracks lead both in and out. The roundhouse is situated north of the depot. There are several tracks leading from the roundhouse to the main track. There is one track direct to the roundhouse from the main track, that one can go to the roundhouse straight from, without doing any switching. There is another track that one can switch in off the main track, and there are several switches to throw to get to the roundhouse. All of these tracks were blocked between the 1st and 11th of July. By "blocked" he means trains and engines were on the tracks. The engines were dead; they had no steam in them. Some of the trains were made up, and some of them, that were coming into the yard,

that were stopped on the main track. On Sunday, the 1st of July, the yard was in such a condition that trains could not pass through the Sacramento depot east or west. He knows the exact condition of the tracks on the 1st of July last. The main track from the west had, on the crossing leading to the roundhouse, No. 4 engine, just about to enter the crossing to go to the roundhouse. Then there was an engine that came in on No. 69, on the 29th of June. Both pilots came together right on the crossing. That blocked the main track to the roundhouse and another track, that we used to let freight trains up and down on, called the "old main track." Crossing Washington, which is on the other side of the river, in Yolo county, the coaches, the smoker, and the mail car and the baggage car stood there in Washington. One of the coaches was shoved part of the way in on a siding, and the other coaches run down against it. That blocked that track. On the Western Division there were some three or four freight and passenger trains down on the main track, mixed up, part on a siding and part on the main track. On the Sacramento Division the cars were sandwiched in every way,—off the track and on the track, coaches among sleepers, and fruit cars, and everything else. That made the blockade complete. As night master he has control of the movement of all trains and engines in the Sacramento yard.

The testimony of Greenlaw, Compton, Knox, and others is to the effect that they had nothing to do with this obstruction, and that the American Railway Union did not countenance, nor was in any way responsible for, it.

Another of the means alleged in the indictment to promote, carry out, effect, and execute the conspiracy is (12), "by compelling the employés of said railroad company to leave their trains, shops, and the work of said company while in the performance of their duties."

### Oakland.

The following testimony relates to what occurred at Oakland:

C. F. Hall, general foreman of the railroad shops at West Oakland, called for the United States, testified on direct examination that men in his shops were prevented from doing any work. He cannot name any of the parties who prevented his men from working, but they had a machinist working in there, with a helper, and they were taken out by a crowd that came in there. He could not now recognize any of the faces of the crowd. The same witness further testified that the crowds that came in took out the men that they had to work there,—pushed them out of the shops,—they took hold of them with their hands and shoved them out. Cannot name or designate or identify any men who were forced out of the shops, who were forcibly prevented from working. Cannot identify the men by their employment in the shops. This was on the 4th of July. He saw four men pushed out. He saw the stationary engineer taken out. He was surrounded by a gang that were forcing him out,— telling him to get out. They put their hands on him. Referring to the persons who thus prevented the men in the shops from working, the witness stated that one would not see the same parties there

every time. In the forenoon there were probably 150 or 200 men. In the afternoon, about 4 o'clock, he should judge about 300 came in, and so it was. There were small bodies coming in frequently. These crowds were composed partly of strikers,—he would not say largely.

## Red Bluff.

The following testimony relates to what occurred at Red Bluff:

William H. Jones, agent and train master of the Southern Pacific Company at Red Bluff, called for the United States, testified that on the 4th of July he did not remain in the continued occupancy of the telegraph office at Red Bluff. The telegraph office is his office. It is under his charge. It is the railroad office, the railroad wires doing the business of the railroad company. Mr. Clodtfelder and Mr. Demmick took possession of the office, and ordered him and his operator out. This was at 9:30 of the morning of the 4th of July. He asked them what for. He was told, "We have decided to close this office, and we want you to get out," and they locked it up. He immediately had the operator cut out the instruments, and locked the office and left. Both Demmick and Clodtfelder are operators, and have run both stations. They were on the strike at the time. Before the strike they were brakemen. He regained possession of the telegraph office at 6 o'clock in the evening. They, Clodtfelder and Demmick, opened it for their own use at about 1 o'clock. He was notified that he could come back to the office. Mr. Harper, another brakeman,—a striker,—also a leader, notified him that they had opened the office for their own benefit, or their own use, and he could come there and see nothing was disturbed. He did so. He went down after about half an hour. Mr. Demmick and Mr. Clodtfelder, Mr. Shepler, Mr. Heaney, came in at one time. Those that remained there all the time were Clodtfelder and Demmick. They used the office. His operator was telegraphing for them. The lines were working, and they were using the keys. Clodtfelder and Heaney both told him he could have possession of the office. Then he took possession. The night operator comes on at 6 and they took possession of the office until probably half past 9 or 10 of the evening, when another gang came in and said they had decided to close the office, and out they went. The other gang were Frierson and Roller. Both were brakemen. They were on strike. He thinks there were others there with Frierson and Roller at that time. There were about 17 there after the station train had left for Sacramento,—about 15 or 17. He does not recollect who was there particularly, but those two men came to the office. They said: "We have decided to close your office." He asked, "For what reason?" They could not give any reason at first. They went out and consulted together, several of them, outside on the platform. They held a meeting. They came back, and he said, "Have you decided why you are going to close me up?" or "that you are going to close me up?" They said, "Yes, we are going to close you up for the same reason that you were closed this morning." That is all the reason they gave.

J. C. Shepler, called for the defense, admits that the telegraph office was taken possession of by the men who were out on strike that day, and that he may have been there while it was in the exclusive control of those men, but he denies that he, with others, put Jones out, or told him he had to get out.

Finally, the indictment charges that it was sought to promote, carry out, effect, and execute the conspiracy "by using all such other forcible means as to them should seem expedient to prevent for an indefinite period the use of the said railway for the transportation of the mails of the United States and interstate commerce."

### Red Bluff.

The following testimony relates to Red Bluff:

### Miller Hooks.

John Kelly, previously referred to as one who went out on the strike at Red Bluff, and who had been previously employed by the Southern Pacific Company as a fireman, called as a witness for the government, testified on direct examination that he recollects train No. 15 coming into Red Bluff about half past 4 (of July 1st last). The train was prevented from going on. The bolts were taken out of the Miller hooks. He only noticed Will Ray, Richard Roe (Joe Hill) engaged in doing this, and he was there himself. He noticed what they were doing. These men whom he has mentioned were members of the A. R. U. They were among the strikers. They took the bolts out of the Miller hooks, so that they could not pull the train, and marked them all, and put them in a sack.

Joseph B. Hill, the person referred to in the testimony of the witness Kelly, just quoted, was called for the defense, and stated that he was present when the Portland express came in; that he did not see any safety chains or brake chains taken off, nor did he see any one at work taking off bolts or nuts from that train. He states, however, that all this could have been done without his knowing it; that there was quite a crowd around the station at the time the train came in. He states that he did not see Ray there, nor Richard Roe.

### Dunsmuir.

The following testimony relates to Dunsmuir:

### Ejected from Telegraph Office.

James Agler, superintendent of the Shasta Division, from Red Bluff to Ashland, Or., called for the United States, testified as to his being dispossessed from the telegraph office at the station as follows: That he has a telegraph office at the station at Dunsmuir; that on the 4th of July, from 10:30 until 12:15 p. m., he was dispossessed. After detailing how a crowd of 30 or 40 strikers rushed into the office, the witness states that Conductor Seyler was the man who did the talking. He said: "We are in here, and we have got to have this office." He (witness) said: "I don't see how you can

do this." Seyler replied: "We have got to have it." That it looked a little shaky. Agler told the dispatcher: "You had better go home. It seems they want the office, and I guess they are going to have it." He went out. Agler passed out, and went upstairs to the resident engineer's office, and was upstairs there 25 or 30 minutes. The witness then goes on to state who was there, and whether those persons had been in the employ of the railroad company. To the question, "Q. Were these men who came into your office at that time then in the employ of the Southern Pacific Company?" he answers, "A. No, sir; they were not. Q. Of what class was the crowd made up? A. Employés; train men, car men, machinists of all the different departments. There was a large crowd of them. A Juror: Q. Men who had been in the employ of the company? A. Yes, sir. Q. They were not at that time? A. No, sir." The witness further states that after going upstairs he saw these people get the engine No. 1,762 out of the round-house, which pulled the irregular train out of Dunsmuir. At 12:15 he was notified by them that they were ready to turn the office back to him. He thereupon went to the office. At 12:20 they pulled out.

### Dunsmuir.

The following testimony also relates what took place at Dunsmuir:

### Irregular Train from Dunsmuir to Sacramento.

The same witness (Agler) testifies as to this irregular train substantially as follows: That on the 4th of July a train went from Dunsmuir to Sacramento. Did not know who ordered it out. Saw the engine getting out. Saw the train made up. It was not a regular train. Had an engine and two cars. The instructions from the railroad officials concerning the movement of trains came to no other person than himself. He states that he received no instructions from his superiors in the Southern Pacific Company concerning the movement of this train. The train went without his authority. Witness knew a good many men that went on that train. Some 45 left Dunsmuir on it. He saw one Seyler, Littlefield, Walthers, Roberts, Price, Parrish. These men had been employés of the railroad company up to the 28th of June. H. L. Walthers was running the engine. Conductor Seyler seemed to be in charge of her. He noticed guns in the car. He had a conversation with Seyler just before the train pulled out. He explained to him that the coach and engine that was carrying Mrs. Stanford from Red Bluff to Dunsmuir had the right of way, and that he did not want him to leave there with a train that he had no right to. Seyler replied, "We have received a message from Sacramento and must go there, and are going." Then they pulled out.

In this connection it might be well to refer to the following telegram, Exhibit No. 687, which reads:

"July 4, 1894. To H. L. Walthers, Dunsmuir, Cal.: One thousand cavalrymen and militiamen here. Come with whole outfit by train, without orders, at once. H. A. Knox."

It will be noticed that this telegram is dated on the same day that this irregular train in charge of Walthers left Dunsmuir.

Walthers, who was called for the defense, admits that on the morning of July 4th a message arrived in Dunsmuir, purporting to have come from Mr. Knox at Sacramento, asking the men to come down,—asking their assistance,—to come to Sacramento. Walthers testified as follows:

"The message was read to all those present, members and outsiders, men and employés in general, and they all signified their intention of going. They all said they would go, and they left in a body, went down there, prepared an engine and coach, met the mail agent, and told him we were going to Sacramento. I could not state positively whether we asked him to go with us, or whether he put the question."

He states that they had a number of guns on the train,—perhaps 35. He states that the train was running without any orders at all. There were no orders from the company to run the train. He further states that he does not think Mr. Agler could have stopped his train.

M. C. Roberts, who was the secretary of the American Railway Union at Dunsmuir, of which Walthers was president, testifies to substantially the same facts as Walthers.

You will also recall that there is testimony with reference to an irregular train from Truckee to Sacramento, which arrived at the latter place about July 4th; and another from Lathrop to Sacramento, on the night of July 10th. You will observe that, so far, I have not alluded to the testimony tending to show acts committed by the defendants at Palo Alto on the 6th of July, although the indictment brings that place within the range of such testimony as I have referred to tending to show the means to be employed in carrying out the conspiracy. I have, however, deferred reference to this testimony until we reach the consideration of the overt acts charged to have been committed by the defendants, when such testimony may then be considered in the double aspect, namely, as tending to show, not only the overt acts required to be established by the statute, but also as tending to show the means whereby the conspiracy was to be carried out.

I have now directed your attention to the testimony which it is claimed by the prosecution tends to establish the means whereby the conspiracy was to be promoted, carried out, effected, and executed; that is to say, it is claimed that such means were, in fact, used, and were part and parcel of the conspiracy; that the acts concerning which testimony has been given were unlawful acts, which entered into and became part of the crime of conspiracy to prevent the use of the Southern Pacific Railways in this district for the transportation of the United States mails and interstate commerce. I have, however, not attempted to exhaust the testimony presented for the prosecution and defense, nor are you to conclude or assume that, in your deliberations upon these matters, you are confined to the testimony referred to by me. I have merely attempted to classify the general features in such a way that you may be able to apply the law, as I shall give it to you, to the facts as you may find them. It is for you to determine beyond a reasonable doubt, not alone from the testimony I

have alluded to, but from any and all parts of the evidence, whether any one or more of such acts as have been referred to was or were, in fact, committed; and, if you should so determine, whether any one or more of them was or were the means conspired to be used to promote, carry out, effect, and execute the object of the conspiracy, as charged in the indictment. For, after all, the real question is not whether these acts were, in fact, committed, but whether these acts, or some of them, was or were the means to be used to carry out the conspiracy. You will observe that it is not necessary, to establish this element of the conspiracy, that you should find that all the means charged were to be used in carrying out its purpose. If you find beyond a reasonable doubt that there was a conspiracy to commit the offense charged, it will be sufficient if you also find beyond a reasonable doubt that one of the acts charged was to be the means for carrying out and executing that conspiracy. We have now arrived at a stage of the case where we may properly refer to the law applicable to the conditions which it is claimed prevailed during the occurrences now under consideration. With the merits of the controversy between the railroad company and its employés you have nothing to do, except in so far as the facts relating thereto may furnish evidence as to the actual parties engaged in violating the laws of the United States. Moreover, it is no defense in this case to say that the railroad company obstructed and retarded the passage of the mails, or entered into a conspiracy in restraint of trade and commerce. If the railroad company violated the law, it should be punished, but we are here now charged with the sole and only duty of determining whether these defendants at the bar have been engaged in a conspiracy as charged in the indictment; and the testimony to which I have referred, bearing upon this question, suggests certain questions of law, to which I will now direct your attention.

The testimony tends to show, as you will remember, that the boycott of the Pullman cars was declared by Debs at Chicago on June 26th, to take effect at noon on that day. It did not, however, take effect at Sacramento until about midnight or early on the morning of the 27th, and its first operation in this district appears to have been to stop train No. 84 at Sacramento, due to leave there at 10:25 in the morning, for Oakland, by the way of Tracy. This train, when regularly made up, carries a Pullman car which comes from Chicago to Sacramento on train No. 2. The Pullman car is destined for Los Angeles, and is carried from Sacramento to Lathrop, where it is attached to the train for Los Angeles. The members of the American Railway Union at Sacramento refused to handle this car, by reason of the boycott declared by Debs at Chicago the day before. This train carried the mails. Knox, speaking of this train, says:

"They [meaning the railroad officials] refused to allow the engine to go without the Pullman car on. We tried to induce Mr. Wright to let her go, because it was a mail train, and we did not want to be parties to holding the mail. He refused."

He says further:

"That train stood there until leaving time, when it started to pull out, and perhaps pulled four or five car lengths out, and some one ran down out of

the office and turned the plug on the hind end of the air hose, and stopped the train. She was backed up to the depot, and stood there for a couple of weeks."

A mail train is a train as usually and regularly made up, including, not merely a mail car, but such other cars as are usually drawn in the train. If the train usually carries a Pullman car, then such a train, as a mail train, would include the Pullman car as a part of its regular make-up. The obligation which the railway company is under, as a common carrier, to employ such resources as it can command in the transportation of passengers, mails, express, and freight, without unnecessary delay, is one thing. The claim that the employés of a railroad company have the right to say what cars shall constitute a train is quite another thing. It is not for the employés of the railroad company to say whether a Pullman car shall constitute part of a mail train or not.

In the case of U. S. v. Clark, in the district court of the United States for the Eastern district of Pennsylvania (23 Int. Rev. Rec. 306, Fed. Cas. No. 14,805), the defendant was one of a number of persons who assembled at the depot of the Lehigh Valley Railroad at South Easton, Pa. On the arrival of the mail train at the depot, the defendant, who had no connection with the train, said to persons having charge of it that the mail car could go on, but not the rest of the train. The defendant afterwards got on the train, and, with others, placed it on a siding, where it remained for several days. Judge Cadwallader, in charging the jury upon these facts, said:

"The defendant is charged with retarding the transportation of the mail. * * * The mail, in point of fact, was retarded, as the postmaster testifies, two or three days. The occurrence which retarded it, according to the tendency of the proofs, was that several persons were assembled at the depot at Easton for no lawful purpose, and that one or more of them declared that the mail might go, but the passenger train should not. They uncoupled the mail, and afterwards coupled it, for the purpose of carrying it, as they did, to a siding. If that was the fact, and their purpose was to retard the train which transported the mail, it matters not, in point of law, whether they were or were not willing that the mail car or baggage car or the particular vehicle carrying the mail should go."

The learned judge then quotes with approval the opinion of Judge Drummond of Chicago upon the subject, as follows:

"In relation to the transportation of the mails by means of railroads, it is true that it appears by the evidence in this case that these defendants were willing that the mail car should go, but it must be borne in mind that the mail car can only go in such a way as to enable the railroad to transport the mail where there are other cars to accompany it. It is not practicable, as a general thing, for a railroad to transport a mail car by itself, because that would be attended by serious loss; so that, while nominally they permit the mail car to go, they really, by preventing the transit of other passenger cars, interfere with the transportation of the mails."

The law as thus declared by two learned judges many years ago is the law to-day. Apply that law to this case as you find the facts to be in relation to train No. 84 at Sacramento on June 27th; and also to train No. 2 at Sacramento on June 29th; and train No. 4 at Sacramento on June 28th, 29th, and July 3d, 4th, and 11th; train No. 69, from Red Bluff to Sacramento, on June 29th, stopped at Broderick; train No. 16, from Portland to San Francisco, stopped

at Dunsmuir, June 28th; train No. 15, from San Francisco to Portland, stopped at Red Bluff, July 1st; train No. 42, Santa Rosa to South Vallejo, stopped at South Vallejo, July 12th; train No. 19, from San Francisco to San Jose, July 5th; train No. 13, stopped at Palo Alto, July 6th; train No. 33, known as the "San Ramon Train," stopped at Sixteenth street station, Oakland, July 3d; and train No. 1, known as the "Santa Cruz Narrow-Gauge Train," at Alameda pier, July 4th. I do not understand that the testimony tends to show that there was any mail or express on the three local trains stopped in the vicinity of tower No. 2, West Oakland, on July 4th.

It is contended on behalf of the defense in this case that the boycott declared by the American Railway Union on June 26th, and the strike declared on June 29th, were in themselves lawful. The logical effect of this contention would be that, if any unlawful acts were committed during the pendency of the boycott and strike, they should be separated from these general and admitted acts of the American Railway Union. This feature of the case calls for the most careful consideration of the law as declared by the courts.

In Thomas v. Railway Co., 62 Fed. 803, Judge Taft, in the United States circuit court for the Southern district of Ohio, determined that the boycott of Pullman cars, as it was enforced in Ohio, was unlawful. The facts in that case were substantially the same as in this case. He said:

"The employés of the railway companies had no grievance against their employers. Handling and hauling Pullman cars did not render their services any more burdensome. They came into no actual relation with Pullman in handling the cars. He paid them no wages. He did not regulate their hours, or in any way determine their services. Simply to injure him in his business, they were incited and encouraged to compel the railway companies to withdraw custom from him by threats of quitting their service, and actually quitting their service. This inflicted an injury upon the companies that was very great, and it was unlawful, because it was without lawful excuse. All the employés had the right to quit their employment, but they had no right to combine to quit their employment, in order thereby to compel their employer to withdraw from the mutually profitable relations with a third person, for the purpose of injuring that third person, when the relation thus sought to be broken had no effect whatever upon the character or reward of their services. It is the motive for quitting and the end sought thereby that makes the injury involved unlawful, and the combination by which it is effected an unlawful combination. The distinction between an ordinary, lawful, and peaceable strike, entered upon to obtain concessions in the terms of the strikers' employment, and a boycott, is not a fanciful one, or one which needs the power of fine distinction to determine which is which. Every laboring man recognizes the one or the other as quickly as the lawyer or the judge. The combination under discussion was a boycott. Boycotts, though unaccompanied by violations or intimidations, have been pronounced unlawful in every state of the United States where the question has arisen, unless it be Minnesota. They are held to be unlawful in England. * * * But the illegal character of this combination with Debs at its head and Phelan as an associate does not depend alone on the general law of boycotts. The gigantic character of the conspiracy of the American Railway Union staggers the imagination. The railroads have become as necessary to life and health and comfort of the people of this country as are arteries in the human body, and yet Debs and Phelan and their associates proposed, by inciting all the employés of all the railways in the country to suddenly quit their service, without any dissatisfaction with the terms of their own employment, to paralyze utterly all the traffic by which the people live, and in this way to compel Pullman, for whose acts neither the public nor the railway companies are in the slight-

est degree responsible, and over whose acts they. can lawfully exercise no control, to pay more wages to his employés. The merits of the controversy between Pullman and his employés have no bearing whatever on the legality of the combination effected through the American Railway Union. The purpose, shortly stated, was to starve the railroad companies and the public into compelling Pullman to do something which they had no lawful right to compel him to do. Certainly the starvation of a nation cannot be a lawful purpose of a combination, and it is utterly immaterial whether the purpose is effected by means usually lawful or otherwise. More than this, the combination is in the teeth of the act of July 2, 1890, which makes it an offense to restrain interstate commerce." 62 Fed. 821.

In U. S. v. Elliott, Id. 801, Judge Thayer, in the United States circuit court for the Eastern district of Missouri, states the law in the following language:

"A combination whose professed object is to arrest the operation of railroads whose lines extend from a great city into adjoining states until such roads accede to certain démands made upon them, whether such demands are in themselves reasonable or unreasonable, just or unjust, is certainly an unlawful conspiracy in restraint of commerce among the states. Under the laws of the United States, as well as at common law, men may not conspire to accomplish a lawful purpose by unlawful means. Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542; Com. v. Hunt, 4 Metc. (Mass.) 111."

In Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 324, Mr. Justice Harlan of the supreme court of the United States, sitting in the circuit court of appeals for the Seventh circuit, states the law in the following terms:

"It seems entirely clear, upon authority, that any combination or conspiracy upon the part of its employés would be unlawful which has for its object to cripple the property in the hands of the receivers, and to embarrass the operation of the railroads under their management, and thereby disabling or rendering unfit for use engines, cars, and other property in their hands, or by interfering with their possession, or by actually obstructing their control and management, or by using force, intimidation, threats, or other unlawful methods against the receivers or other agents, or against employés remaining in their service, or by using like methods to cause the employés to quit, or prevent or deter others from entering the service in place of those leaving it. Combinations of that character disturb the peace of society, and are mischievous in the extreme. They imperil the interests of the public, which may rightfully demand that the free course of trade shall not be unreasonably obstructed. They endanger the personal security and personal liberty of individuals who, in the exercise of their inalienable privilege of choosing the terms upon which they shall labor, enter and attempt to enter the service of those against whom such combinations are specially aimed."

The right of labor to organize for its own benefit and protection, as I have before explained to you, is a substantial right, which the laboring class is entitled to enjoy to the greatest extent consistent with the rights of others. The limitation is that in the exercise of this right the property and rights of others must be respected. It remains for you to apply this law to the facts in the case at bar.

I will now direct your attention to the overt acts charged against these defendants.

## Overt Acts of Defendants.

George Cornwall, an engineer on train No. 13, going down towards San Jose, and No. 6, coming up, on the 6th of July, testified to what occurred at Palo Alto as follows: That he was the engineer on

train No. 13 on the 6th day of July last; that they took No. 6's time in coming back. It was express train No. 13, from San Francisco. It went down as far as this side of Santa Cruz crossing. They carried the mail and had a mail car. He saw some mail on the train. * * * They stopped at all the main points going along. Left San Francisco at 3:15, he thinks. He returned towards San Francisco. He backed up a train to Lawrence's Station. He ran around it, got on the other end, and pulled it back. Going down, the mail car was on behind; when he was coming back it was in front, next to the engine. He backed up from Lawrence's Station towards Palo Alto station, at the switch there. Reached Palo Alto somewhere about 5 o'clock. It was after 5, pretty near 6, when he got back there. He don't recollect exactly. The mail had not been taken off the train before it reached Palo Alto. At Palo Alto they stopped, uncoupled, and went in on the turntable track. He knows Clark, Rice, Mayne, and Cassidy. * * * He first saw some of them on his engine. This was at Palo Alto. He went in to turn around on the turntable. He got about half way turned around, and was saying something to the brakeman,—he forgets what it was,—when Mayne said: "Never mind those fellows. We will take charge of this engine." Then Mayne began to shake the grates, and was going to open the blow-off cock. He could not get it open until he loosened the nut underneath. He was trying to loosen it with a coal pick. Cornwall told him: "Don't break it off. Take the monkey wrench and unscrew it." Rice gave him the wrench, and told Mayne to go under it, as he knew more about it than he did. Mayne then went under. These men let the water out of the tank; shook the fire down. Mayne tried it, but thinks Rice did most of the shaking. Mayne was on the engine. He said he would take charge of her, and commenced shaking the grates. Cornwall was saying something to the brakeman, and he said: "Never mind them. We will take charge of this engine." Cornwall looked around,—that was the first time he saw them,—and he saw three or four of them there, and seven or eight on the ground; seven or eight all together. He saw Rice, Cassidy, and Mayne. He knows a man named Clark, but is not acquainted with him much. Believes he knows him by sight. Could not swear whether Clark was there with those men or not. The hose was uncoupled. One side was uncoupled by Cassidy; the other side, he could not say. The hose was uncoupled between the tank and the engine. The effect of uncoupling that hose was to let the water all out of the tank if the valve was open on top. * * * It is necessary to go under this engine to unscrew the nut. He handed Mayne the wrench, and saw him go under. The turntable was then turned half around. Cornwall wanted them to turn it around, that he might clean the fire out of the ash pan, so that it would not burn the grates. Some one did turn it around, and he ran her over the pit where they put out the ashes. Then the boys went up to the other engine, and, as everything was all quiet down there, he put his coat on, and went up too. He had a talk with Mayne about the mail. He called him to one side and spoke to him. He said: "Mr. Mayne, aren't you

afraid you will get into trouble by stopping the mail?" Mayne said: "Damn the mail. You ain't got no mail." Cornwall said: "You have fired on this train long enough to know we do carry the mail all the time." And then Mayne went away, and that is the last Cornwall saw of him to speak to him. * * * There is very seldom a Pullman car on that train. His engine was killed at that time. After these men left his engine, they went up to Mr. Minatt's engine and killed that one. He saw what was going on there. He saw her blowing off, and some one backed her on a split switch in front of the ticket office, and blew the steam right into the ticket office. The back drivers were partly off. It would take five minutes to get her on, if they had another engine there to do it. Could not see who was on the Minatt engine from the time it was moved from its position. There was too much steam. He could not say that these same men were there. Supposes they were. He believes he heard some of them say: "Come on. Let us go up to the other engine." * * * On cross-examination the witness stated that he did not tell those men that they were interfering with the United States mail train when he was on the turntable there, for the reason that there were so many around there he did not think of it. * * * Nothing said, to his knowledge, at the time that engine was killed, with reference to its being a mail train, by either party. It had a mail car on, though, and mail in it going north and south. * * * This conversation that he had with Mayne was close by the depot, on the other side of the track. He called him to one side, close by where Minatt's engine was. No one else heard it. Is sure that no one else heard it. That is the only conversation he had with him. Did not have a conversation with him to this effect, in which he said: "Aren't you afraid you will get into trouble about stopping the mail?" Mayne said: "No. I did not know there was any mail on the train, and, if there was, it is pretty late in the day to tell me." * * * Thinks there were more than four there. About seven or eight. Somewhere in that neighborhood. He had one brakeman and a fireman. He thinks he was helping turn around. He did not offer any resistance to them. They came on him so quickly that he did not think about much of anything.

W. R. Sowers testified that he was a brakeman in the employ of the Southern Pacific Company. That he was such on the 6th of July last. That he was on Conductor Gould's train as brakeman. Saw what happened to the engine of that train run by Cornwall. When they came into Palo Alto, coming back as No. 6, he cut the engine off from the train and took it over to the turntable, and started to turn it. He had the engine half or a third turned around, when there were five or six different parties came from over the field,—five or six different men. They were all together, as close as they could be, coming towards the engine. They came over and proceeded to kill the engine. One of the gentlemen in the crowd spoke to him and said: "You don't need to turn it any further. You remain in Palo Alto over to-night. You have run far enough to-day." Does not know who that man was. He was a tall gentleman, with a black mustache. He would know any of the gentlemen that were

with them at that time by sight, but not by name. (The defendants Mayne and Cassidy being directed to stand up, the witness identified them both.) After one of these men told him that he need not turn the engine further, but that he could remain in Palo Alto, the light-headed gentleman (Mr. Cassidy), who was on the left-hand side of the engine, and had something in the way of a hammer or monkey wrench, assisted to uncouple the hose between the tender and engine. He could not see who was on the other side. Did not notice who was in the cab. Mr. Mayne was in the cab, but what he was doing the witness does not know. He could not see unless he got into the cab. There were a couple of others in the cab at that time. Nothing else occurred, that he knows of, outside of uncoupling the hose between the tender and the engine, letting the water out, and blowing the steam off. Saw the steam escaping. Water escaped from the boiler. That engine was killed at that time. The fire was shook down. He supposes it was all out. * * * Mr. Mulder was in the cab before these men reached the cab. Mulder was helping to turn the engine. Mulder was on the opposite side from where he was. After they killed the engine, these men went from his engine over to Palo Alto station. * * * They were going at a moderate little trot. They were not running very fast, or anything like that. * * * Is acquainted with the signals that are used on passenger trains. This was a regular train.

Peter Mulder was fireman on the engine of which Cornwall was engineer. He was present when Cornwall's engine was killed, but he is unable to identify the defendants as being the persons who assisted in killing the engine. The material parts of his testimony are as follows: Having returned as far as Palo Alto, they stopped the train, uncoupled, backed it on the turntable, to turn the engine around, because she was headed the other way, and they were going to San Francisco. As soon as the engine stopped on the turntable, he got off the engine, to help push the engine round. * * * He was alone on the back end. He don't know whether any more were on the forward end with Long, or not. The engine was between them. Just as he put his shoulder to the lever to push it around, he saw some men coming from the back end of the engine towards the engine. They were walking pretty fast. Some were running a few steps. Some of them went up on the engineer's side of the engine; some of them stayed behind the engine. One of them turned open the air pipe under the engine while he was pushing around. He looked round and saw the air was blowing out of the hose. He stepped up and shut it off. Some one says, "God damn, leave that alone." With that this person opened it again, and Mulder went up on the engine. They pushed the engine partly around a little ways. Mulder got up on his seat, and sat down to see what was going on. Cornwall, the engineer, at the time he (Mulder) got up, was sitting on the seat box. * * * The engine was killed. Saw the squirt hose used. One of the men said to him, "Turn that squirt hose on." Mulder said, "No, I will have nothing to do with this," and with that he reached by him and turned it on himself. They opened the door of the fire box, and squirted the water over

the fire, and killed it. They had already shaken the grates a little, although the fire was not altogether shaken down. This person was trying with a pick to open the blow-off cock, and the engineer told him it could not be opened that way; he would have to take a wrench and go underneath and loosen the nut before he could turn it. The engineer handed him a monkey wrench. One of the men went underneath and loosened the nut, and they blew the water out of the boiler and out of the tank. There were engaged in that work at least six, if not seven. He thinks there were seven,—three behind the tank when he left there, and four in the cab when he got up there.

T. J. Long was also a brakeman on the train pulled by Cornwall's engine. He accompanied the engine to the turntable, to assist in turning it around. He saw the killing of the engine, but is unable, like Fireman Mulder, to identify the defendants, or to distinguish the part they took in the disabling of the engine. He noticed some of the men coming down in the train with him. He recognizes Cassidy as being a member of that party. Cannot say as to Mayne, nor as to Rice and Clark.

C. B. Gould was the conductor of the train whose engine, of which Cornwall was engineer, was killed. He states that he left San Francisco on July 6, 1894, at 3:05, on train No. 13. The time was 2:20, but they waited for troops to take to San Jose. It was a mail train, having a mail car. He had baggage and express and mail, smoker, and, he thinks, two or three coaches. He had no Pullman cars,—no Pullman sleepers. He went as far as Santa Clara crossing, left the troops there, and returned immediately as No. 6; that is, on train No. 6's time. Those were his orders. It was a mail train returning. Left Santa Clara crossing at 5:15 p. m. Reached Palo Alto at 5:55. The engine had been backed all the way from Santa Clara crossing, there being no turntable between that place and Palo Alto. Arrived at Palo Alto, he left the train on the south switch. The engine was sent on to the turntable, to turn her, so that the pilot and engine would come first. He told his men to go up with the engineer and fireman and turn the engine, while he went to the depot to get orders, if there were any to obtain. It was his intention to take that train right through to the city. Did not intend to stay at Palo Alto more than about 10 minutes. It would have taken them only a couple of minutes had they not turned the engine. He had just arrived at the ticket office when some one sang out to him, "I saw some one running towards your engine." He ran to the engine from the ticket office. When he reached her she was virtually dead. Saw Rice, Clark, Cassidy, and Mayne around the engine when he reached it. Rice was shaking the grate. The hose of the engine was cut; that is, it was uncoupled. That is the hose between the tender and the engine. Did not see who cut it. While examining the engine, he noticed Cassidy, Mayne, and others make a run for the other engine, of which Engineer Minatt was in charge. She had just arrived with a train from San Francisco. He followed them up. When he arrived, it also had been killed. With the exception of seeing Rice

shaking the grate, he did not see any of the acts connected with the killing of the two engines. In answer to the question, "Did you have any conversation with Mr. Rice and Mr. Clark in respect to this act?" the witness stated:

"After this was over I went to the telegraph office and notified the superintendent what had been done. Shortly after, I passed down track to go to my train, which was on the main track below, to protect it, and I met Mr. Rice and Mr. Clark coming towards the ticket office. I said to Mr. Rice and Mr. Clark: 'Well, you have tied us up.' He said: 'Yes. Well?' I said: 'This is a very wrong, unlawful act, and you have no grievances whatever against the Southern Pacific company, or any other company;' that is, speaking of them as the A. R. U.'s. I says: 'It was only to make the railroad companies whip Pullman, or, in other words, bring him to their terms.' He stated: 'We had orders to do this, and we have done it.'"

Rice, Clark, Mayne, and Cassidy remained around Palo Alto about 20 or 30 minutes. Possibly it might have been more. There were no other engines at Palo Alto save those two. They laid there until the next morning, until they got another engine to pull these engines to Menlo Park, and filled them with water and got up steam, so that they were able to make the trip out. Got back to San Francisco about half past 10 or 11 o'clock the next morning. Were due in San Francisco the night before.

Edward J. Kincaid, assistant agent at Palo Alto, called for the United States, testified that his attention was attracted to Cornwall's engine by hearing some one holler, "They have got it." He was then in the ticket office, and ran out, and saw four or five men coming from the field between the county road and the railroad track. He saw the men climb over the fence and climb up on the engine. The engine was half turned around on the turntable, and he did not see what they were doing to her, but he states that steam soon began to issue from the boiler, and the engine was turned clear around and run onto a side track, and there the steam was blown off. This crowd remained around the engine probably about six or seven minutes. They then went to Minatt's engine, and climbed up on the engine and told them to get out,—told the fireman to get out. They then let the steam and water out of the engine. Knows Rice, Clark, and Cassidy by sight. Does not know the others. He saw them there at the time these two engines were killed. Saw them mingling with the crowd. The only one he saw on the engine, to recognize, was Rice. Did not see either Clark or Cassidy on the engine. But they could have been on the engine, and still he might not have seen them. Could not see what they were doing. On redirect examination he states that he could see that the hose between the engine and tender was uncoupled, hanging down, and he could see under this hose where the water had run out.

Robert Dannenburg, station agent at Palo Alto, also agent for Wells, Fargo & Co., and Western Union operator, called for the prosecution, testified that he saw some five or six men coming from the county road towards the railroad track east, at a sort of dog trot; that they went to Cornwall's engine; that he saw them stop the turntable when about half way around, but he could not dis-

tinguish who it was that stopped the turntable. He saw steam escaping from the engine, and shortly after they (the crowd) turned the engine clean around, and ran over the ash pit. Ran her off the turntable, right onto the track. He could not see any particular thing that was done on the engine from where he was. The crowd then went over to Minatt's engine. He saw Rice board that engine, and also another man. All that he saw with reference to Minatt's engine was two or three men climbing the engine. He did not see the rest of it. But, probably two or three minutes after these men boarded the engine, he saw steam blowing off from the engine. Saw Cassidy, Mayne, Clark, and Rice in the neighborhood of those engines at these times. Distinguished them near Minatt's engine, but could not see what they were doing.

E. F. Minatt, called for the United States, testified that he was an engineer on the Southern Pacific system, running on the Coast Division; that he was an engineer on or about the 6th of July last. He went off on No. 17 according to the time card, which leaves San Francisco at 4:25 in the afternoon, but he thinks they were 10 minutes late on that day. Pulled a local train between San Francisco and Palo Alto. He reached Palo Alto that day. He was to return from Palo Alto the next morning at 6:40. Four of the boys,—two of them fired for him before, and he pulled the other two as brakemen (Cassidy and Mayne, they both fired for him, and a fellow named Rice, a brakeman, and Clark),—they came to his engine. He was down on the ground and they got up. He thinks Rice—he is not sure—commenced to shake the fire out of the grates down into the ash pan. Cassidy and Mayne commenced to uncouple the hose. They wanted to blow the water out of the boiler, and let it out of the tender. At this time Rice came around, and the witness said to him, "Boys, don't damage the engine." They said they would not; only let the water out of the boiler and tender; and they did that. There was such a crowd around there that he could not tell how many there were. Cassidy, Mayne, Rice, and Clark were actively taking part and killing the engine. Mr. Cassidy, he thinks, and Mr. Mayne, both had a hand in loosening the blow-off cock. The witness gave them a wrench to do it,—to unloosen the blow-off cock,—and they did it. After they had blown the water partly out of the boiler,—the water was about out of the tender,—the young man Clark got up and backed her out through an open switch. Witness hollered to him, and told him the switch was wrong. He got the tender out and the back drivers out over this switch, then he undertook to run her ahead on the main track, and derailed her. She stood there like that until they sent a man from San Francisco to pull her on. * * * There were some exclamations made of "Hip, hip, hurrah for the A. R. U." There was such a crowd around there—such a jam—that he could not get to the engine from the crowd. Who it was did it he don't know. The only man that he saw at the time of the hurrahing was Clark. The latter was on the engine after he derailed her. He did not see Mayne or Cassidy or Rice at the time the hip, hip, hurrahing was going on. After the excitement

was over, he saw the parties going towards Menlo Park. He saw Mayne, Cassidy, Rice, and Clark going towards Menlo Park.

Edward C. Murray, a witness for the United States, testified that he was the railway postal clerk who accompanied train No. 13, coming back on the same train,—it coming back as No. 6; that is, on No. 6's time. He testifies as to its being a mail train. He did not see the engine killed. He testifies as follows:

"Q. State what mail, if you recollect, you took up or delivered on the way down, or coming back. A. I received mail from all stations between San Francisco and Lawrence, inclusive. Coming back, I received mail from Lawrence, Mountain View, and Mayfield. Q. Did you have a mail car, or not, on that train? A. Yes, sir. Q. Did you reach Palo Alto? A. Yes, sir. Q. Did you go beyond Palo Alto that day. A. Not that night; no, sir. * * * Q. What time were you due at San Francisco with that mail? A. 6:26."

## As to Conversations Had with Clark.

R. M. Donne states that he was a conductor on the Coast Division, and that he was at San Mateo on the evening of the 6th of July, and the morning of the 7th. He saw Cassidy, Rice, and Clark there that night (the 6th). Also saw a gentleman with them who weighed about 180 pounds; had a smooth face; was heavy set. He had a talk with Clark that night. He spoke to him outside of the ticket office, and asked him if he would come inside of the office with him (Donne), and that he would introduce him to their assistant general passenger agent, and several others. He acceded, and came in. F. S. Douty, the secretary of the Pacific Improvement Company; H. R. Judah, the assistant general passenger agent; L. H. Fuller, an employé in the ticket auditor's department; the station agent, Mr. Peckham; and his assistant, Mr. Elmes,—were present. He testifies as to the conversation as follows:

"I introduced Mr. Clark to these men, and he was asked by Mr. Douty why they wanted to tie up the Coast Division. Well, he said that the boys on the other side were complaining that they were not taking any part in this affair; that they had the other side tied up, also the Narrow Gauge, and they had to do something on this side. Q. Do you recollect anything further that was said at that time? A. Nothing more, except that he was asked whether they had any grievances against the Coast Division. He replied by saying, 'No; not particularly.'"

F. S. Douty, a witness on the part of the government, narrates the conversation that passed between himself and Clark as follows:

"I think the conversation with Mr. Clark, after the introductions were over, by asking his reasons for this strike,—to get some information. He said that the Pullman Company had not treated the boys right, so that they had to strike on any road where Pullmans were used. I suggested that no Pullmans were used on this division. He said, in effect: 'No; but the boys on the other side' (referring to the Oakland side) 'are kicking, thinking that we are not doing enough here; so we have to keep our end up.' I said, 'Why do you have to keep your end up?' 'Well, we belong to an organization where we have taken an oath to stand together.' And he added, 'If we don't win this fight, I will go to China.' I said, 'Have you got any complaint to make against this Coast Division?' He said, 'No; there is no kick coming.' I asked him if it was what he called a 'sympathetic strike'; if he was striking in sympathy. He said, 'Yes,' he thought that was substantially it, so far as the Coast Division was concerned. I am giving the essence of my recollection, without trying to repeat the language."

Upon being asked if he could give the names of any other person with Clark, he says one was called Cassidy; another, Rice.

H. R. Judah, who was present at the conversation carried on between Mr. Douty and Mr. Clark, thus gives his version of it:

"Mr. Douty took the leading part in opening the conversation, and in a general, pleasant way, asked Mr. Clark what was the object of their tying up the Coast Division. * * * I cannot give the exact language, but, according to my recollection, Mr. Clark replied that the men on the other side (having reference to the Oakland side) had complained that nothing had been done on the Coast Division in the way of tying up trains, and that they felt it necessary to do something (or words to that effect). Then Mr. Douty asked him —I think that was the next question that was asked—why the Coast Division should be singled out, you might say, entirely disconnected with the balance of the system, in so far as Pullman cars were concerned. Mr. Clark replied, in substance, that that did not cut any figure in the matter at that time; that they were into this fight, and that they were going to stay with it; and, furthermore, said that if they lost their cause he was going to China,—he would not live in this country. The conversation was carried on by all of us. Questions would be asked, but I cannot recall every single question that was asked, or every answer that was given. In substance, it is the same as Mr. Douty has given, and Mr. Peckham. My memory might be refreshed if some questions were asked of me, but, in the main, what I have said covers the ground. Of course, a good deal was said to Mr. Clark, to try and persuade him to have the men cease on the Coast Division; to allow that to be an exception, as there did not exist, in fact, any cause for complaint on the part of those employed on the division, and if they continued in blocking the traffic it must be on the ground of sympathy, and nothing else. Then Mr. Clark reiterated—in fact, he reiterated on two or three occasions—the fact that they were in this fight, and they proposed to see it through."

The witnesses Peckham and Elmes testify substantially to the conversation between Clark and Douty as detailed above.

On page 644, vol. 8, of the testimony, appears the following admission:

"Mr. Monteith: We will admit that both of these defendants are members of lodge No. 345 of the American Railway Union, located in San Francisco. Mr. Knight: Q. In the latter part of June? Mr. Monteith: In all of June, and all of July last. Mr. Foote: Let that be taken down. Mr. Monteith: We will admit anything of that kind. We have nothing to conceal about it. Our side of the case is an open book."

### Testimony on Behalf of Defendants.

The defendant John Mayne testified: That he was a locomotive fireman on the Coast Division last spring. That he was hostler at San Francisco at the time of the strike. He had charge of the engines after they came in off the road, put the necessary supplies on, put the engines in the house, and got other engines out to go out on the road. Had been employed on the railroad about six years. Understands all the duties of a fireman. Was familiar with the rules of the company at the time of the strike. Belonged to the Brotherhood of Locomotive Engineers and the American Railway Union. That he attended meetings of the A. R. U. in the last part of June. He belonged to the San Francisco lodge. He attended a meeting on the night of the 29th of June. The lodge met on Mission street, between Fifth and Sixth. After the admission of members there was a message read stating that the members of the local union 310, in Oakland, had declared a strike on account of the discharge of

men.   He identifies Exhibit No. 296 as the message, as near as he could remember.   It reads as follows:

"June 29, 1894, Oakland, Calif.   To J. E. Riordan, 118 Sixth St., Room 71, S. F.:  American Railway Union three hundred ten has declared strike takes effect twelve thirty a. m. to-day.   T. J. Roberts, President."

He further states that he thoroughly understood the cause of the strike.   His union never participated in the boycott against the Pullman cars.   With regard to the strike at Oakland, a motion was made, and a standing vote taken, that they indorse the action of the Oakland Union in striking, and that a strike be declared by their lodge for the reinstatement of the discharged employés.   So far as this lodge was concerned, there was no other purpose in striking than the reinstatement of these men.   After the strike was declared, the next action of the meeting was the appointment of an executive committee.   Harry Bederman, George Elliott, Pete Farrel, and W. S. Runyon were appointed on that committee.   They had full power to manage the strike, and all the business connected with it.   The union did not reserve any authority to itself.   After the appointment and authorization of this committee, the next business transacted was a discussion in regard to handling the mail.   This was on the night the strike was ordered.   The meeting of the 29th, some one made a motion (he thinks, Mr. Achorn) that the lodge take a vote as to whether they were willing to handle the mail or not.   A standing vote was taken.   Everybody in the hall stood up, in favor of handling the mails at all times.   He did not hear any reference to interstate commerce.   After that they held a meeting every day,—sometimes twice a day.   He thinks he attended all meetings up to the afternoon of the 6th.   Does not remember anything that was done, except routine business connected with the admission of new members, and so forth.   He was in San Francisco on the 5th of July.   Saw Cassidy every day.   Has known him about six years.   For the last three years he has been almost a constant companion of Cassidy.   They roomed together, boarded together, and were together evenings, and all the time.   Saw him on the 5th.   On the morning of July 5th, Cassidy and he, after breakfast, attended a meeting of the union.   After the meeting they went around town,—he does not know just where, now; and in the afternoon they went to Valencia street, and took the train bound south,—bound for San José.   He invited Cassidy to go down with him to San José, to see his folks, on the morning of the 6th.   He had been with him all the morning from the time they got up.   He asked the agent if there would be a train along in the afternoon.   The latter informed him there would.   He asked him for two tickets to San José.   He notified him they were only carrying passengers as far as Mayfield.   He bought two tickets for Mayfield, and handed one to Cassidy.   He thinks it was about 3:30 o'clock when he got on the train.   It was an ordinary train.   There was a mail car on the hind end of it.   Next to the mail car there was a car load of passengers.   He tried to get into the car, and did not know what was in it, and the brakeman refused him admission.   He then took the car immediately ahead of that.   Cassidy did not get in at the same time he did.   He saw Clark and Rice on that day.

When he got on at Valencia street, he was reading a newspaper. When he finished with the paper, he went into the smoking car. When he arrived there, there were quite a few people in the smoking car. There he saw Rice and Clark, and he believes Cassidy was in the smoker at the time. Rice and Clark and a number of passengers were talking to a captain of the militia,—he supposes it was a captain; he had stripes on his uniform. Just before they got to Redwood, the captain left the car, and went back through the train. Fred Clark came and sat down alongside of him. They chatted along the way. Mayne asked him where he was going. He said he intended to go to San José, but he only had a ticket for Mayfield. When they got to Mayfield he and Cassidy got off, and Rice and Clark also, and a great number of the other passengers. The first thing they did was to look for a conveyance. He found nothing there; no wagons around the depot. They talked the matter over, and finally concluded to go back to Palo Alto. There are a couple of crews which run in there, and they thought they could get definite information of whether train 19 was coming out that afternoon or not. If there was no way of getting to San José they would have come back to the city. They walked up the county road very leisurely. Stopped just outside of Mayfield, and looked at the cavalry. There was a company of cavalry camping just outside of Mayfield. Walked up the county road to almost opposite Palo Alto. Cassidy complained that his shoes were hurting him, and wanted them to wait a moment. They jumped over the fence; sat down under a tree in University Park. They stayed there 10 or 15 minutes. While they were sitting there an engine came in on the turntable. They all got up and looked at it. He does not know whether he suggested that they go and kill it, or whether Rice did. He knows that Rice and he got over the fence, and went over and killed the engine. Rice and he were in advance of the rest. He did not know whether the rest were coming or not. He did not look around to see. They got to the engine first. He went up on the left-hand side, over the timber of the turntable, and thinks Rice went on the right-hand side. When he got on the engine, Engineer Cornwall was standing up with his head out of the window. There was a fireman, a man with overalls, and a man in citizen's clothes, turning the turntable. Cornwall was saying: "A little ahead. How is that, pard? A little ahead,"—repeating that remark two or three times. He (Mayne) said to him, "That is all right, George; she is all right where she is." Cornwall said, "What are you going to do?" Mayne replied, "Nothing in particular." Cornwall then stated, "Don't hurt my engine, boys." To which Mayne replied, "We have no intention of hurting your engine." That was all that was said. He caught hold of the grates, and started to shake the fire out. He tried to shake the fire out. It was in such a condition—it was all clinkered—that it would not go through the grates. He was about to give it up, when the idea struck him that he could put it out with a squirt on the left-hand injector. He put on the injector, turned the water into the fire box, and drowned the fire out. * * * About the time he thought the fire was quenched, he asked the engineer if he thought

it would be safe to let the water out. The latter stooped down, looked into the fire box, and said he thought it was all right. Then Mayne took the coal pick, and tried the blow-off cock. He suggested to the engineer that they had better run the engine off the turntable, on account of the blow-off pipe coming against the timber of the turntable, and it would scald the paint on the engine. He approved of that, and the table was turned back for the straight track, and the engineer ran the engine off over the ash pit. Mayne tried the blow-off cock, and he could not open it. The engineer told him he would have to get down underneath with a monkey wrench, and loosen up the nut in the bottom of the car. Cornwall gave him the monkey wrench. Mayne jumped down on the ground. It was necessary for him to get under the engine, so he took off his hat and coat, and handed it to the engineer. The latter held his hat and coat while he opened it, and until he got back on the engine. * * * There was nothing said, further than what he has stated. The engineer requested them not to hurt his engine. He said: "Boys, don't hurt my engine. I like my engine." And he repeated that remark two or three times, and that was all that was said. * * * Just before he finished killing the engine, Rice came back from up towards the depot, and after he let about four inches of water out of her he went back into the cab, and opened the blow-off cock. Then he stood by the water glass, and watched it until the water went out of sight in the glass. Then he closed the blow-off cock. He did not know but what the fire might kindle up again, and he was not taking any chances on it. He shut the blow-off cock as soon as the water went out of sight. After they killed the engine, Rice and he walked up to the depot. There was a crowd of 20 people up there, he supposes. Just before they reached the depot, the other engine that Minatt was running was blowing out against the side of the station-house,—a little station, six by six. He said to him (Rice): "That won't do. You don't want to spoil the paper in there." He mentioned the paper and instruments. Rice went up on one side, and he on the other. They moved the engine ahead a foot, so that she would clear the building. Rice was moving the engine, and he had hold of the brake wheel. About the time they moved a foot, some one hollered, "Whoop! you are off the track." They stopped immediately. The water was all, or nearly all, out. He kicked the blow-off cock shut, and got down off the engine. He had nothing whatever to do with the killing of Minatt's engine. He got up there. The fire was all out, and the water almost all out. He had a talk with Engineer Cornwall just before they left Palo Alto. Cornwall was up at the station. Cornwall called him over, and said to him: "Pard, don't you think you have done something pretty serious, in stopping the mail?" Mayne replied: "No, I don't think so. Even so, this is a hell of a time to tell us of it now, when it is all over." Mayne then turned round and walked off. He denies having made the statement testified to by Cornwall, as follows: "I says, 'Mr. Mayne, aren't you afraid you will get into trouble by stopping the mail?' He [Mayne] said, 'Damn the mail. You ain't got no mail.'" Cornwall replied, "You have fired on this train long enough to know

we do carry the mail all the time." He, on the contrary, affirms
that statement was just exactly as he gave it, word for word. He
further states that he had no knowledge of any mail train coming
along at that time, and before he killed the engine; did not know
that a mail train was due at that time on the schedule. Is familiar
with the surroundings at Palo Alto. The train could not be seen from
that turntable. He remained in Palo Alto about 40 minutes; then
went over to Menlo Park. Cassidy told him he had heard that Hay-
dock had telegraphed to the constable at Palo Alto to arrest them.
The first thing they thought of was to move over to Menlo Park.
They stayed in Menlo Park an hour, or may be an hour and a half.
Ate supper over at the hotel. Then they tried to get a rig. The
livery stable man wanted too much. He suggested to the boys that
they walk over to Redwood; there was a friend of theirs over there
who would drive them up. They walked to Redwood, got a rig
there, and they were taken as far as San Mateo. Got to San Mateo
between half past 10 and 11 o'clock. Did not do anything in par-
ticular, only sat on the platform and talked with the boys around
there. On cross-examination the defendant Mayne testified that he
bought his tickets as far as he could go in the direction of going home,—
to San José. The distance from Mayfield to San José is 16 miles.
He was there when the train left. He made no effort to get on and
buy a ticket from the conductor, and proceed on his journey, when
he saw it going further on, although his destination was his home,
at San José. He did not think they were carrying passengers any
further than Mayfield. He supposed he would find the regular Palo
Alto crews at Palo Alto. He knew that two trains laid over at
Palo Alto at night. From where he was, he could not see the train
coming back. He did not hear it coming. He was over 200 yards
from the road. He admits that, although he neither heard nor saw
the train come in, he suddenly started over to kill a live engine. He
had fired on that train. He knew that Cornwall sometimes went
on that engine. He knows all the engineers on the Coast Division.
He states that he did not know what engine was on the train that
he went up on, but he admits that he knew train 6 was due at San
Francisco at 6:30. Being asked to repeat the circumstances under
which he jumped up and ran for that engine, he states that when the
engine came over the switch, just before she came on the turntable
the cylinder cocks were opened, and made a lot of noise,—steam blow-
ing off. They got up and looked at the engine. He don't know
now whether he suggested to Rice, or the latter suggested to him,
"Let's go and kill her." They did not debate the question at all.
They went and killed her.

"Q. What was your purpose in killing a live engine there? A. I have not
any good reason for killing the engine. We wanted to be doing something,
I suppose. We wanted a frolic. Q. Did you not know that a live engine
could pull a train? A. I did. Q. And a dead one could not? A. And a
dead one could not. Q. Did you not kill that engine because you did not
want it to pull a train? A. I did not know one was there at the time. Q.
Did you not know that a live engine usually pulls a train? A. Yes, sir. Q.
Did you not know that to kill that live engine was to disable it from pulling
a train? A. I did. Q. Yet you killed it, and for no purpose? A. I did not
know there was a train there, attached to it. I thought it was a light en-

gine. It is customary— Q. I do not want anything about customary. I want you to answer my question. Now. Mr. Mayne, did you not know that to kill that live engine would render it impossible to take a train that might be there back to San Francisco? A. I did not think anything about it. Q. You just went up there out of pure deviltry? A. Yes, sir. Q. You did not know whether there was a train or not, or whether or not there was any mail, or not any mail, and you killed it out of pure deviltry? A. I did not debate it. I thought it was a light engine, and went over there and killed her for no reason whatever. Q. Did you not do it for that reason? A. For deviltry? Q. Yes; from a pure spirit of mischief and deviltry. A. I guess you might as well put it that way. Q. Without caring what the result was? A. That is as good an answer as any."

Referring to the conversation he had with Cornwall about the mail, he states that, if he had stopped the mail, it was too late to start it then. The engine was killed. He made no effort whatever to repair that which he was told was a violation of the law. He left because he did not know just exactly what the consequences would be. He went off towards San Francisco. He went in company with these men,—Clark, Cassidy, and Rice.

John Cassidy, the other defendant on trial, testifies, substantially, that he was a fireman employed by the Southern Pacific Company last spring; that he had been such for about eight years; that he belongs to the Brotherhood of Locomotive Firemen, and San Francisco Lodge, No. 345, of the American Railway Union; that he attended the meeting of that union on June 29th; that "every one was there, and there was a telegram read about the Oakland strike, or about the Oakland boys going out on a strike, and we indorsed their action. * * * We all decided to strike." He states that most of the members of his union were employed on the Coast Division; that at that meeting, besides ordering a strike, they took in a number of new members, and appointed a crew to go down, and go out with the mail the next morning. They also appointed a mediation committee. The witness' statement as to the invitation tendered him by Mayne to go down to San José on July 6th, to visit Mayne's folks, agrees substantially with the latter's testimony. The witness further states that he first saw Rice and Clark on July 6th, somewhere between San Mateo and Redwood City, on the train. He got off the train at Mayfield. He states that, after an ineffectual attempt to secure a conveyance to San José—

"We concluded to go back to Palo Alto. We went back to Palo Alto to see if train 19 was coming through. When we got up about opposite Palo Alto, on the way up, there was some cavalry marching back from Santa Cruz; some regular troops. They were in the field. We stopped and talked with them for quite a while. We walked on until we got opposite Palo Alto. I had a new pair of shoes on. I told the fellows they could go on the rest of the way, if they wanted, but I was going to take my shoes off. I climbed over a fence in the park, took off my shoes, and laid down in the grass. They all got over the fence, too. We were sitting there, or laying there, telling stories and yarns, for about ten or fifteen minutes, when we heard the cylinder cock of an engine blowing off. Some of the boys got up, and looked over the fence, and saw an engine. Some one says, 'There is an engine on the turntable,' and they started for it. I had to put my shoes on, and, I believe, somebody else had their coat off. They were on the engine before I got there. I got there just as quick as I could, after I got my shoes and coat on. There were two or three in the cab of the engine. I went around to the left, and started to take off or uncouple the tank hose.

I turned around, and happened to see Minatt's engine up the track, and I quit my job, and went up to Minatt's engine. Q. What did you do with Minatt's engine? A. Between Minatt and myself, we loosened the blow-off cock, and blew the water out. The fire was already out of it. I had to crawl under the engine to do it. The tank valve was open, and the water was running out of the tank. Q. Did Minatt offer any resistance? A. No; he stood off, and seemed tickled. He gave me a wrench to do it; told me where I could get one. I had to lay down flat. There is an air drum under the deck, and I had to lay down flat, and crawl under it. Q. Was Mayne there when you were killing that engine? A. No, sir. Q. Who was there besides Minatt and yourself? A. I think Clark and I did that job. I am pretty sure Clark was there."

Upon being asked by his counsel if he knew what the indictment charged, he states that he does, but that he never did anything except to let water out of that engine. Respecting the cause of his leaving Palo Alto that night, he states that somebody in the crowd told him that the division superintendent, Haydock, had ordered the constable at Palo Alto to arrest them; that they thereupon went over the county line to Menlo Park, and subsequently to San Mateo. On cross-examination, being interrogated as to his motive in running towards Cornwall's engine to assist in killing her, he states that he went because the others did; that he helped kill the engine because the rest of them were killing it; that he simply wanted to be with the crowd, or, to use his own language, "I suppose I wanted to be in the swim." Respecting the killing of Minatt's engine, he states that he thinks he was the first man to reach it; that when he did he got up and looked into the fire box; the fire was out of her; he started in to open the blow-off cock; that the effect of this was to let the water out; that he let nearly all of the water out; that the effect of this was to kill the engine. He also states that, while engaged in killing Minatt's engine, he heard some one holler, "Three cheers for the A. R. U." Being asked to give his reason for killing Minatt's engine, he states it was "to have a good time." He states that he would have done what he could towards killing Cornwall's engine if the other engine (Minatt's) had not been there. Further, that he did not think of any consequences that might ensue, from the killing of those engines, to him; that the only reason that prompted him to kill those engines was "to keep my hand in."

F. W. Clark, one of the defendants in the indictment, but not on trial, was called for the defendants, and testified, briefly, that he was a brakeman on the Coast Division of the Southern Pacific Company, and had been such for about two years; that he was braking between San Francisco and Monterey, on freight trains; that he knows Rice; that he met him on the morning of the 6th of July at the A. R. U. meeting; that, after the meeting adjourned, Rice asked him to go down to San José with him; that they could not get tickets for San José, and they went as far as Mayfield. On cross-examination he states that he met Cassidy and Mayne on the train between San Mateo and Redwood City; that he stayed with them all the while until they got back to San Mateo; and that he finally came to San Francisco with them. He states that, when they got opposite University Park, Cassidy complained that his shoes were hurting him. They thereupon climbed over the fence

of the park, and sat down under the shade of a tree. After they had been sitting there about 10 minutes, he heard a noise of steam blowing out of a cylinder cock of an engine. He rose up, and looked over, and saw an engine going on to the turntable. Either Mayne or Rice said: "There is an engine. Let's kill her." They jumped over the fence. He followed them over to the engine. When he reached there, Mayne got up on the engine,—on the left side,—and Rice on the right side. He got up behind Rice. Cornwall was standing by his lever. He had his head inside the cab when he (Clark) first got up. Then he stuck his head out, and said to some one in front of the engine: "What do you want? A little more ahead. Is she all right, pard?" He believes it was Mayne who replied, "She is all right where she is, George." Cassidy was some distance behind. The witness stayed on Cornwall's engine about a couple of minutes, and then went over to Minatt's engine. Cassidy also went over. Rice got on the engine, and Cassidy did also. The witness got up behind Cassidy. There was no fire in the fire box; the witness took out a hammer from the tool box on the tank, and disconnected the hose, and took the packing off, and pulled the strainer out, and put the hook and hammer and strainer back in the box. Respecting the conversation he had with Douty, Judah, Donne, and others in the station at San Mateo, he testifies that he was called by Conductor Donne, who said to him: "There is some people in here who want to have a talk with you." He asked: "Who are they?" Donne said: "Douty and Judah. They want to talk with you about the strike. This is no put-up job to put you in a hole, or anything like that." He states that he went in, and was introduced to Douty and Judah. He believes it was Douty who asked them what they had struck for. He told them members of the Oakland Union had been discharged for refusing to handle Pullman cars, and that the union over there had ordered a strike, and Union 345, in San Francisco,—the union he was a member of,—indorsed the action of Union 310, and they struck. Douty said: "What do you want to strike on the Coast Division for? They are not hauling any Pullman cars here." And he wanted him (Clark) to go back to San Francisco, and declare the strike off. Clark told him (Douty) that he could not declare the strike off. Respecting his motive in participating in the killing of the engines, the testimony is as follows:

"Q. (on cross-examination). What was your idea in killing these engines, where there were no Pullmans running on that end of the line, unless it was to help out those that were striking against the Pullmans? A. I do not know. I was with the others, and helped them. Q. You were with the others, and helping them? A. Yes, sir. Q. And you had no idea in the world as to what the object was? A. No, sir."

This concludes the review of the testimony relating to the overt acts charged as having been committed by the defendants at Palo Alto. It is for you to say whether it establishes, to your satisfaction and beyond a reasonable doubt, that the defendants committed any of the following acts charged in the indictment, to wit:

"(1) Forcibly taking possession and control of the * * * engines * * * of the Southern Pacific Company, by (1) * * ,* (2) threats, intimidations,

personal assaults, or other acts of force and violence, in, upon, and towards the engineers, firemen, conductors, brakemen, switchmen, agents, and other employés of said company having charge of said * * * engines, etc.

"(2) By forcibly and violently preventing the movement of all trains of the Southern Pacific Company to, from, or through the town of Palo Alto, by (1) gathering in crowds, etc.; (2) by placing physical obstructions upon said track; (3) by displacing the switches; (4) by forcibly and violently assaulting, threatening, and intimidating said engineers, firemen, conductors, brakemen, switchmen, agents, and other employés while engaged as aforesaid; (5) by uncoupling the cars of said trains, and disconnecting the same; (6) by removing said cars from said tracks; (7) by withdrawing the water from the boilers and tanks of said engines, and putting out and removing the fires therein [I call your particular attention to this charge, and the evidence relating to the overt acts under this head]; (8) by displacing and removing valves, pins, bolts, plates, and other appliances and portions of the machinery of said engines and cars, and of the rails of said railways, thereby loosening said rails; (9) by other violent, forcible, and unlawful acts and means, to the grand jurors unknown."

As I have before explained to you, it is not necessary that the government should prove that all the overt acts charged were committed by the defendants. If you are satisfied, beyond a reasonable doubt, that they committed any one of the acts charged, it will be sufficient, in determining this element of the offense involved in the crime of conspiracy.

Whether the Southern Pacific Company was in June and July last a railway corporation, duly organized and existing under the laws of the state of Kentucky, engaged in the business of a common carrier of the mails of the United States, and of passengers, freight, and express matter, in this district, and over the lines of the railways mentioned in the indictment, is a material fact in the case, which you will be required to find, as you would any other material fact; that is to say, beyond a reasonable doubt. You will recall the testimony of Mr. Lansing upon this point, and the circumstance that no testimony was offered to contradict him in any particular.

Whether train No. 6, at Palo Alto, on July 6th, was a regular or special train, is immaterial. The testimony tends to show that the train carried the mail, and that it was being carried over post route No. 176,002. Whether some other train was annulled or not is also immaterial. The question is, was this train carrying the mail under the sanction of the postal authorities? If it was, it was a mail train, in the eye of the law.

It is claimed by counsel for the defendants that an intent to obstruct and retard the passage of the mails cannot be inferred against these defendants unless they had knowledge that the mails were on board the train when they killed the engine on the turntable. In the language of Judge Grosscup in the case of U. S. v. Debs (in the United States district court of Illinois) 65 Fed. 211:

"I do not concur in this view. The defendants are properly chargeable with an intent to do all the acts that are the reasonable and natural consequence of the acts done. The laws make all the railways post routes of the United States, and it is within every one's knowledge that a large portion of the passenger trains on these roads carry the mail. There is no stretch, therefore, either of law or common sense, to presume the person obstructing one of those trains contemplates, among other intents, the obstruction of the mail."

And in U. S. v. Debs, 64 Fed. 764, Judge Woods, of the circuit court, uses the following language:

"The rule is well settled, and I suppose well understood, that all who engage, either as principals, or as advisers, aiders, or abettors, in the commission of an unlawful or criminal act, are individually responsible for the criminal or injurious results which follow the commission or an attempt by any of their number to commit the intended crime or wrong. It is by the same rule that co-conspirators are responsible for the acts and declarations of each other in the furtherance of their unlawful purpose. * * * 'A man may be guilty of a wrong which he did not specifically intend (says Bishop), if it came naturally, or even accidentally, through some other specific, or a general, evil purpose. When, therefore, persons combine to do an unlawful thing, if the act of one, proceeding and growing out of the common plan, terminates in a criminal result, though not the particular result meant, all are liable.'"

But, aside from this responsibility which the law imposes upon those who commit unlawful acts, the testimony of the defendants Mayne and Cassidy may throw some light on the real motive that actuated the defendants in killing the engine at Palo Alto. When asked by Cornwall if he did not think he had done something serious in stopping the mail, he admits that he replied: "Even if I have, this is a hell of a time to come and tell us of it, after it is all over." And, hearing, soon after, that an officer was after them, the defendants fled from that place. Was the motive "deviltry," as Mayne says; and the consequences, whatever they might be? Was the motive "to be in the swim," as Cassidy says; and the consequences, whatever they might be? If so, how can they avoid responsibility for such consequences?

In considering the testimony relating to the whole case, it will be for you to determine whether there was such a general conspiracy as claimed by the government, involving the members of the American Railway Union in a combination and concert of action to obstruct and retard the passage of the mails of the United States, and in restraint of trade and commerce, and whether these defendants were members of that conspiracy; but you may also consider the case, under this indictment, within much narrower limits. A conspiracy may have been formed between these defendants, at Palo Alto, while Mayne, Cassidy, Clark, and Rice were sitting under the tree at University Park, to commit an offense against the United States, in obstructing and retarding the passage of the United States mails, and in restraint of trade and commerce, and in pursuance of such conspiracy they committed the overt act of killing the engine on the turntable; and if you believe from the testimony, beyond a reasonable doubt, that they did at that time form a conspiracy to commit such an offense and committed the act they did in pursuance of that conspiracy, it will be your duty to find the defendants guilty on the facts involved in that occurrence alone, without regard to the testimony relating to occurrences elsewhere.

### Reasonable Doubt.

This is a criminal case. The presumption of innocence is in favor of the defendants. A mere preponderance of testimony, in a criminal case, is not sufficient to justify a verdict of guilty. The burden

of proof is upon the prosecution, and it must prove every material fact, and establish the guilt of the defendants to your satisfaction, beyond a reasonable doubt. The degree of satisfaction and certainty required is not absolute conviction or certainty, but the evidence must produce that effect on the minds of the individual jurors, so that, after its consideration, he can, in view of his oath, have no reasonable doubt of the guilt of the accused. By 'reasonable doubt,' I mean a reasonable doubt arising out of the evidence, and not an imaginary doubt, a fanciful conjecture, or strained inference, but such a doubt as a reasonable man would act upon, or decline to act upon, when his own concerns are involved,—a doubt for which a good reason can be given, which reason must be based on the evidence, or the want of evidence. When such a doubt exists, the accused is entitled to its benefit, and should be acquitted. But where the evidence is satisfactory to the impartial mind that the crime was committed; that the defendant committed it as charged,—when the mind comes naturally and reasonably to this conclusion, from a fair consideration of the evidence, properly, there can be no reasonable doubt, and the prisoner should be convicted.

### Jury Sole Judges of Credibility of the Witnesses.

Now, in relation to all the testimony in this case, you, gentlemen of the jury, are the sole judges of the credibility and the weight which is to be given to the different witnesses who have testified upon this trial. A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies; by the character of his testimony, or by the evidence affecting his character for truth, honesty, or integrity, or his motives; by contrary evidence. And you are the exclusive judges of his credibility. In judging the credibility of the witnesses in this case (and their testimony is, to some extent, conflicting), you may believe the whole or any part of the evidence of any witness, or may disbelieve the whole or any part of it, as may be dictated by your judgment as reasonable men. You should carefully scrutinize the testimony given, and in doing so consider all the circumstances under which any witness has testified, his demeanor, his manner while on the stand, the relations which he bears to the government or the defendants, the manner in which he might be affected by the verdict, and the extent to which he is contradicted or corroborated by other evidence, if at all, and any construction that tends to shed light upon his credibility, and to determine the amount of credence to which each statement is entitled at your hands, as reasonable and intelligent men; but, in this respect, you must remember that your power and duty to judge the effect of evidence is not arbitrary. It must be exercised with legal discretion, and in subordination to the rules of evidence. This is a government of law, and you are charged with its administration in this case without fear, favor, or partiality. An honest, fair, and impartial trial of persons accused of crime is the highest obligation we owe to society. The law, properly administered, affords protection alike to the high and the low, to the rich and the poor. Popular clamor should not direct

it, nor the insinuating influence of prejudice turn it aside. Courts never appeal to the passions, prejudices, or sympathies of a jury, in favor of a prosecution, or against the accused. They seek only equal and exact justice, and appeal only to reason. In this light only is the case presented to you by the court, and it is with the utmost confidence in your reason and intelligence, and in the fullest belief that you highly appreciate the important duty imposed upon you, that I commit this case to your careful and patient consideration.

NOTE. The jury, after deliberating four days and nights, failed to agree, and were discharged. On the final ballot, 10 jurymen voted for conviction, and 2 for acquittal, upon the count for conspiracy to retard the mails, and 8 for conviction, and 4 for acquittal, on the count for conspiring to obstruct and interfere with interstate commerce.